# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MELODY J. ROSE,

           Plaintiff,

    v.

STEVEN M. CAHEE, M.D., FOND DU
LAC REGIONAL CLINIC, S.C., and
AGNESIAN HEALTHCARE, INC.

           Defendants.

Case No. 09-CV-142

Jury Trial Demanded

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO AGNESIAN HEALTHCARE, INC.'S MOTION FOR SUMMARY JUDGMENT

---

Scott A. Schoettes, Ill. Bar No. 6282105
Bebe J. Anderson, NY Bar No. 1795327
Attorneys for Plaintiff Melody J. Rose
Lambda Legal Defense & Education Fund, Inc.
11 East Adams, Suite 1008
Chicago, IL 60603-6303
(312) 663-4413 (tel.); (312) 663-4307 (fax)
Email: sschoettes@lambdalegal.org
Email: banderson@lambdalegal.org

Kathryn S. Devine, Ill. Bar No. 6286033
Nina M. Knierim, Ill. Bar No. 6298480
Attorney for Plaintiff Melody J. Rose
Schiff Hardin LLP
233 South Wacker Drive, Suite 6600
Chicago, IL 60606
(312) 258-5500 (tel.); (312) 258-5600 (fax)
Email: kdevine@schiffhardin.com

Rebekah Kopec-Farrell, Wis. Bar No. 1052895
Attorney for Plaintiff Melody J. Rose
AIDS Resource Center of Wisconsin
820 N. Plankinton Ave.
Milwaukee, WI 53203
(414) 225-1578 (tel.); (414) 225-1632 (fax)
Email: rebekah.kopec-farrell@arcw.org

February 8, 2010

# TABLE OF CONTENTS

STATEMENT OF FACTS......................................................................................................1

    Defendants' Discriminatory Conduct ...........................................................................1

    Operation and Control of Agnesian Healthcare, Inc......................................................6

ARGUMENT ....................................................................................................................15

    I.    AGNESIAN HAS NOT ESTABLISHED THAT IT IS EXEMPT FROM
        THE ADA'S PROHIBITION ON DISCRIMINATION. .........................................15

        A.  Title III's Religious Exemption Must be Narrowly Construed. ............................15

        B.  Agnesian Has Not Established that It Is Controlled by a Religious
            Organization. ...................................................................................................19

        C.  Agnesian Has Not Established that It Is a Religious Organization. .....................22

        D.  The Differences Between Agnesian and the Educational Facilities Found
            Exempt Underscore Why the Exemption Does Not Apply to Agnesian.............24

    II.   THE EVIDENCE ESTABLISHES PLAINTIFF WAS DISCRIMINATED
        AGAINST SOLELY BECAUSE OF HER DISABILITY. ........................................25

        A.  Through the Direct Method of Proof, Plaintiff Will Establish That Her
            Disability Was the Motivating Factor for Dr. Cahee's Conduct............................26

        B.  Rose Need Not Rely on an Inference of Discrimination Drawn From
            Circumstantial Evidence Because Substantial Evidence Establishes Dr.
            Cahee Was Motivated Solely by Illegitimate Concerns Related to Her HIV........29

        C.  If Necessary, Rose Will Be Able Refute Defendant Cahee's Purported
            Reasons for Denying Her Surgical Care. ...........................................................36

    III.  PLAINTIFF IS ABLE TO MEET HER BURDEN ON SUMMARY
        JUDGMENT FOR THE WISCONSIN ANTIDISCRIMINATION
        STATUTES UNDER WHICH SHE BRINGS HER CLAIMS. ................................42

    CONCLUSION ..........................................................................................................44

# TABLE OF AUTHORITIES

**Cases**

*A. H. Phillips, Inc. v. Walling*, 324 U.S. 490 (1945) ............................................................16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................15

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ............................................................... 27, 30, 32, 36

*Bryan v. Adler*, 72 N.W. 368 (Wis. 1897) .........................................................................43

*Burks v. Wis. Dep't. of Transp.*, 464 F.3d 744 (7th Cir. 2006) ...........................................29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................................15

*Cortes v. Bd. of Governors of Ne. Ill. Univ.*, No. 89 C 3449,
1990 U.S. Dist. LEXIS 15414 (N.D. Ill. Nov. 14, 1990)...............................................28

*Curtis v. Timberlake*, 436 F.3d 709 (7th Cir. 2005) ...........................................................16

*Darchak v.City of Chicago Bd. of Educ.*, 580 F.3d 622 (7th Cir. 2009) ....................... 27, 28, 31, 33

*Doe v. Abington Friends School*, 480 F.3d 252 (3d Cir. 2007)........................... 17, 18, 19, 22

*Doe v. Deer Mountain Day Camp, Inc.*, No. 07 Civ. 5495 (DCP),
2010 U.S. Dist. LEXIS 3265 (S.D.N.Y. Jan. 13, 2010)....................................... 29, 30, 32, 39

*EEOC v. Fox-Point Bayside Sch. Dist.*, 772 F.2d 1294 (7th Cir. 1985) ...............................16

*Fairely v. Andrews*, 578 F.3d 518 (7th Cir. 2009) .............................................................29

*Foster v. Arthur Anderson, LLP*, 168 F.3d 1029 (7th Cir. 1999) .................................. 26, 29

*Gabby v. Luy*, No. 05-C-0188, 2007 U.S. Dist. LEXIS 70324
(E.D. Wis. Sept. 21, 2007).............................................................................................35

*Gil v. Reed*, 535 F.3d 551 (7th Cir. 2008) ........................................................................15

*Glanz v. Vernick*, 750 F. Supp. 39 (D. Mass. 1990).........................................................38

*Gross v. FBL Financial Services*, 129 S. Ct. 2343 (2009) ............................................ 29, 37

*Howe v. Hull*, 873 F. Supp. 72 (N.D. Ohio 1994)....................................................... 30, 32, 33, 34

*Johnson v. Thompson*, 971 F.2d 1487 (10th Cir. 1992).............................................28, 38, 39

*Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473 (7th Cir. 2009) ....................................16

*Lesley v. Chie*, 250 F.3d 47 (1st Cir. 2001).............................. 27, 30, 35, 36, 38, 40, 41

*Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061 (9th Cir. 2007)........................30

*Luckett v. Bodner*, 769 N.W.2d 504 (Wis. 2009) .............................................................42

Case 2:09-cv-00142-JPS   Filed 02/08/10   Page 3 of 50   Document 66

*Marshall v. Sisters of the Holy Family of Nazareth*, 399 F. Supp. 2d 597
(E.D. Pa. 2005) ...................................................................................... 18, 24

*Merchant v. Kring*, 50 F. Supp. 2d 433 (W.D. Pa. 1999) ........................................ 27, 28, 29, 31, 32, 33, 37

*Rothman v. Emory Univ.*, 123 F.3d 446 (7th Cir. 1997) ........................................ 27

*Serwatka v. Rockwell Automation, Inc.*, No. 08-4010, 2010 U.S. App.
LEXIS 948 (7th Cir. Jan. 15, 2010) ................................................ 29, 43

*Sharrow v. Bailey*, 910 F. Supp. 187 (M.D. Pa. 1995) ................................................ 30

*Spann v. Word of Faith Christian Ctr. Church*, 589 F. Supp. 2d 759
(S.D. Miss. 2008) .................................................................................... 16, 18

*Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119 (2005) ................................ 16

*State ex rel Kalal v. Cir. Ct. for Dane County*, 681 N.W.2d 110
(Wis. 2004) ............................................................................................ 43

*Temme v. Bemis Company, Inc.*, 651 F. Supp. 2d 865 (E.D. Wis. 2009) ................ 15

*Toney v. U.S. Healthcare, Inc.*, 838 F. Supp. 201 (E.D. Pa. 1993) ........................ 34, 35

*Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985) ................................ 28

*U.S. Fire Ins. Co. v. Barker Car Rental*, 132 F.3d 1153 (7th Cir. 1997) ................ 42

*Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002 (3d Cir. 1995) ........................ 38

*White v. Denver Seminary*, 157 F. Supp. 2d 1171 (D. Colo. 2001) ........................ 18, 19, 25

**Statutes**

20 U.S.C. § 1681(a)(3) .................................................................................... 17

29 U.S.C. § 794 (2009) .................................................................................... 42

42 U.S.C. § 2000e-1 ........................................................................................ 17

42 U.S.C. § 12101(b)(1) .................................................................................. 15

42 U.S.C. §§ 12181-12189 .............................................................................. 15

42 U.S.C. §§ 12182 .......................................................................................... 43

42 U.S.C. § 12187 ............................................................................................ 16, 17, 23

I.R.C. § 501(c)(3) ...............................................................................................................23

Wis. Stat. § 106.52 (2009)............................................................................................ 42, 43

Wis. Stat. § 252.14(2) (2009) ...................................................................................... 42, 43

**Other Authorities**

Katherine A. White, Crisis of Conscience: Reconciling Religious
    Health Care Providers' Beliefs and Patients' Rights,
    51 Stan. L. Rev. 1703, 1703-04 (1999) ...............................................................18

Lawrence E. Singer, The Role of Religion in Health Law and Policy
    Symposium:  Does Mission Matter?,
    6 Hous. J. of Health L. & Pol'y 347, 351 (2006) ...............................................18

**Rules**

Fed. R. Civ. P. 56(c)(2)........................................................................................................15

**Regulations**

28 C.F.R. pt. 36 app. B .......................................................................................................17

v

Plaintiff Melody J. Rose, by her attorneys, respectfully submits the following brief in opposition to Defendant Agnesian Healthcare, Inc's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For all of the reasons set forth herein, that motion should be denied in its entirety.

## STATEMENT OF FACTS

### Defendants' Discriminatory Conduct[1]

Melody Rose has been living with HIV for at least six years.[2] On February 27, 2008, Dr. Franklin M. Graziano – the immunologist at the University of Wisconsin Hospitals and Clinics in Madison ("UW – Madison") who was treating Rose's HIV disease while she was incarcerated in the Taycheedah Correctional Institution ("TCI") in Fond du Lac, Wisconsin – decided that Rose needed to be placed back on antiretroviral medications to treat her HIV. (Graziano Dep. at 23:8–24, 44:10–45:3; Rose Dep. at 8:5-6, 58:3-15; Meress Dep. at 22:18-22.)[3] Before prescribing HIV medications

---

[1] The singular "Defendant" (with a capital "D") will be used herein to refer to Agnesian Healthcare, Inc., the moving defendant, while "Defendants" (also with a capital "D") will be used to refer to all three defendants as a group. Plaintiff notes, however, that each of the Defendants has adopted the arguments of the others "to the extent they are applicable and do not conflict." (Def.'s Br. at 1 n.3 (Docket No. 48); Brief in Supp. of Mot. for Summ. J. on Behalf of Defendants Steven M. Cahee, M.D. and Fond du Lac Regional Clinic at 15 n.1 (Docket No. 39).) Plaintiff therefore requests that all of her arguments be considered applicable to each defendant where necessary to oppose that defendant's arguments. In this brief, Plaintiff addresses only those arguments actually briefed in the moving Defendant's brief, not those merely referenced by way of adoption. Plaintiff's Statement of Facts (contained herein) seeks to provide the Court with sufficient factual context to understand the actual nature of plaintiff's claims in this lawsuit.

[2] Rose is not sure when she first contracted HIV; however, she first became aware that she has HIV in 2003. (Rose Dep. at 33:9-10.)

[3] True and correct copies of all deposition transcript pages, deposition exhibits, and discovery responses are attached to the Declarations of Scott A. Schoettes and Nina M. Knierim (filed herewith). Attached to the Declaration of Scott A. Schoettes are deposition transcript pages and deposition exhibits from the following: Deposition of Franklin M. Graziano, M.D. (Exhibit 1); Deposition of Melody J. Rose (Exhibit 2); Deposition of Steven G. Meress, M.D. (Exhibit 3); Deposition of Steven M. Cahee, M.D. (Exhibit 4); Deposition of Jon C. Gould, M.D. (Exhibit 5). Attached to the Declaration of Scott A. Schoettes are excerpts from the following: Answers to Plaintiff Melody J. Rose's Second Set of Interrogatories Directed to Defendant Steven M. Cahee Pursuant to Rule 33 (Interrogatory Nos.5 and 6) (Exhibit 6); Response to Plaintiff Melody J. Rose's Third Request to Defendant Dr. Steven M. Cahee for Production of Documents Pursuant to Rule 34 (Requests Nos. 47 and 48) (Exhibit 7); Plaintiff Melody J. Rose's Responses to Defendant Dr. Steven M. Cahee's Written Interrogatories (Responses No. 5 and 6) (Exhibit 8). Attached to the Declaration of Nina M. Knierim are deposition transcript pages and deposition exhibits from the following: Deposition of Robert

1

for Rose, however, Dr. Graziano recommended that Rose be evaluated to determine whether her gallbladder – which had been giving her problems for a number of years and creating increasingly frequent and painful attacks in recent months – should first be removed. (Graziano Dep. at 34:18–35:9, 49:19–50:16, 51:3–52:7, 55:2-5; Pl.'s Resp. to Def. Cahee's Written Interrogs. (hereinafter, "Interrog. Resp."), No. 5; Rose Dep. at 50:13-17; Meress Dep. at 66:8–67:2, 68:3-21, 76:3-7, 77:20–78:15, 80:19–82:6.) In response to this recommendation, Rose's treating physician at TCI, Dr. Steven G. Meress, referred Rose to Agnesian Healthcare, Inc. ("Agnesian") for a surgical consult.[4] (Meress Dep. at 81:8–82:6; Meress Aff., ¶ 2 (Meress Dep., Ex. 1001).)

On March 7, 2008, Rose met with Dr. Steven M. Cahee, a general surgeon at the Fond du Lac Regional Clinic ("FdLRC"). (Cahee Dep. at 182:4-13.) During their brief encounter that day, Dr. Cahee did not physically examine Rose – in fact, he did not touch or come near her at any time. (Rose Dep. at 67:21-24; Rose Decl. ¶ 2 (Docket No. 56); Cahee Dep. at 134:21-22.) After introducing himself and ascertaining that Rose was seeing him because of problems related to her gallbladder, Dr. Cahee began asking Rose questions about her HIV. (Rose Dep. at 68:2-7.) Once Dr. Cahee learned that Rose had a high HIV viral load, Dr. Cahee explicitly told Rose that he *would not* perform the surgery to remove her gallbladder because of the risk he thought her HIV presented to him and his surgical team. (Rose Dep. at 70:6-9; Cahee Dep. at 140:21–141:1; General Surgery

Fale (Exhibit A); Deposition of Sister Mary Noel Brown (Exhibit B); Deposition of Norma Tirado Kellenberger (Exhibit C); and Deposition of Glen Treml (Exhibit D). Attached to the Declaration of Nina M. Knierim is a copy of the following: Agnesian Healthcare of Fond du Lac, Wisconsin, Inc. Corporate Bylaws ("Bylaws") (AH 1581-1604) (Exhibit E). Attached to the Declaration of Nina M. Knierim are excerpts from the following: Agnesian Healthcare, Inc.'s Responses to Plaintiff's Third Set of Interrogatories (Nos. 18 and 19) (Exhibit F); Defendant Agnesian's Responses to Plaintiff's Third Set of Requests for the Production of Documents (Nos. 60-62, 146-47) (Exhibit G).

[4] The Wisconsin Department of Corrections and Defendant Agnesian have an ongoing contractual agreement under which Agnesian arranges for the provision of health services for any individual incarcerated in a Department of Corrections' facility, including TCI. (Meress Dep. at 27:2-8.) In the majority of instances in which an inmate of TCI needs health care services, TCI sends the inmate to the Agnesian facilities Fond du Lac Regional Clinic or St. Agnes Hospital for such services. (Meress Dep. at 27:2-8, 34:6-9, 48:1-7; Am. Compl. ¶ 30 (Docket No. 22); Answer of Defs. Cahee and SC ¶ 30 (Docket Nos. 8, 30).)

Office/Clinic Note – Final Report, electronically signed by Steven M. Cahee, MD, on May 7, 2008

(hereinafter, "Final Report") (Cahee Dep. Ex. 21).)  Rose was shocked by Dr. Cahee's statement to

her and said, "You've got to be kidding me."  (Rose Dep. at 70:22-25.)  Dr. Cahee did not respond

to Rose – without further comment or any additional questions, Dr. Cahee exited the room.[5]  (Rose

Dep. at 71:1-2.)  During their visit, Dr. Cahee never asked Rose for the name of her infectious

disease specialist in Madison.[6]  (Rose Dep. at 71:12-18; Cahee Dep. at 166:2-3.)

   During the next two weeks, Rose continued to experience pain as a result of her gallbladder

disease.  (Rose Dep. at 101:12-20; Rose Decl. ¶ 3 (Docket No. 56); Meress Dep. at 104:17-19.)  On

her next visit with Dr. Meress at TCI, Rose told him that Dr. Cahee said he would not perform

surgery to remove her gallbladder because of her HIV.  (Rose Dep. at 76:2-16, 88:15–89:2; Meress

Dep. at 98:24–99:1; Meress Aff., ¶ 3 (Meress Dep., Ex. 1001).)  Dr. Meress immediately called Dr.

[5] There is a factual dispute as to precisely which medical records accompanied Rose on her visit to the Fond du Lac Regional Clinic on March 7, 2008.  (*See* Pl.'s Resp. to Defs.' Proposed Findings of Fact No. 28.)  It is undisputed that the Off-Site Service Request and Report, dated Mar. 7, 2008 (Cahee Dep., Ex. 17; hereinafter, "Off-Site Service Request"), accompanied Rose (though only the top section, filled out by Dr. Meress, would have been completed when Rose presented at FdLRC (Meress Dep. at 92:20–93:9); however, Rose has testified that a list of medications she was taking and a lab report detailing her CD4 count and HIV viral load were also a part of the materials that accompanied her on the March 7, 2008 visit.  (Rose Dep. at 68:10-19.)  In addition, at his deposition, Dr. Cahee testified that *he* recalled seeing a "clinic note" – likely the notes from a visit Rose had at the AIDS Resource Center of Wisconsin ("ARCW") in September 2007 – among the documents that accompanied Rose on the day he met with her.  (Cahee Dep. at 131:25–132:18, 136:10-14, 179:22–182:13, 183:11-18; 206:7-11.)

[6] Plaintiff does not dispute that in the report that accompanied her back to TCI, Dr. Cahee requested four additional pieces of information from her medical records: the ultrasound report; a list of current medications; the name of her infectious disease specialist; and the recent clinic notes from that doctor.  (Off-Site Service Request; Cahee Dep. at 170:25–171:4.)  Dr. Cahee claims that he required this information before he could make a recommendation as to whether Rose's gallbladder needed to be removed; but Plaintiff disputes that this was Dr. Cahee's actual motivation for making these requests, or whether he in fact had any intention of reviewing or utilizing this information.  At his deposition, Dr. Cahee at first claimed that he had never received any of the additional information he requested (Cahee Dep. at 171:8-10); however, after being confronted with documents indicating that at least two of the four pieces of requested information – the ultrasound report and current medications list – were faxed to the FdLRC on the very same day Dr. Cahee requested them, Dr. Cahee backtracked and admitted that he "may have" in fact seen those two items after meeting with Rose.  (Cahee Dep. at 171:14–175:7, 177:17–179:18; Meress Dep. at 94:22–95:17.)  It was not until after this exchange at his deposition that Dr. Cahee claimed it was really the *other* two pieces of information that were critical to his assessment (though one of those pieces of information was the name of Rose's infectious disease specialist at UW - Madison, which Rose easily could have supplied had Dr. Cahee simply asked her for it during their meeting). (Cahee Dep. at 141:2-16, 165:21–166:3, 200:2-19.)

Cahee and asked "him specifically was that the case, would he not do a surgery on Rose because she was HIV positive." (Meress Dep. at 99:2-5; Meress Aff, ¶ 4 (Meress Dep., Ex. 1001); Rose Dep. at 89:2-89:13.) Dr. Cahee confirmed that he would not perform the surgery on Rose because she was not on HIV medications and he thought this presented a risk for him and his surgical team. (Meress Dep. at 99:5-16; Meress Aff., ¶ 4 (Meress Dep., Ex. 1001); *see also* Final Report (Cahee Dep., Ex. 21).) Dr. Cahee further stated that he would not perform the surgery until Rose had been on HIV medications "for at least a month." (Meress Dep. at 91:2-4, 104:12-14; 161:13–162:12; TCI Progress Note, dated Mar. 20, 2007 (hereinafter, "TCI Progress Note") (Meress Dep., Ex. 1002, MJR 266); Meress Aff., ¶ 4 (Meress Dep., Ex. 1001).) At his deposition, Dr. Meress testified that this created a "Catch-22" because – based on Dr. Meress's own examination of Rose, the frequent nurse visits she had lately required, and the pain she was experiencing – Dr. Meress thought that Rose's gallbladder was too inflamed to wait a month before taking it out.[7] (Meress Dep. at 102:11–103:2, 104:14-21.) According to Dr. Meress, Dr. Cahee made it clear that he would not perform the surgery to remove

---

[7] Though it is his normal practice to dictate notes regarding a patient encounter within a day or two, Dr. Cahee dictated no notes regarding his patient encounter with Rose until over two weeks after speaking with Dr. Meress – making it over a *month* after his visit with Rose before he recorded his impressions and recommendations. (*See* Final Report, dictated by Steven M. Cahee on April 9, 2008 (Cahee Dep., Ex. 21); Cahee Dep. at 109:8–110:25, 199:19-25.) In this post-hoc documentation of his encounter with Rose, Dr. Cahee makes it seem as though he told Dr. Meress that he was willing to remove Rose's gallbladder – though only after she had started on HIV medications – if the medications caused "sludging of the bile" and made her symptoms worse. (Final Report at 2.) Dr. Meress, however, has no recollection of any such offer. (Meress Dep. at 104:3-8; Cahee Dep. at 218:11–219:8.)

The Final Report makes two additional points exceedingly clear: (1) Dr. Cahee *was* able to make a recommendation regarding whether Rose's gallbladder needed to be removed, without reviewing all of the information he requested of TCI on March 7, 2008 ("It seems reasonable to remove her gallbladder"); and (2) his concerns regarding Rose's HIV were focused entirely upon some perceived risk to him and his surgical team and were not at all about any possible risk or detriment to Rose's health ("[A]lthough if she does indeed, as she says, have HIV with a high viral load, it seems reasonable that she might be started on medication for [her HIV] as it could *reduce the risk of exposure to the surgical team*." (emphasis added)). (*See* Final Report (Cahee Dep., Ex. 21).) At no point in this document – or anywhere else for that matter – does Dr. Cahee express a concern that Rose's HIV might negatively impact *her* health should he proceed with the surgery. (Final Report (Cahee Dep., Ex. 21; Cahee Dep. at 145:3-19).)

4

Rose's gallbladder.[8] (Meress Aff., ¶¶ 4-5 (Meress Dep., Ex. 1001); Meress Dep. at 98:21–99:12, 102:11-20, 104:10-21, 116:17–118:8, 129:10-14, 161:13–162:15; TCI Progress Note (Meress Dep., Ex. 1002, MJR 266).)

Shortly after speaking with Dr. Cahee, Dr. Meress – who knew that her treating physicians wanted Rose's gallbladder removed *before* starting her back on HIV medications – spoke with Dr. Graziano to inform him that the surgeon at the FdLRC was refusing to perform the surgery until Rose had been on HIV medications for at least a month. (Meress Dep. at 104:14–105:25.) When Dr. Graziano heard this, he told Dr. Meress that TCI should just send Rose back to UW-Madison to have the surgery performed by a general surgeon there. (Meress Dep. at 104:22–105:25.)

On April 17, 2008, Rose returned to UW-Madison for a consultation regarding removal of her gallbladder. (Gould Dep. at 27:18-25.) The surgeon at UW-Madison, Dr. Jon C. Gould, reached the conclusion that Rose's gallbladder needed to be removed after confirming that Rose's gallbladder contained gallstones (based on the same ultrasound report faxed to FdLRC on March 7) and that Rose was experiencing right upper quadrant pain after eating (a symptom which Dr. Cahee noted Rose was experiencing in his entries on the "Off-Site Service Request and Report" on March 7). (Gould Dep. at 55:23–57:11; Cahee Dep. at 171:14–175:7; Off-Site Service Request (Cahee Dep., Ex. 17).) Neither Rose's HIV nor whether she was going to be placed on HIV medications prior to surgery played a role in this surgeon's decision as to whether to remove Rose's gallbladder. (Gould Dep. at 24:24–26:12, 29:15–31:18, 60:9-24.) Almost three months after first seeing Dr. Cahee at the FdLRC, Rose's gallbladder finally was removed, and she stopped experiencing the pain she had been

---

[8] Despite his natural reluctance to provide testimony that paints a colleague in a bad light, Dr. Meress's testimony in this matter – and a contemporaneous clinic note regarding his conversation with Dr. Cahee – remains firmly in support of Plaintiff's recount of her interaction with Dr. Cahee. (*See* Meress Aff., ¶¶ 4-5 (Meress Dep., Ex. 1001); Meress Dep. at 98:21–99:12; 102:11-20, 104:10-21, 116:17–118:8, 129:10–130:14, 161:13–162:15; TCI Progress Note (Meress Dep., Ex. 1002, MJR 266) ("Will call Dr. Cahee – states will only do surgery [after] HIV meds [times] 1 [month].").)

having as a result of her gallstones.  (Gould Dep. at 46:3-5; Meress Dep. at 133:25–135:14; Rose Decl. ¶ 4 (Docket No. 56).)

On February 12, 2009, Rose filed this lawsuit, asserting claims under federal and state antidiscrimination laws to seek redress for the various types of harm she suffered and to prevent the defendants from discriminating against her in the future based on her HIV status.  (Am. Compl. (Docket No. 22); Rose Dep. at 108:2-7, 126:13-19; 127:16–128:1.)

Operation and Control of Agnesian Healthcare, Inc.

Agnesian Healthcare, Inc. ("Agnesian") is a not-for-profit corporation organized under the laws of Wisconsin, which operates physician clinics and hospitals (including FdLRC and St. Agnes Hospital) in Fond du Lac, Wisconsin and the surrounding areas.  (Fale Dep. at 39:6-10;[9] 92:2-12; Agnesian Healthcare of Fond du Lac, Wisconsin, Inc. Corporate Bylaws ("Bylaws") § 1.2;[10] Cahee Dep. at 29:24-25.)  On its website, Agnesian identifies itself as "a locally based, not-for-profit integrated healthcare system" which is "sponsored by the Congregation of Sisters of St. Agnes (CSA)."  (Agnesian, "About Us," available at http://www.agnesian.com/aboutus.html.)

Agnesian is a "sponsored ministry" of the Congregation of the Sisters of St. Agnes ("CSA"), which is a Roman Catholic institute.  (Bylaws § 1.2; Brown Dep. at 169:12-18, 172:4–173:13, Ex. 53.[11])  CSA's relationship with Agnesian is dramatically different from its relationship with Agnesian's predecessor entity, St. Agnes Hospital.  Prior to the 1960s, St. Agnes Hospital had been

---

[9]  Robert Fale is the current President/Chief Executive Officer of Agnesian; he has held that position since 1996.  (Fale Dep. at 29:13-15.)

[10]  In response to inquiry from Plaintiff's counsel, on February 4, 2010, counsel for Agnesian identified the version of the Bylaws with the Bates numbers AH 1581-1604 as the version in effect as of March 7, 2008, rather than the previously produced version numbered AH 286-309 (portions of which were filed as Ex. E to the Treml Affidavit).

[11]  Sister Mary Noel Brown is currently the Executive Leader of Sponsorship for CSA.  (Brown Dep. at 31:25–32:4.)  Agnesian has identified her as the person "most knowledgeable about the relationship between [CSA] and [Agnesian]."  (Agnesian's Resp. to Pl.'s Third Set of Interrog., No. 18; *see also* Brown Dep. at 22:2-6.)

operated under the charter of and primarily by CSA. (Brown Dep. at 169:12-18, 172:4–173:13, Ex. 53.) In the 1960s, however, St. Agnes Hospital was incorporated as a separate civil corporation (St. Agnes Hospital, Inc.), no longer directly owned by CSA, but with its primary administrative and operational staff supplied by CSA. (Brown Dep. at 168:4-24, Ex. 53.) The corporate structure of the health care organization went through further changes, leading to the eventual formation of Agnesian Healthcare, Inc. and its more minimal "sponsorship" relationship with CSA. (Brown Dep. at 168:4–170:8, 172:4-19, Ex. 53.) Agnesian operates as an independent corporate entity, albeit with some remaining historical links to Catholic principles. (Brown Dep. at 168:4–170:8, Ex. 53.) The official mission statement of Agnesian reflects its role as a healthcare provider and Agnesian's continuation of its historical mission:

> to provide compassionate care that brings Hope[,] Health & Wholeness to those we serve by honoring the sacredness and dignity of all persons at every stage of life. We are rooted in the healing ministry of the Catholic church as we continue the mission of our sponsor, the Congregation of Sisters of St. Agnes.

(Treml Aff. ¶ 4.)[12]

The day-to-day operations of Agnesian are carried out by its executive officers and employees, none of whom are required to have any religious affiliation or be a member of CSA. (Brown Dep. at 137:10-19; Fale Dep. at 38:14-16; Tirado-Kellenberger Dep. at 44:1-10, Ex. 57.) Power over Agnesian's operations is exercised by the executive officers and the Board of Directors. (Bylaws § 2.1.)

---

[12] This mission reflects the ethics of the medical professional, while noting Agnesian's historical roots. *Cf.* American Medical Association, "Principles of Medical Ethics" *available at* http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/principles-medical-ethics.shtml ("A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights."); American Nurses Association, "Code of Ethics for Nurses with Interpretive Statements" *available at* http://nursingworld.org/ethics/code/protected_nwcoe813.htm ("The nurse, in all professional relationships, practices with compassion and respect for the inherent dignity, worth, and uniqueness of every individual, unrestricted by considerations of social or economic status, personal attributes, or the nature of health problems.").

7

The chief executive of Agnesian – the President/Chief Executive Officer ("CEO") – is "responsible for the general and active management of the Corporation," Bylaws § 4.7, and has "overall responsibility" for strategic planning, monitoring, controlling, and developing the operations of Agnesian, primarily by supervising members of the executive team that are responsible for those functions. (Fale Dep. at 29:3-12, 30:11-20, 31:10–32:2, 32:17-25, 36:9-22.) Agnesian's CEO is not required to be a member of any particular religious organization or to subscribe to any particular religious belief. (Brown Dep. at 142:21-25; Tirado-Kellenberger Dep. at 44:7-10, Ex. 57.) Nor are any of the other corporate officers. (Brown 137:10-137:19; Tirado-Kellenberger Dep. at 44:7-10, Ex. 57.)

Agnesian's Board of Directors oversees and evaluates the performance of the CEO.[13] (Bylaws § 3.4(q); Brown Dep. at 107:4-14.) The Board is composed of up to fifteen members, three of whom are *ex officio*: the General Superior of CSA or her designee; the Executive Leader of Sponsorship; and the President/CEO of the Corporation. (Bylaws § 3.1.) None of the Directors is required to be affiliated with any particular religious organization or to subscribe to any particular religious beliefs.[14] (Brown Dep. at 137:10-19.) The voting rights of all Directors are equal; none have veto rights.[15] (*See* Bylaws § 3.1; Brown Dep. at 89:2–90:14; *see also* Fale Dep. at 48:15–49:13 (confirming that Bylaws accurately set forth the powers of the directors, including any differences in

---

[13]  Agnesian's Executive Committee – which consists of the officers of the corporation and, as an *ex officio* member, the Executive Leader of Sponsorship – sets the compensation of the CEO. (Bylaws 5.2; Brown Dep. at 93:16-21.)

[14]  The General Superior of CSA is necessarily Catholic, but her designee is not required to be Catholic. (Brown Dep. at 137:10-19 (stating that there is no requirement that directors be affiliated with any particular religious organization).) Although the Executive Leader of Sponsorship is an employee of CSA, that person is not required to be a member of any religious organization or subscribe to any particular religious beliefs. (Brown Dep. at 197:9-20; *see also id.* 164:22–165:3.) At his deposition, Fale testified that one member of the Board – the General Superior or her designee – is required to be Catholic; however, the Bylaws lack any such requirement and Sr. Brown testified that no Board member must be Catholic. (*Compare* Fale Dep. at 48:3-17 *with* Bylaws, § 3.1 and Brown Dep. at 137:10-19.)

[15]  One *ex officio* member of the Board of Directors – the Chief of Staff of the Medical Staff – does not have any voting rights. (Bylaws § 3.1.)

the powers of the General Superior or her designee).) The Board of Directors has and exercises numerous powers, including: to "establish overall policy for the management and operation of the Corporation, which is consistent with the Articles of Incorporation and these Bylaws, and the policies established by the Members;" to "review and approve the Corporation's annual capital and operating budgets;" to "provide for the annual performance review" of the CEO; to "monitor and evaluate the implementation of the mission within the Corporation;" to "approve and monitor the mechanism to evaluate the quality of care rendered;" and to "review and evaluate the existing and proposed services in order to assure that they meet community needs and Corporation mission." (Bylaws § 3.4; Fale Dep. at 48:15-49:13.) The Board also appoints the other officers of the corporation. (Bylaws § 4.3; Brown Dep. at 140:10-141:14.) The Chief Financial Officer presents the annual operating budget and annual capital budget to the Board; at least since 1996, the Board has never rejected either budget – or even made recommendations with respect to them. (Fale Dep. at 29:13-15, 54:5-16, 55:4-56:3.)

Agnesian has a corporate membership structure, with two classes of members: "Class A" and "Class B." (Bylaws § 2.1.) None of the Class B Members are required to be Catholic or Christian. (Brown Dep. at 182:8–183:5.) In Agnesian's entire corporate structure, the only persons required to have any particular religious affiliation are the Class A Members of the Corporation, who consist of the General Superior of CSA and three other members of CSA. (Bylaws § 2.1; Agnesian Healthcare, Inc.'s Resp. to Pl. Third Set of Interrog., No. 19; Brown Dep. at 137:10-19, 182:8–183:5; 197:9-20; Tirado-Kellenberger Dep. at 44:7-10, Ex. 57.)

Certain sponsorship-related powers are granted by the Bylaws to the Class A Members, but those Members have delegated almost all of their powers to the Class B Members, including, *inter alia*, the power to: review the effectiveness of the Corporation in fulfilling the mission, philosophy, and values of the Corporation; to appoint the Board of Directors and remove Directors, with or

9

without cause; to appoint and remove the CEO, upon the recommendation of the Board of Directors; to approve the establishment of any new subsidiary or affiliate of the Corporation; to approve any acquisitions, joint ventures or other corporate affiliations; to review and approve the strategic, long-range plan of the Corporation; and to approve any agreement pursuant to which a third party obtains the right or obligation to manage all or substantially all of the operations of the Corporation.[16]  (Brown Dep. 114:12–123:15; Bylaws § 2.1.)  The only powers that the Class A Members have not delegated to Class B Members are those which the current version of the Bylaws precludes them from delegating.  (Brown Dep. at 122:6-123:15; Bylaws § 2.2.)  In instances where Class B Members have authority to act alone, they sometimes inform Class A Members, but they do not seek approval from the Class A Members.  (Brown Dep. at 131:9–132:15.)  At least within the past five years, the Class A Members have not exercised their power to change the mission of Agnesian; nor has that mission been altered by the Class B Members, the Board, or CSA, at least during that time period.  (Fale Dep. at 49:25–50:15.)

CSA has several "sponsored ministries," in addition to Agnesian, and employs an Executive Leader of Sponsorship – who serves as a liaison with sponsored entities and is not required to be a member of CSA.  (Brown Dep. at 45:1-22, 197:9-20.)  This liaison is recruited and interviewed by the Class B Members of the Corporation, who are also not required to be members of CSA; the Class B Members then recommend to the Class A members a candidate for appointment to the position.  (Brown Dep. at 109:23–110:23.)  The person in that position communicates with Agnesian's CEO roughly on a monthly basis, for approximately 45 to 60 minutes each time.  (Brown Dep. at 162:19–163:13.)  The Executive Leader of Sponsorship is an *ex officio* Director of Agnesian and also serves as a Class B Member, an Executive Committee member and a Development

---

[16]  Appointment of members of the Board of Directors is also one of the powers held by the Class B Members, but is exercised upon the nomination of new members by the Board itself.  (Brown Dep. at 115:14–116:7, 136:13–137:9.)

Committee member, but wields no extra power or authority compared to the other members of each of those bodies. (Brown Dep. at 86:2–90:14.)

The lack of control by CSA and the Class A Members over the day-to-day operations of Agnesian is further demonstrated by the fact that neither CSA nor the Class A Members are authorized to do any of the following, according to the person most knowledgeable about the relationship between Agnesian and CSA:

- hire or fire any employees of Agnesian;
- set compensation or benefits for employees of Agnesian;
- determine which healthcare services Agnesian offers;
- set prices of Agnesian's services;
- determine what proportion of Agnesian's care is provided on a charity or uncompensated basis;
- determine how Agnesian trains its employees;
- perform evaluations of Agnesian employees;
- sign contracts on behalf of Agnesian;
- sign checks drawn on Agnesian's accounts;
- invest Agnesian's money;
- determine which doctors become members of the hospital medical staff; or
- determine which doctors retain privileges as members of the hospital medical staff.

(Brown Dep. at 77:1–84:24, 98:5–99:2, 101:11–107:3; Fale Dep. at 57:9–62:5.)[17]

CSA does not have any ownership interest in Agnesian or its assets. Agnesian does not issue stock or other equity and does not have any shareholders. (Fale Dep. at 39:13–40:6.) Agnesian itself owns the real property on which its facilities are situated. (Treml Aff. ¶¶ 2-3; Defendant Agnesian Healthcare, Inc.'s Resp. to Pl. Third Req. for Production of Docs. Nos. 146-147.)

---

[17] Moreover, the Executive Leader of Sponsorship does not have the authority to do any of the following: hire or fire employees of Agnesian, set compensation or benefits for employees of Agnesian; determine which healthcare services Agnesian offers; set prices of Agnesian's services; determine what proportion of Agnesian's care is provided on a charity or uncompensated basis; perform evaluations of Agnesian employees; sign contracts on behalf of Agnesian; sign checks drawn on Agnesian's accounts; invest Agnesian's money; determine which doctors become members of the hospital medical staff; determine which doctors retain privileges as members of the hospital medical staff (Brown Dep. at 77:1–84:24).

Not only are no corporate officers, Directors or Class B Members of the Corporation required to have any religious affiliation, but no employee of Agnesian – not even those who provide spiritual services to patients and their families – is required to be religious. (Tirado-Kellenberger Dep. 44:1-10, 66:13-21, 67:22–68:20, 74:17-20; *id.* Ex. 58, 59, 60, 61.)[18] Agnesian's "equal opportunity policy statement" provides that "no otherwise qualified person shall be excluded from employment, be denied the benefits of employment or otherwise be subject to discrimination in employment in any manner on the basis of [*inter alia*] religion." (Tirado-Kellenberger Dep. at 42:24–43:2, Ex. 57.) That policy was adopted both to comply with the law and to comply with Agnesian's mission. (*Id.* at 43:23-25.) Moreover, no employees of Agnesian have been fired because they were not a Catholic or because they did not have a particular religious affiliation. (*Id.* at 73:3-14.)

None of Agnesian's services or programs is distinctly religious or offered on the basis of religious affiliation. It is Agnesian's policy that "[n]o otherwise qualified applicant for service or service participant shall be excluded from participation, be denied benefits, or otherwise be subject to discrimination in any manner on the basis of [*inter alia*] religion;" "this policy covers eligibility for access to service delivery, and treatment in all of the programs and activities" of Agnesian. (*Id.* at 42:24–43:2, Ex. 57.) The major services Agnesian offers are healthcare services; counseling services; employee assistance programs; volunteer services; disaster relief services; domestic violence counseling and intervention; adult day services; retail services; and education services. (Fale Dep. at

---

[18] In its responses to a Request for Production asking for documents "governing and/or describing, as of the relevant time period, any requirements that Agnesian Healthcare, Inc. staff, employees and/or members of its board of directors receive training in religion," Agnesian produced only copies of four job descriptions, for the positions VP-Mission Integration, Chaplain, Director of Spiritual Care, and Outreach Chaplain. (Def. Agnesian's Resp. to Pl.'s Third Request for Prod. of Docs., No. 62.) However, the Vice President of Employees and Information Services explained that Agnesian does not hire individuals on the basis of their religion. (Tirado-Kellenberger Dep. at 44:1-44:10; Ex. 57.) There is, furthermore, no requirement that Agnesian's Director of Spiritual Care services have any particular religious affiliation. (Tirado-Kellenberger Dep. at 66:13-66:21; Ex. 60.)

71:22–72:11.) It makes those services available to patients and others without requiring that they be a member of a particular religion. (Fale Dep. at 72:12–73:22, 74:23–75:1, 75:12–76:8, 76:24–77:3; Tirado-Kellenberger Dep. at 44:22–45:14, 88:2–89:14.)

Agnesian prohibits proselytizing, prohibits all staff from imposing personal religious beliefs or practices on patients and requires that the religious beliefs and traditions of all patients and family must be respected. (Fale Dep. at 90:18–91:20, Ex. 71.) All of Agnesian's programs, including its chaplaincy services, are available to members of any faith – and to those who profess no faith at all. (Fale Dep. at 90:18–91:20, Ex. 71; Tirado-Kellenberger Dep. at 58:10–59:5; *see also* Fale Ex. 70 (stating Agnesian requires that the chapel at St. Agnes Hospital is available on "an ecumenical basis," for the "religious needs for all patients").) Though Agnesian does require that it be managed and operated in accordance with the Ethical and Religious Directives for Catholic Health Care Services ("the Directives," Bylaws § 1.2, the Executive Leader of Sponsorship has no direct authority to ensure that the Directives are followed by Agnesian and its employees. (Brown Dep. at 192:3-19.)

Agnesian is listed in the Official Catholic Directory, along with a vast number of other facilities. But this Directory lists not only church institutions, but also "affiliated facilities;" the directory does not purport to list organizations based on their fit with the wording of the ADA's exemption. (*See* "The Official Catholic Directory: About Us" available at http://www.officialcatholicdirectory.com/about.html.) Entities listed in the Directory include, *inter alia*, "child care centers," "general hospitals," "special hospitals and sanatoria," "protective institutions," and "homes for aged and nursing homes." (Treml Aff. Ex. A & B.) The directory has listings for the entire country, and the 2008 version of the directory lists eleven "general hospitals" in just the Milwaukee area. (Treml Aff. Ex. A.)

Agnesian's tax-exempt status is recognized by the U.S. Internal Revenue Service ("IRS"), pursuant to Internal Revenue Code § 501(c)(3), which provides an exemption for corporations

Case 2:09-cv-00142-JPS   Filed 02/08/10   Page 18 of 50   Document 66

organized for religious, charitable, educational or scientific purposes.  (Treml Aff. ¶¶ 8-9, Ex. C; *see also* Bylaws § 1.4(b).)  The IRS has granted Agnesian that tax exempt status under a group exemption letter, giving blanket tax exemption to entities listed in the Official Catholic Directory.  (Fale Dep. at 94:1-17, Ex. 72.)  In 1946, the IRS held that entities listed in the Official Catholic Directory "are entitled to exemption from federal income tax" under the provision of the tax code currently known as Section 501(c)(3), and it has continued to grant that exemption to entities listed in that publication.  (Treml Aff., Ex. C; Fale Dep., Ex. 72.)  The IRS itself did not determine whether Agnesian was eligible to be listed in the Official Catholic Directory; rather Diocesan officials make that determination, based on information submitted by Agnesian.  (Fale Dep. at 95:17–98:9, Ex. 72; Treml Aff. Ex. C.)

<u>**STANDARD FOR SUMMARY JUDGMENT**</u>

To prevail on summary judgment, the moving party has the burden of establishing that there is "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material fact[s]" are those facts which "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a reasonable finder of fact "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a factual record permits multiple interpretations, the inconsistencies are not resolved at the summary judgment phase, *see Gil v. Reed*, 535 F.3d 551, 558 (7th Cir. 2008), and "[a]ny doubt as to the existence of a material fact is to be resolved against the moving party." *Temme v. Bemis Company, Inc.*, 651 F. Supp. 2d 865, 867 (E.D. Wis. 2009).

<u>**ARGUMENT**</u>

I. **AGNESIAN HAS NOT ESTABLISHED THAT IT IS EXEMPT FROM THE ADA'S PROHIBITION ON DISCRIMINATION.**

Agnesian has failed to establish that it is statutorily exempt from Title III of the Americans with Disabilities Act ("ADA"). To be eligible for that exemption, Agnesian must actually *be* a religious organization or be *controlled by* one, and neither conclusion is supported by the evidence Agnesian has presented. Therefore, this Court must deny Agnesian summary judgment on Plaintiff's ADA claim.

A. **Title III's Religious Exemption Must be Narrowly Construed.**

The ADA provides a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title III of the ADA, 42 U.S.C. §§ 12181-12189, which prohibits discrimination on account of disability in the provision of public accommodations, is part of a "broad remedial statute designed to protect persons with disabilities in a variety of activities and settings." *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119,

145 (2005) (Ginsburg, J., concurring); *see also id.*, 545 U.S. at 132 (plurality). Although Title III exempts from its coverage "religious organizations or entities controlled by religious organizations," 42 U.S.C. § 12187 (the "religious exemption"), Agnesian has failed to establish that it qualifies for that exemption.

Agnesian bears the burden of proving that it is entitled to the religious exemption under Title III, because it is an affirmative defense. *See Spann v. Word of Faith Christian Ctr. Church*, 589 F. Supp. 2d 759, 762-63 (S.D. Miss. 2008) (holding that the exemption under § 12187 is an affirmative defense; collecting cases showing "courts have consistently held that statutory exemptions, particularly from remedial statutes, must be pled as affirmative defenses"); *see also EEOC v. Fox-Point Bayside Sch. Dist.*, 772 F.2d 1294, 1302 (7th Cir. 1985) (recognizing the general principle that a defendant has the burden of establishing an exemption from a remedial statute). A defendant seeking summary judgment based on an affirmative defense must establish that there is no genuine factual dispute about its entitlement to that defense. *See Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009).[19]

In deciding whether Agnesian has met its burden, this Court must construe Title III's exemption narrowly. Statutory exemptions from remedial statutes must be given very narrow construction to avoid undermining the purpose of the statute and the will of Congress. *See Fox-Point Bayside Sch. District*, 772 F.2d at 1302; *see also A. H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (holding that extending a statutory exemption "to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people"). The U.S. Department of Justice's ("DOJ's") implementation guidance to the Title III

---

[19] The fact that Agnesian failed to plead the exemption as an affirmative defense, *see* Answer of Defendant Agnesian (Docket Nos. 12, 30), as required by Rule 8(c) of the Federal Rules of Civil Procedure, does not change the fact that Agnesian bears the burden of proving that it is entitled to the exemption. *See Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005) (*per curiam*).

regulations, quoted by Agnesian (Def.'s Br. at 9), does not undercut this basic principle. The DOJ's guidance uses the term "very broad" to refer to the *effect* of the exemption once an organization qualifies for it, not to *whether* an organization or entity qualifies for it. 28 C.F.R. pt. 36 app. B ("The ADA's exemption of religious organizations and religious entities controlled by religious organizations is very broad, *encompassing a wide variety of situations*. Religious organizations and entities controlled by religious organizations *have no obligations under the ADA*.") (emphasis added).[20] The very breadth of the exemption for those who qualify underscores the importance of construing the exemption narrowly.

The terms "religious organizations" and "entities controlled by religious organizations" are not defined in Title III. The only amplification of the terms provided by the statute is that "places of worship" qualify for the exemption. 42 U.S.C. § 12187. The implementation guidance unsurprisingly indicates that a "church" comes within the definition of "religious organization." 28 C.F.R. pt. 36 app. B. The DOJ explains that the test requires a fact-specific, case-by-case analysis: "whether the church or other religious organization controls the operations of the school or of the service or whether the school or service is itself a religious organization." *Id.* The only Court of Appeals to consider whether an entity qualified for this religious exemption has noted that the issue "is a mixed question of law and fact, the answer to which depends, of course, on the existence of a record sufficient to decide it." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 258 (3d Cir. 2007).

---

[20] Unlike some other civil rights statutes, which exempt certain conduct motivated or required by an entity's religious beliefs, section 12187 exempts *all* of an entity's conduct from the reach of Title III – but only after the entity establishes either that it is a religious organization or controlled by a religious organization. *Compare* 42 U.S.C. § 12187 *with id.* § 2000e-1 ("This title shall not apply . . . to a religious corporation, association, educational institution, or society *with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities*.") (emphasis added) *and* 20 U.S.C. § 1681(a)(3) (stating the subsection "shall not apply to any educational institution which is controlled by a religious organization *if the application of this subsection would not be consistent with the religious tenets of such organization*") (emphasis added).

To date, very few cases have addressed entitlement to the Title III "religious exemption." Notably, despite the fact that numerous healthcare facilities have ties of various types to religious entities,[21] there is no reported decision in which a court has considered the application of the exemption to a healthcare provider. The only cases in which courts have determined whether the exemption applies have arisen in the contexts of a church and educational facilities. *See Abington Friends Sch.*, 480 F.3d at 257-59 (deciding that record was too undeveloped to determine whether school affiliated with the Religious Society of Friends qualified for religious exemption); *Spann*, 589 F. Supp. 2d at 764 (dismissing Title III claim asserted against defendant church); *Marshall v. Sisters of the Holy Family of Nazareth*, 399 F. Supp. 2d 597, 605-607 (E.D. Pa. 2005) (finding that a private co-educational school that was operated and controlled solely by an Order of Catholic nuns qualified for the religious exemption); *White v. Denver Seminary*, 157 F. Supp. 2d 1171, 1174 (D. Colo. 2001) (finding that a seminary qualified for the religious exemption).

The Third Circuit Court of Appeals stated the following areas of inquiry are ones "that, under any definition of the ADA's religious exemption, are relevant to deciding whether [a defendant] is a religious organization or controlled by one," 480 F.3d at 258: (1) ownership of the entity, "including both tangible and real property;" (2) control of the entity, "including control over day-to-day operations, policy, finances, [program], and its advising system;" (3) the religion as presented in programs; (4) the religious affiliation of the recipients of services, employees, and oversight body; (5) any requirements that the recipients of services, employees, or oversight body "follow or subscribe to the tenets" of the religion and any training employees receive regarding the

---

[21] For example, healthcare providers with links to the Catholic Church constitute six of the ten largest nonprofit healthcare systems ranked by beds and four of the top ten ranked by revenue. Lawrence E. Singer, *The Role of Religion in Health Law and Policy Symposium: Does Mission Matter?*, 6 Hous. J. of Health L. & Pol'y 347, 351 (2006); *see also, e.g.*, Katherine A. White, *Crisis of Conscience: Reconciling Religious Health Care Providers' Beliefs and Patients' Rights*, 51 Stan. L. Rev. 1703, 1703-04 (1999) (noting the prevalence of healthcare providers with links to religious denominations). It should be noted that terms such as "religious healthcare facilities" and "Catholic hospitals" are frequently used in contexts that do not involve the meaning of the statutory terms at issue here. *See, e.g.*, White, *supra* at 1703.

religion; and (6) the oversight body's composition, activities "and alleged control" over the entity. *Id.* at 255.

The evidence upon which Agnesian relies in its summary judgment motion is very similar to that which the Third Circuit considered insufficient to establish whether an entity qualified for the exemption. *Compare id.* 254-55, 257-58 *with* Treml Aff. ¶¶ 4-10, Ex. A-E. Agnesian's proffered evidence consists merely of the following: its mission statement and its historic roots in "the healing ministry of the Catholic church;" its "sponsorship" by a Catholic congregation; its requirement that one class of corporate members (with a few non-delegable powers) are required to be members of a Catholic congregation; its operation in accordance with the "Ethical and Religious Directives for Catholic Health Services;" and its 501(c)(3) tax-exempt status based on its listing in the "Official Catholic Directory." (Def.'s Br. at 10-12; Treml Aff. ¶¶4-10; *id.* Ex. A-E.)

### B. Agnesian Has Not Established that It Is Controlled by a Religious Organization.

Agnesian has not established that it is controlled by a religious organization. Although, as it asserts, some of its Corporate Members are required to be affiliated with the Catholic Church, other evidence makes clear that the corporation itself is managed and controlled by its executives and members of its Board of Directors, none of whom are required to be affiliated with, or members of, any particular religious organization. *See Abington Friends Sch.*, 480 F.3d at 258 (explaining that the "day-to-day oversight" of an entity is relevant to the control issue).

Agnesian is a not-for-profit corporation organized under the laws of Wisconsin. (SOF.) Agnesian operates, *inter alia*, St. Agnes Hospital, which – prior to the 1960s – had been operated under the charter of and primarily by the Congregation of the Sisters of St. Agnes ("CSA"), a Roman Catholic entity. (SOF.) In the 1960s, however, St. Agnes Hospital was incorporated as a separate civil corporation. (SOF.) After further changes, Agnesian Healthcare, Inc., an independent

corporate entity, with its more minimal "sponsorship" relationship with CSA, came into being. (SOF; Brown Dep. at 168:4–170:8, Ex. 53.)

The day-to-day operations of Agnesian are carried out by its executive officers and employees, none of whom are required to have any religious affiliation or be a member of CSA. (SOF.) Power over Agnesian's operations is exercised by the executive officers and the Board of Directors. (Bylaws § 2.1.) The chief executive of Agnesian – the President/Chief Executive Officer ("CEO"), Bylaws § 4.7; Fale Dep. at 29:3-12 – is "responsible for the general and active management of the Corporation," Bylaws § 4.7, and has "overall responsibility" for strategic planning, monitoring, controlling, and developing the operations of Agnesian, primarily by supervising members of the executive team that are responsible for those functions. (SOF.)

Agnesian has a Board of Directors composed of up to fifteen members, three of whom are *ex officio*: the General Superior of CSA or her designee; the Executive Leader of Sponsorship; and the President/CEO of the Corporation. (Bylaws § 3.1.) No Director has greater voting rights than the others, and no Director is required to be a member of any particular religious organization or to subscribe to any particular religious beliefs. (Bylaws § 3.1; SOF.) The Board of Directors has and exercises numerous powers, including: to "establish overall policy for the management and operation of the Corporation, which is consistent with the Articles of Incorporation and these Bylaws, and the policies established by the Members;" to "review and approve the Corporation's annual capital and operating budgets;" to "provide for the annual performance review" of the CEO; to "monitor and evaluate the implementation of the mission within the Corporation;" to "approve and monitor the mechanism to evaluate the quality of care rendered;" and to "review and evaluate the existing and proposed services in order to assure that they meet community needs and Corporation mission." (Bylaws § 3.4; Fale Dep. at 48:15-49:13; *see also* SOF.) The Board also

oversees and evaluates the performance of the CEO and appoints the other officers of the corporation. (Bylaws §§ 3.4(q), 4.3; Brown Dep. at 107:4-14, 140:10–141:14.)

In Agnesian's entire corporate structure, the only persons required to have any particular religious affiliation are the Class A Members of the Corporation, all of whom are members of CSA. (Bylaws § 2.1; Agnesian Healthcare, Inc.'s Resp. to Pl.'s Third Set of Interrog., No. 19; SOF.) Certain sponsorship-related powers are granted by the Bylaws to the Class A Members, but those Members have delegated almost all of their powers to the Class B Members, including, *inter alia*, the power to: review the effectiveness of the Corporation in fulfilling the mission, philosophy, and values of the Corporation; to appoint the Board of Directors and remove Directors, with or without cause; to appoint and remove the CEO, upon the recommendation of the Board of Directors; to approve the establishment of any new subsidiary or affiliate of the Corporation; to approve any acquisitions, joint ventures or other corporate affiliations; to review and approve the strategic, long-range plan of the Corporation; and to approve any agreement pursuant to which a third party obtains the right or obligation to manage all or substantially all of the operations of the Corporation. (Brown Dep. 114:12–123:15; Bylaws § 2.1.) The only powers which the Class A Members have not delegated to Class B Members are those they are precluded from delegating under the Bylaws. (*Id.* at 122:6–123:15, *id.* § 2.2.)

The lack of control by CSA and the Class A Members over the day-to-day operations of Agnesian is further demonstrated by the fact that neither CSA nor the Class A Members are authorized to, *inter alia*: determine which healthcare services Agnesian offers; set prices of Agnesian's services; hire or fire employees of Agnesian; determine how Agnesian trains its employees; perform evaluations of Agnesian employees; sign contracts on behalf of Agnesian; invest Agnesian's money; determine which doctors become members of the hospital medical staff; or determine which

doctors retain privileges as members of the hospital medical staff. (Brown Dep. at 77:1–84:24, 98:5–99:2, 101:11–107:3; Fale Dep. at 57:9–62:5; *see also* SOF.)

The Executive Leader of Sponsorship, a CSA employee who is not required to be a member of CSA, serves as a liaison between CSA and Agnesian. (Brown Dep. at 45:1-22, 197:9-20.) That person communicates with Agnesian's CEO on roughly a monthly basis, for approximately 45 to 60 minutes each time. (*Id.* at 162:19–163:13.) The Executive Leader of Sponsorship is an *ex officio* Director and also serves as a Class B Member and member of Agnesian's Executive and Development committees, but has no special or extra power or authority in those positions. (*Id.* at 86:2–90:14.)

Finally, CSA has no ownership interest in Agnesian or its assets. *See Abington Friends Sch.*, 480 F.3d at 258 (holding that an organization's ownership interest in an entity is relevant to the control issue). In fact, Agnesian does not issue stock and does not have any "owners" – religious or otherwise. (Fale Dep. at 39:13–40:6.) Agnesian itself owns the real property on which its facilities are situated. (Treml Aff. ¶¶ 2-3; SOF.)

Agnesian cannot support its *ipse dixit* that CSA "maintains active control over key aspects of Agnesian's operations." (Def.'s Br. at 11.) It therefore has not established that it is controlled by a religious organization.

### C. Agnesian Has Not Established that It Is a Religious Organization.

In addition to the facts set forth above, additional facts show that Agnesian has not established that it is a "religious organization." No employees of Agnesian – not even those who provide spiritual services to patients and their families – are required to be affiliated with a particular religion. (SOF.) Moreover, none of Agnesian's services or programs is distinctly sectarian or offered on the basis of religious affiliation. The major services Agnesian offers are healthcare services; counseling services; employee assistance programs; volunteer services; disaster relief

services; domestic violence counseling and intervention; adult day services; retail services; and education services. (SOF.) It makes those services available to patients without regard to whether they have any religious affiliation, much less any particular religious affiliation. (SOF.) In fact, it is Agnesian policy – applicable to all staff, including spiritual care staff – that: "[p]roselytizing is not permitted;" the religious beliefs and traditions of all patients and family must be respected; "[s]taff persons may not impose their religious beliefs and practices on patients;" and "accommodation is made for those who profess to have no faith." (Fale Dep. at 90:18–91:20, Ex. 71.) All of its programs, including its chaplaincy services, are available to members of any faith – or to those who profess no faith at all. (SOF.)

Agnesian's tax-exempt status does not establish that it is a religious organization. First, Agnesian does not claim that it has 501(c)(3) status solely based on religious purposes; rather, Agnesian claims to be "organized and shall be operated exclusively for religious, charitable, educational and scientific purposes within the meaning of Section 501(c)(3)" of the Internal Revenue Code. (Bylaws § 1.4(b).) Second, the Internal Revenue Service's ("IRS's") criteria for 501(c)(3) eligibility do not require that an entity be a "religious organization" or "controlled by a religious organization." *Compare* I.R.C. § 501(c)(3) (applying the exemption to "corporations . . . organized and operated exclusively for religious, charitable, scientific . . . or educational purposes") *with* 42 U.S.C. § 12187 (exempting "religious organizations or entities controlled by religious organizations"). Third, it appears that the IRS has granted Agnesian that tax exempt status under a group exemption letter, giving blanket tax exemption to entities listed in the Official Catholic Directory. (SOF.) The IRS does not itself determine whether Agnesian is eligible to be listed in the Official Catholic Directory; rather Diocesan officials make that determination, based on information submitted by Agnesian. (SOF.)

Furthermore, Agnesian's listing in the Official Catholic Directory does not mean that it comes within the Title III religious exemption. That publication lists a vast number of both church institutions and "affiliated facilities" and does not purport to list organizations based on the criteria of the ADA's exemption. (SOF.) To read the exemption as encompassing all entities listed in that publication would mean that a significant number of healthcare providers in this country could deny healthcare services on the basis of disability without fear of liability under the ADA. Such an interpretation of the exemption finds no support in the wording of the exemption or the case law interpreting it and clearly would be at odds with the ADA's "comprehensive national mandate" against disability discrimination.

> **D.     The Differences Between Agnesian and the Educational Facilities Found Exempt Underscore Why the Exemption Does Not Apply to Agnesian.**

The facts regarding Agnesian's affiliation with CSA are very different from those present in the cases Agnesian relies on in its attempt to establish its entitlement to the exemption. The differences between the instant case and those cases make clear why this healthcare provider should not be exempt from the obligations of Title III of the ADA.

The religious academy at issue in *Marshall v. Sisters of the Holy Family of Nazareth* was not only founded by a community of nuns, but it continued to be operated and controlled solely by the nuns. 399 F. Supp. 2d at 597, 606. The academy's program – *i.e.*, its curriculum – focused "on the acquisition and practice of true Christian principles" and included "Bible study classes." *Id.* at 606. Based on this evidence – not merely the academy's listing in the Official Catholic Directory and tax-exempt status (*see* Def.'s Br. at 10) – the court concluded that the academy qualified for the religious exemption. 399 F. Supp. 2d at 606-07.

Similarly, the seminary at issue in *White v. Denver Seminary* was a "pervasively religious organization" that provided "graduate education founded on and steeped in Biblical teachings." 157

F. Supp. 2d at 1174. The seminary's "sole mission" was to "train students for Christian ministry." *Id.* It required that a majority of its Board of Trustees be members of the Conservative Baptist Association and that all of its employees "(a) profess a personal belief in Jesus Christ as a personal Savior; (b) subscribe to a statement of faith . . . and (c) are active members of a local Christian Church." *Id.* Faculty and students also were required to sign a "statement of religious beliefs," and students were required to "participate in a religious curriculum and attend weekly chapel." *Id.*

The facts of *Marshall* and *White* stand in stark contrast to the instant situation. Agnesian undeniably has historical links to the Catholic Church and continues to be influenced by those roots, including its use of the Ethical and Religious Directives for Catholic Health Care Services. (*See* Bylaws § 1.2.) However, those links to Catholicism do not make Agnesian a religious organization or an entity controlled by one. The evidence shows that Agnesian is controlled by its executives and Board of Directors, who are not required to be members of any particular religion or religious organization. Moreover, in contrast to the educational facilities held to be exempt from Title III in *Marshall* and *White*, Agnesian requires that its services be provided *without* proselytizing, does not limit the provision of services on the basis of religion, and does not require that any of its employees have any religious affiliation. Therefore, this Court must deny Agnesian's motion for summary judgment on plaintiff's ADA claim.

## II. THE EVIDENCE ESTABLISHES PLAINTIFF WAS DISCRIMINATED AGAINST SOLELY BECAUSE OF HER DISABILITY.

Rose is more than capable of meeting her burden to show that Dr. Cahee's actions were motivated "solely by reason of her disability." Evidence from various sources establishes that Dr. Cahee's decision to deny Rose the opportunity to have her gallbladder removed through the Fond du Lac Regional Clinic was motivated solely by his misperception that Rose's HIV posed a threat to the health of him and his surgical team. Because Rose is able to establish her Rehabilitation Act claim through the direct method of proof, Rose does not – as Defendant claims – need to jump

25

through the alternative evidentiary hoops through which a plaintiff must pass when attempting to prove claims through the indirect method of proof. (*See* Section II.B., *infra*) Given the substantial amount of direct and circumstantial evidence of Dr. Cahee's improper motive, Rose's claim must go to the factfinder to determine in whose favor the weight of the evidence tilts.

Defendants' attempts to defend themselves by pointing to circumstantial evidence of reasons for Dr. Cahee's conduct *in addition* to his concerns regarding transmission of the virus (Def.'s Br. at 13-24) do not change the legal analysis above, nor render adjudication before a trier of fact unnecessary. Rather, their attempted rebuttal of Plaintiff's prima facie case merely underscores the disputed issues of fact, showing that Plaintiff must be provided with the opportunity to prove that Defendant Cahee's proffered reasons for refusing to provide gallbladder surgery were not in fact motivating his conduct. And though not necessary to defeat summary judgment, Plaintiff demonstrates below that she has, in addition to her direct evidence of Dr. Cahee's improper and illegal motive, substantial circumstantial evidence indicating that the roadblocks erected and excuses proffered for not performing her surgery were and are pretextual. (*See* Section II.C, *infra*.)

It would be inappropriate to dismiss Rose's claims under Section 504 of the Rehabilitation Act on summary judgment unless this Court were to hold that *no rational trier of fact* could find that Dr. Cahee's fear of transmission of the HIV virus was the "but-for" cause of his actions with respect to Rose. Because the undisputed facts do not support such a holding – and in fact weigh heavily in favor of the opposite conclusion – Defendant's motion for summary judgment must fail.

### A. Through the Direct Method of Proof, Plaintiff Will Establish That Her Disability Was *the* Motivating Factor for Dr. Cahee's Conduct.

For disparate treatment discrimination claims – including this one – the relevant inquiry is whether the adverse action was undertaken based on an improper and illegal motive. *See Foster v. Arthur Anderson, LLP*, 168 F.3d 1029, 1032 n.5 (7th Cir. 1999) ("[C]ausation is one of the explicitly articulated elements of a prima facie case of disparate treatment disability discrimination."). That is,

the issue is *why* the adverse action was taken, and in particular, whether the adverse action was taken based on a particular trait or characteristic consideration of which is prohibited by law – not whether it was reasonable for the defendant to take the challenged action at all (*e.g.,* it may be perfectly reasonable to terminate one or more employees or to limit program access to only a certain group of individuals). *See, e.g., Darchak v.City of Chicago Bd. of Educ.*, 580 F.3d 622, 632 (7th Cir. 2009) (focusing on whether the plaintiff was able to raise a disputed question as to the defendant's discriminatory intent).[22] The analysis is no different for a claim of discrimination within the healthcare context. *See, e.g., Bragdon v. Abbott*, 524 U.S. 624, 649 (1998) ("[P]etitioner receives no special deference simply because he is a health care professional."); *Lesley v. Chie*, 250 F.3d 47, 54 (1st Cir. 2001) ("Physicians, of course, are just as capable as any other recipient of federal funds of discriminating against the disabled, and courts may not turn a blind eye to the possibility that a supposed exercise of medical judgment may mask discriminatory motives or stereotypes.").

A plaintiff may prove her disability discrimination claim through either the direct or indirect (*i.e.,* burden-shifting) method of proof. *Merchant v. Kring*, 50 F. Supp. 2d 433, 436-37 (W.D. Pa. 1999). Because it is rare to have direct evidence of discrimination – or the ability to present one's claims through the direct method of proof – a plaintiff often must rely on the indirect method and its accompanying inference of discriminatory intent drawn from circumstantial evidence. *See, e.g., Rothman v. Emory Univ.*, 123 F.3d 446, 451 (7th Cir. 1997). That, however, is *not* the case here.

Unlike the plaintiffs in the cases cited by Defendant (*see* Def.'s Br. at 15-21), Rose is not relying on the indirect method of proof or any inference of discriminatory intent drawn from circumstantial evidence alone. (SOF.) Where, as here, a plaintiff has a substantial amount of *direct*

---

[22] Plaintiff recognizes that Title VII allows for mixed-motive cases while the Rehabilitation Act does not; however, the propositions for which Plaintiff cites to Title VII cases (such as *Darchak*) are applicable to all discrimination claims. *See Rothman v. Emory Univ.*, 123 F.3d 446, 451 (7th Cir. 1997) ("Both the ADA and the Rehabilitation Act . . . are interpreted consistent with Title VII.").

*evidence* establishing the discriminatory intent behind the defendant's conduct, it is unnecessary to rely on any such circumstantial inference. *See, e.g., Darchak*, 580 F.3d at 631-33 (reversing dismissal of discrimination claims plaintiff was able to establish through the direct method of proof – even though she could not prove those claims through the indirect method); *Merchant*, 50 F. Supp. 2d at 436-37.[23] And summary judgment will rarely, if ever, be appropriate in situations in which the plaintiff proves her case through direct evidence of the defendant's improper motive – because even if the defendant attempts to rebut that direct evidence of discriminatory intent, there is very likely to remain a disputed issue of fact as to the defendant's true motivation. *See, e.g., Darchak*, 580 F.3d at 632-33 (noting that discrimination cases "often center on parties' intent and credibility, which must go to a jury unless no 'rational factfinder' could draw" the conclusion that the defendant's actions were motivated by discriminatory intent) (citation omitted); *Cortes v. Bd. of Governors of Ne. Ill. Univ.*, No. 89 C 3449, 1990 U.S. Dist. LEXIS 15414, at *28-29 (N.D. Ill. Nov. 14, 1990).

Through the direct method of proof, Rose is able to establish that Defendants denied her services "solely by reason of . . . her disability." Although there is limited case law parsing precisely what this language requires of a plaintiff,[24] a recent decision of the Seventh Circuit strongly suggests

---

[23] Nor does Dr. Cahee's mere proffer of purportedly legitimate reasons for his conduct require Rose to prove that Dr. Cahee's proffered reasons for his decision are pretextual. *See id.* at 436 ("[E]vidence of pretext is unnecessary when there is direct evidence of discrimination.") (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).

[24] In quoting from *Johnson v. Thompson,* 971 F.2d 1487, 1493 (10th Cir. 1992), for what it purports is an explanation of the "based solely on disability" language, Defendant is conflating two different elements of a claim under the Rehabilitation Act: the "based solely on disability" and "otherwise qualified" elements. (*See* Def.'s Br. at 13.) In the quoted portion of the *Johnson* opinion, the Tenth Circuit is explaining that the plaintiffs in that case could not sustain a claim that all infants with myelomeningocele (the alleged disability) were being discriminated against based on the type of treatment they were receiving from the defendants because the *only* infants requiring such treatment were those with that condition. The plaintiffs could not show that the nondisabled were receiving preferential treatment because those infants had no need of the treatment plaintiffs claimed was being denied to the disabled infants. The quoted portion of the *Johnson* opinion does not clarify what the phrase "based solely on disability" means and has no applicability to Rose's case. The treatment Rose was denied – gallbladder surgery – is provided on a regular basis to people who do not have HIV. Though Plaintiff does not think Defendant so intended, if Defendant is actually asserting that Rose cannot establish that Dr. Cahee performs gallbladder surgery on people who are not living with HIV, that assertion is patently false. (*See* Cahee Dep. at 44:8–45:11.)

28

that a "but-for" causation standard now governs claims brought under the Rehabilitation Act.

*Serwatka v. Rockwell Automation, Inc.*, No. 08-4010, 2010 U.S. App. LEXIS 948, at *11 (7th Cir. Jan.

15, 2010) (holding that a "but-for" causation standard governs claims under the ADA). [25]

Therefore, Rose's claim under Section 504 survives summary judgment if she can demonstrate a

disputed issue of material fact regarding whether "but for" her disability, Dr. Cahee would have

offered to perform the operation; in other words, whether her disability was *the* motivating factor for

Defendants' discriminatory conduct, as opposed to *a* motivating factor. *See Doe v. Deer Mountain Day*

*Camp, Inc.*, No. 07 Civ. 5495 (DCP), 2010 U.S. Dist. LEXIS 3265, at *40 n.40 (S.D.N.Y. Jan. 13,

2010) (recognizing recent Supreme Court precedent may impose a "but-for" standard under the

ADA).

### B. Rose Need Not Rely on an Inference of Discrimination Drawn From Circumstantial Evidence Because Substantial Evidence Establishes Dr. Cahee Was Motivated Solely by Illegitimate Concerns Related to Her HIV.

Defendants have failed to identify any valid reasons unrelated to Rose's HIV upon which

they are relying to argue that Dr. Cahee's decision was not based solely on her disability. [26]  Instead,

Defendants acknowledge that there could be both legitimate and illegitimate reasons – all related to

Rose's HIV – for refusing to perform surgery (and/or delaying it), [27] and then attempt to establish

---

[25] Before *Serwatka*, Seventh Circuit case law was somewhat inconsistent as to the degree of similarity between the standards for proving discrimination under the ADA ("on the basis of" disability) and the Rehabilitation Act ("solely by reason of" disability). *Compare Burks v. Wis. Dep't. of Transp.*, 464 F.3d 744, 756 n.12 (7th Cir. 2006) *with Foster*, 168 F.3d at 1033 n.7. However, after the U.S. Supreme Court eliminated liability under the ADEA for mixed motive cases, the Seventh Circuit made clear that the "but-for" standard should be the causation standard for all discrimination cases arising under federal laws that do not specifically provide otherwise. *See Gross v. FBL Financial Services*, 129 S. Ct. 2343, 2352 (2009) (establishing a "but-for" standard for ADEA cases); *Fairely v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009) ("[U]nless a statute provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law").

[26] The only asserted reason not linked to Plaintiff's HIV is Defendant's claim that Dr. Cahee wasn't "authorized" to perform the surgery. (*See* Def.'s Br. at 13-14)  Defendant's argument, however, is a red herring, because Rose and TCI could not "authorize" the surgery until Dr. Cahee expressed a willingness to perform it.  For further discussion of this proffered justification, *see* Section II.C., at 39 n.39, *infra*.

[27] Plaintiff's position is that by refusing to provide the surgery for "at least a month" after Rose was started on HIV medications, Dr. Cahee intended to force Rose to another provider, and thereby constructively refused

that Dr. Cahee relied on at least *some* legitimate reasons related to Rose's HIV, in addition to his

unfounded fears regarding transmission of the virus.[28]  (Def.'s Br. at 13-24.)  Therefore, it is not the

Plaintiff's claims but the Defendants' attempted justification of Dr. Cahee's actions – and their

reliance upon the distinction between legitimate and illegitimate reasons related to HIV – that would

force this Court to wade into the murky waters of evaluating the reasonableness of a doctor's

medical judgments.

This Court, however, should not succumb to Defendants' repeated attempts to shield

themselves from liability by invoking a supposed requirement of deference to a doctor's "exercise of

his medical judgment" (*see* Def.'s Br. at 16; Defs.' Br. in Supp. at 18 (Docket No. 39)) for one simple

reason:  Rose's case is based upon substantial (primarily direct) evidence that Dr. Cahee was

motivated entirely by illegitimate reasons regarding her HIV; therefore, she is not relying on any

inference of discriminatory intent to be drawn from the doctor's treatment decisions and conduct

overall.  This distinguishing factor renders inapplicable to Rose's situation the cases Defendant cites

– because those cases all involved drawing such an inference instead of relying on direct evidence of

a doctor's discriminatory intent.  *See, e.g., Lesley*, 250 F.3d at 53 n.5 (noting its opinion does *not*

address the situation where "a doctor [is] explicitly refusing to treat a disabled person out of fear for

---

to perform the surgery.  *See Merchant*, 50 F. Supp. 2d at 436-37 (holding that dentist effectively denied services when he prescribed an HIV test and walked out of the room).  Moreover, *delaying* surgery because of someone's HIV status – even for one day – supports a claim under the Rehabilitation Act.  *See Sharrow v. Bailey*, 910 F. Supp. 187, 190-93 (M.D. Pa. 1995); *see also Howe v. Hull,* 873 F. Supp. 72, 78 (N.D. Ohio 1994) ("Discrimination in public accommodation can take the form of the denial of the opportunity to receive medical treatment, [unnecessary] segregation . . . , unnecessary screening or eligibility requirements for treatment, or provision of unequal medical benefits.").

[28] If Defendants could prove that Rose's HIV presented a "direct threat" to the health and safety of the surgical team, then this would also serve as a legitimate reason related to her disability (HIV) for denying her surgery.  Tellingly, however, Dr. Cahee has not asserted a "direct threat" defense in this litigation – likely because such a defense is unsupportable given the case law regarding the definition of a "direct threat" and the current scientific analysis regarding the actual threat posed by an HIV-positive surgery patient.  *See Bragdon v. Abbott*, 524 U.S. 624, 649 (1998) (holding that the disability must present a *significant* risk); *Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061, 1066 (9th Cir. 2007) (noting a defendant "asserting a 'direct threat' . . . bears a heavy burden of demonstrating that the individual poses a significant risk to the health and safety of others"); *Deer Mountain,* 2010 U.S. Dist. LEXIS 3265, at *46-60.

30

his own health"). With the kind of evidence Rose has to support her claims, it is unnecessary to rely on inferences and burden-shifting mechanisms. *See, e.g., Darchak,* at 632-33 (holding the plaintiff raised a question of discriminatory intent by establishing her prima facie case under the direct method of proof and that "a question of intent . . . is properly put to the jury, not to the court on summary judgment"); *Merchant,* 50 F. Supp. 2d at 436-37.

Rose is more than able to "meet her burden" on this element of her claim, given her strong evidence that Dr. Cahee's actions were motivated solely by reason of her disability. Rose's testimony regarding the exchange that took place between her and Dr. Cahee on March 7, 2008 is unequivocal – in contrast to Dr. Cahee's lack of recall and equivocation on the subject. (*Compare* Rose Dep. at 67:6–68:23; 70:1–71:2 *with* Cahee Dep. at 127:3–133:12, 140:2–142:9.) Even if her testimony were the *only* evidence she could present regarding Dr. Cahee's improper motive for refusing to provide her with surgical services, this Court would face a dispute of material fact that could not be resolved on summary judgment. *Darchak,* 580 F.3d at 631 (holding "testimony based on first-hand experience" coupled with an adverse action, suffices to survive summary judgment).

Plaintiff's testimony, however, is only the beginning of her direct evidence of discriminatory intent. In addition, there is the testimony and affidavit of Dr. Steven G. Meress, a disinterested participant in these events. Dr. Meress was simply the physician in charge of Rose's medical care while she was incarcerated and, as such, has no vested interest in providing testimony against another doctor or slanted in Rose's favor;[29] yet his testimony and affidavit support Rose's understanding of Dr. Cahee's motivation for refusing to perform surgery. (SOF.) Furthermore, documentary evidence that Dr. Meress created *contemporaneously* to his conversation with Dr. Cahee – a clinic note in which he first recorded Dr. Cahee's statement that he would not perform surgery on

---

[29] In fact, Dr. Meress made it clear at his deposition that he would have preferred not to be testifying in this case at all. (*See* Meress Dep. at 116:17–118:8, 129:10–130:14).

Rose unless she was first placed on HIV medications for "at least a month" – confirms the accuracy of Dr. Meress' recollection of that conversation and the events of March 20, 2008.[30] (TCI Progress Note (Meress Dep., Ex. 1002, MJR 266).) Finally, even Dr. Cahee's own clinic note (recorded, in violation of his own standard practice, over two weeks after his conversation with Dr. Meress and over one month after his encounter with Rose) makes it clear that the *only* reason he did not want to perform the surgery on Rose was her "HIV with a high viral load" and the threat that he thought this presented to him and his surgical team.[31] (*See* Final Report, at 1-2.)

Rose's direct evidence of Dr. Cahee's improper motive in denying her surgical care places her case squarely within the cadre of cases concluding that nothing more than direct evidence is required to establish the "solely by reason of disability" element of a claim of discrimination under the Rehabilitation Act. *See, e.g., Howe v. Hull*, 873 F. Supp. 72 (N.D. Ohio 1994); *see also, e.g., Bragdon*, 524 U.S. at 624 (reviewing a claim of disability discrimination under the ADA); *Merchant*, 50 F. Supp. 2d at 436-37 (holding direct evidence of discrimination made establishing pretext unnecessary). *Howe v. Hull* presents circumstances strikingly similar to those here, and the jury rendered a verdict in the plaintiff's favor under the Rehabilitation Act based on direct evidence of the doctor's discriminatory motive; no evaluation of whether the doctor's referral decision was "unreasonable" or how others with HIV may have been treated by this doctor was required. *Howe*, 873 F. Supp. at 79.

*Howe* involved a man living with HIV who presented at a hospital emergency room with a severe allergic reaction to a medication prescribed by his treating physician. *Id.* at 75. When the examining emergency room doctor called the on-call admitting physician to get his patient admitted

---

[30] Though more circumstantial in nature, Dr. Meress's *actions* after his conversation with Dr. Cahee are further proof that Dr. Cahee made his decision with respect to Rose's surgery quite plain: Dr. Meress immediately called Dr. Graziano to explore other avenues for getting Rose the surgery she needed. (SOF.)

[31] All the evidence points to the inescapable conclusion that Dr. Cahee was acting pursuant to his illegitimate and unfounded concerns regarding the potential effect of Rose's HIV on his own health (*see* Section II.C., *infra*). *Cf. Deer Mountain*, 2010 U.S. Dist. LEXIS 3265, at *41 ("Thus, no reasonable jury could find that HIV was not a substantial factor – or, indeed, a but-for cause – in Defendants' decision[.]").

to the hospital for care, the admitting physician refused to admit the patient.  *Id.*  Even though the condition for which the patient required treatment was unrelated to HIV, the admitting physician told the examining physician that people with AIDS should be treated in special AIDS programs and that "if you get an AIDS patient in the hospital, you will never get him out."  *Id.*  The ER doctor subsequently recorded this statement in the patient's medical records.  *Id.*

Faced with the admitting physician's refusal to authorize care, the ER doctor referred the patient to another hospital, telling the man that the admitting physician did "not feel comfortable admitting him."  *Id.* at 76.  At the second hospital, the man got the care he needed.[32]  *Id.*  After litigation commenced, the on-call admitting physician attempted to claim that the reason he had refused to admit the man was that he needed to be under the care of a dermatologist in a specialized burn unit – neither of which the defendant hospital had.  *Id.*  Both the court (ruling under the ADA) and the jury (as the finder of fact under the Rehabilitation Act), rejected the defendants' attempts to rebut the plaintiff's direct evidence of discrimination based on disability, and found in favor of the plaintiff.  *Id.* at 77, 79 (finding that the patient's AIDS/HIV status was the motivating factor in the admitting physician's refusal to admit him to the hospital, and that this was "consistent with the jury's finding that, under the [Rehabilitation Act], the defendants discriminated against [the patient] *solely on the basis of disability*") (emphasis added).  The court did not explore whether the admitting physician treated others with HIV in the same manner or whether the doctor's medical judgment raised an "inference" of discriminatory intent – because such an inference is unnecessary when the plaintiff has direct evidence of a discriminatory motive.  *Id.* at 72-80; *see also Merchant*, 50 F. Supp. at 436 ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of

---

[32] The doctor who treated the patient at the second hospital testified that he was "surprised" that he was consulted on the case because the patient's condition was very "straightforward," stating that "simply because [the patient] was HIV-positive doesn't mandate a consult from an infectious disease specialist."  *Id.* at 76. This is very similar to the testimony of Dr. Gould, for whom Rose's HIV was simply not relevant to an assessment of whether her gallbladder should be removed.  (Gould Dep. at 25:10–26:2, 60:15-24.)

Case 2:09-cv-00142-JPS   Filed 02/08/10   Page 38 of 50   Document 66

discrimination.") (internal citations and quotations omitted); *Darchak*, 580 F.3d at 630-32 (same).

As in *Howe*, Rose has ample direct and circumstantial evidence that Dr. Cahee's sole motivation was his unfounded fear of contracting the HIV virus during surgery; in fact, Rose has even more direct evidence of the discriminatory motive than did the plaintiff in *Howe*. Like the plaintiff in *Howe*, Rose has testimony from another doctor treating her at the time, confirming that the defendant was acting based on an improper consideration related to her HIV. (SOF.) Furthermore, Rose has documentary evidence contemporaneously created by that treating physician confirming his understanding of the defendant's discriminatory motive (as did the plaintiff in *Howe*). (SOF.) In addition – unlike the plaintiff in *Howe* – Rose has her own testimony regarding what transpired on March 7, 2008 *and* Dr. Cahee's "Final Report," in which he confirms that he is unwilling to perform the surgery (at the very least not until Rose is placed on HIV medications for some unspecified period of time) because of a perceived risk to himself and his surgical team. (SOF.) Where the reason for the healthcare professional's decision not to treat (or to delay treatment) is a perceived but unsubstantiated risk to the healthcare professional's own health – and the healthcare professional has admitted as much in statements to others – the plaintiff has met her burden to show the discrimination was "based solely on her disability." *See Howe*, 873 F. Supp. at 79.

Because Rose has evidence from multiple sources that Dr. Cahee was motivated solely by an illegitimate concern with respect to her HIV, she need not rely on the indirect method of proof and an inference of discrimination drawn from an unreasonable medical judgment or from the manner in which the doctor treated others with HIV. The cases Defendant cites address these latter evidentiary burdens. In *Toney v. U.S. Healthcare, Inc.*, 838 F. Supp. 201 (E.D. Pa. 1993), the plaintiff had almost no evidence – and certainly no direct evidence – supporting his contention that the doctor's allegedly improper conduct toward him related to his HIV, much less that it resulted from an illegitimate concern related to his HIV. *Id.* Because the plaintiff's claim in *Toney* essentially was

"that Dr. Thorndyke did not see him or call him frequently enough, not that she refused to provide [him] treatment at all" the court looked at the rest of the undisputed facts ("that Dr. Thorndyke accepted him as a patient with full knowledge that he was HIV positive, that she treated him nine times in ten months herself and referred him to specialists three times, . . . that the decision to end the doctor-patient relationship was his, not Dr. Thorndyke's" and "that [Dr. Thorndyke] has other HIV positive patients") and held that there was no way plaintiff could "show that his HIV status was the sole basis for Dr. Thorndyke's alleged discrimination against him." *Id.* at 203-04. Implicit in the court's opinion is that the plaintiff would have had trouble establishing that his HIV was even *a* motivating factor in the way he was treated, much less *the* motivating factor. *See id.*; *cf. Gabby v. Luy*, No. 05-C-0188, 2007 U.S. Dist. LEXIS 70324, at *21-22 (E.D. Wis. Sept. 21, 2007) (noting plaintiff had not submitted any evidence that defendants discriminated against him on the basis of his disability). Because the facts of *Toney* are so vastly different from the facts at issue here[33] – and the plaintiff in *Toney* was attempting to create an inference of discriminatory intent from circumstantial evidence that did not support such an inference – the case does not guide this Court in evaluating Rose's claims.

Lesley v. Chie is similarly off-point. 250 F.3d at 53. The plaintiff in *Lesley* sought to prove that a doctor referred the patient to another provider motivated solely by an illegitimate concern or fear regarding the patient's HIV, but had no direct evidence that the doctor was conducting himself based on such an improper motive. *Id.* at 49-51. Therefore, to establish that the doctor was discriminating, the plaintiff had to rely on an inference drawn only from circumstances surrounding the doctor's decision to refer her elsewhere. *Id.* at 53. It was in this context that the First Circuit felt

---

[33] The Defendant's attempt to equate Toney's voluntary decision to leave the care of his HIV physician, after seeing her *nine* times, with Rose's decision to seek care elsewhere after seeing Dr. Cahee *once* and being told by him that he would not perform surgery on her because of a purported risk to his surgical team (Def.'s Br. at 16), borders on the preposterous. It is difficult to say Rose was even under Dr. Cahee's care, much less that the decision to "leave" his care was ever hers (or Dr. Meress's) to make. When the doctor is refusing to provide the only service sought from him, there is little choice but to seek that service elsewhere.

it necessary to establish a standard for when actions a doctor claims to have taken based on medical judgment could give rise to an inference of discrimination based solely on disability. *Id.* at 55 ("[T]he point of considering a medical decision's reasonableness in this context is to determine whether the decision was unreasonable *in a way that reveals it to be discriminatory*.").

The plaintiff's reliance upon an inference of discrimination reveals precisely why the *Lesley* court's standard is inapplicable here. When a plaintiff has direct evidence of the improper motive behind a healthcare professional's decision or conduct, it is not necessary to add another layer of assessment to "determine whether the decision was unreasonable in a way that reveals it to be discriminatory." *Id.* Defendants' attempt to impose the *Lesley* framework upon Rose's claims of discrimination – which are supported by direct evidence of Dr. Cahee's illegitimate reason for refusing to perform the surgery – is just another attempt to transform this case into one that may be evaluated under the more deferential standard used in medical malpractice cases. *See id.* at 54 (recognizing that "the courts may not turn a blind eye to the possibility that a supposed exercise of medical judgment may mask discriminatory motives or stereotypes"). The *Lesley* court made it clear that application of the specific standard announced in that opinion is inappropriate where the doctor explicitly bases his decision on concerns related to his own health.[34] *Id.* at 53 n.5. Because Rose establishes her claim through the direct method of proof, she need not deal with the special evidentiary mechanisms used – or hurdles faced – by plaintiffs employing the indirect method.

**C.    If Necessary, Rose Will Be Able Refute Defendant Cahee's Purported Reasons for Denying Her Surgical Care.**

---

[34] In fact, the Lesley court several times disclaims the decision's relevance or applicability to cases involving evidence of a healthcare professional "explicitly refusing to treat a disabled person out of fear for his own health[.]" *See id.* at 53 n.5 (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998)); *id.* at 57 n.13 ("There is a second reason why deference to the provider is more appropriate in a case like this than in a case like Bragdon. Bragdon concerned a provider's judgment about risks posed to his own health – a matter in which the provider's admitted self-interest may be expected to color his professional judgment.") Based on these admonitions, it is clear that the First Circuit did not intend that the special standard it created to evaluate medical judgments in that context be used in situations like the one presented by Rose.

Through direct evidence of Dr. Cahee's improper motive for refusing her care, Plaintiff can show that Dr. Cahee's actions were motivated solely by his illegitimate fears regarding her HIV; and properly framed, the Defendant's arguments in defense of Dr. Cahee's conduct merely create disputed issues of material fact regarding his true motivation for refusing to perform the necessary gallbladder surgery. [35] Therefore, though not strictly necessary to defeat summary judgment, Plaintiff here addresses how she will ultimately succeed at trial by refuting the Defendant's attempts to explain or justify Dr. Cahee's actions. Defendant's arguments in rebuttal to Rose's *prima facie* case of discrimination appear to be: 1) that Dr. Cahee could not have been discriminating against Rose based on her HIV because he performed surgery on others who have HIV; 2) that Dr. Cahee in fact did not refuse to perform surgery on Rose because he never made a final recommendation regarding removal of Rose's gallbladder; and 3) that his "individualized inquiry" into Rose's health with respect to her HIV shows that he was merely exercising his medical judgment, in pursuit of the optimal outcome for his patient. Plaintiff will address each of these arguments in turn.

Defendant's first argument – that Dr. Cahee has performed surgery on others with HIV – is essentially an attempt to directly repudiate the statements Dr. Cahee repeatedly made in March 2008, both orally and in writing, that he was not going to perform surgery on Rose until her viral load had been reduced because he was afraid that she might infect him or another member of the surgical team. (SOF.) This argument ignores the fact that Dr. Cahee was completely preoccupied by Rose's "high" HIV viral load and the fact that she was not on medications for her HIV when he met with

---

[35] In this brief, Plaintiff has not embraced the burden-shifting scheme of *McDonnell-Douglas* for two reasons. First, the *McDonnell-Douglas* burden-shifting mechanism is generally used only when the plaintiff does not have direct evidence of the discrimination at issue and must instead rely on an inference of discrimination created through circumstantial evidence, which is not the case here. *See* Section II.B, *supra*. Second, the continuing availability of *McDonnell-Douglas* burden-shifting in suits outside of Title VII was called into question by the U.S. Supreme Court in *Gross v. FBL Financial Services*. 129 S. Ct. at 2349 n.2. Because Plaintiff is confident she can meet her burden regardless of the approach employed, she will leave it to this Court to determine the most appropriate lens through which to view the facts of this case. *See, e.g., Merchant*, 50 F. Supp. 2d at 436-37 (acknowledging that the plaintiff would prevail under either method of proof).

her.  (SOF.)  Without establishing that the other HIV-positive individuals on whom Dr. Cahee allegedly performed surgery were similarly situated, Defendants cannot support an inference that he did not act with discriminatory intent in Rose's case.  *See Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1016 n.15 (3d Cir. 1995) (holding that the severity of a person's Alzheimer's disease may serve as the basis of a claim of disability discrimination and, therefore, that the defendant's assertion it provided care to others with Alzheimer's had "no impact on" plaintiff's claims under Section 504 of the Rehabilitation Act.); *see also Lesley,* 250 F. 3d at 56 n.11 (citing *Wagner*).[36]

    This highlights another problem regarding Defendant's first argument: while Dr. Cahee has testified that he performed surgeries on similarly situated people with HIV, Defendants are unwilling or unable to produce any (appropriately redacted) documentary evidence to support Dr. Cahee's statement on this topic.[37]  Without the documents to support Dr. Cahee's assertion that he performed surgeries on others with HIV, Plaintiff cannot adequately test the veracity of this statement or explore the details of those medical records – details that might explain Dr. Cahee's supposed willingness to perform those surgeries but not Rose's.  For this reason, Defendants should not be permitted to rely on Dr. Cahee's unsubstantiated and self-serving statement that he has, in the past, performed surgeries on individuals with HIV.  Without information to establish that these (purported) other patients were similarly situated to Rose, Dr. Cahee's statement could not possibly

---

[36] Defendant does not argue in its motion that Rose is not "otherwise qualified" for the services provided by Defendants, only that Rose was not denied those services "based solely on her disability."  Defendants' failure to assert that she is not "otherwise qualified" renders the Tenth Circuit's holding in *Johnson v. Thompson,* 971 F.2d at 1493 – that the degree of one's handicap cannot serve as the basis for a showing of differential treatment between individuals with the same handicap (and, therefore, as a basis for showing discriminatory intent) – inapplicable in Rose's case.  Furthermore, because the service Rose required was not related to her disability, she does not face the same problem the plaintiffs in *Johnson* encountered; they were caught between the "otherwise qualified" and "based solely on disability" language of the Rehabilitation Act, but Rose is not. *See id.* at 1493 n.3 (citing *Glanz v. Vernick,* 750 F. Supp. 39, 45-46 (D. Mass. 1990) (AIDS patient denied treatment for ear perforation stated claim under section 504)).

[37] *See* Def. Agnesian's Resp. to Pl.'s Third Requests for Prod. of Docs., No. 60; Def. Cahee's Answers to Pl.'s Second Set of Interrogs., Nos. 5, 6; Def. Cahee's Resp. to Pl.'s Third Set of Requests for the Prod. of Docs., No. 47.

have any impact upon Rose's claims under the Rehabilitation Act.

Defendant's second argument to rebut Plaintiff's *prima facie* evidence of discrimination – that Dr. Cahee never made a "final recommendation" regarding removal of Rose's gallbladder – is not credible on its face. One need only look at the clinic note Dr. Cahee recorded more than two weeks after his March 20 discussion with Dr. Meress. This clinic note is prominently labeled a "Final Report" several times; and in it, Dr. Cahee explicitly states that it "seems reasonable to remove her gallbladder."[38] (Final Report, at 1-2.) Furthermore, the clear message Dr. Meress received from Dr. Cahee on March 20, 2008 was not that Rose's gallbladder did *not* need to be removed, but that Dr. Cahee was refusing to do it unless Rose was first placed on HIV medications for at least a month. (SOF.) Everyone involved – even Dr. Cahee – was operating under the understanding that Rose's gallbladder needed to be removed (as indeed it did, and subsequently was). Dr. Cahee's assertion that he had not made a "final" recommendation regarding removal of Rose's gallbladder, and thus may escape liability under the Rehabilitation Act, is factually unsupported and disingenuous.[39]

---

[38] All of the documented reasons for the refusal to provide Rose with surgical care are related to unsubstantiated concerns Dr. Cahee had regarding *his* (and his team's) health, not Rose's health. (*See* SOF, n.7, *supra*.) Even Dr. Cahee's purported willingness to perform surgery on Rose at some point in the future (as set forth in a self-serving statement at the end of his clinic note) is contingent upon two things interrelated to the perceived risk presented by Rose's HIV: 1) Rose first being placed on HIV medications to *further* reduce the risk of infection to the surgical team; *and* (secondarily) 2) Rose developing complications as a result of the HIV medications on which Dr. Cahee was demanding she first be placed. *Cf. Deer Mountain*, 2010 U.S. Dist. LEXIS at *40 n.40 (noting that defendants' "alternate" justifications were related to the plaintiff's HIV, confirming that the denial of access to defendants' program was solely based on plaintiff's HIV).

[39] Defendant also contends that Dr. Cahee was never "authorized" to perform the surgery (*see* Def.'s Br. at 13, 21-24); however, in one of the cases relied upon by Defendant, a very similar argument was rejected out of hand by the Tenth Circuit. *See Johnson*, 971 F.2d at 1492. In *Johnson*, the district court held that "when the intervention of parental decision, well based on adequate medical briefings or not, necessarily lies in the path of the infant's receipt of the benefit, it cannot be said either that the infant is 'otherwise qualified' or that the discrimination is 'solely' because of handicap." *Id.* (internal quotations omitted). The Tenth Circuit rejected this ruling from the district court, stating: "The appellants argue that if the MM team's actions rendered parental consent a sham, such 'consent' cannot be considered an intervening cause that makes section 504 inapplicable. We agree with this argument by the appellants[.]" *Id.* (upholding dismissal for other reasons). Similarly, any claim by Defendants here that they could not have denied Rose surgery because surgery had not been authorized by Rose and Dr. Meress (TCI) sets up a "Catch-22" that would render Section 504 meaningless, as long as the doctor was careful never to present surgery as a treatment option. Rose arrived at FdLRC expecting to consult with a surgeon there regarding removal of her gallbladder (*see* Rose Dep. at 63:3-

39

Finally, Dr. Cahee's alleged "individualized inquiry" into Rose's health with respect to her HIV – which Defendant argues shows he was exercising his medical judgment, in pursuit of the optimal outcome for his patient – was, at best, a less-than-vigorous effort to obtain information unnecessary to remove Rose's gallbladder and, at worst, a pretext to obscure Dr. Cahee's true intention to avoid performing surgery on Rose. Dr. Cahee's "individualized inquiry" into whether he should perform the gallbladder surgery on Rose,[40] in light of the fact that she was HIV-positive and not on HIV medications, consisted of sending Rose back to the prison with a note requesting further information from her medical records. Dr. Cahee did nothing further with respect to conducting an individualized inquiry regarding Rose. Even after two of the four pieces of information he requested (the ultrasound report and her current list of medications) were faxed to FdLRC, Dr. Cahee did not actually utilize or refer to them in any way.[41] It was not until he heard from Dr. Meress on March 20 that Dr. Cahee's attention returned to Rose – and after his conversation with Dr. Meress, he again did nothing with respect to Rose's file until he dictated his final report two weeks later. Dr. Cahee's signing of that final report one month later marked the end of his medical engagement with respect to Rose; and one request for more information from the

---

7; 68:2-5; 69:17-21), and certainly after Dr. Cahee spoke with Dr. Meress on March 20, 2008, it had to be crystal clear that both Dr. Meress and Rose were eager to have the surgery performed. (SOF.) Moreover, the undisputed facts as to the events occurring on and after March 20, 2008, establish that "consent" and "authorization" were not the impediments to Rose receiving gallbladder surgery. (SOF.) Once Dr. Cahee made clear that he would not be performing surgery on Rose anytime soon, Dr. Meress immediately set Rose on the path to have her gallbladder removed at another hospital – and that is indeed what took place on June 2, 2008. (SOF.) Defendants' contention that an inability to obtain consent and/or authorization was an intervening cause of Dr. Cahee's denial of surgical services for Rose is completely without merit.

[40] It is important to recognize that it was not a question of whether Dr. Cahee was qualified, competent and properly equipped to perform the requested surgery on Rose, which was the question the doctor in *Lesley v. Chie* was trying to answer. *See Lesley*, 250 F.3d at 49-51. Dr. Cahee is not making such an assertion and readily admits that he would not do anything differently, surgically, in removing the gallbladder of a person living with HIV. (*See* Cahee Dep. at 59:8-11; 147:1-9.)

[41] In addition, Dr. Cahee could have: asked Rose for the name of her infectious disease specialist; asked Dr. Meress for the name of and/or records from her infectious disease specialist during their call; and/or at least noted in his report his desire to obtain the information he claims was being withheld. *See* Pl.'s Resp. to Agnesian's Proposed Finding of Fact, No. 48.

prison is the sum total of his "individualized inquiry" into her health and needed care.

The "individualized inquiry" conducted by Dr. Cahee stands in stark contrast to the kind of inquiry the *Lesley* court found actually helped dissipate any inference that the defendant doctor in *Lesley* was motivated by an illegitimate concern regarding the plaintiff's HIV when he referred her to another obstetrician and hospital to deliver her baby. *See Lesley*, 250 F.3d at 56. In *Lesley*, the physician: 1) read a clinical advisory regarding use of AZT during childbirth to prevent mother-to-child transmission; 2) consulted with the hospital pharmacy to see if the drug could be made available for use during plaintiff's delivery; 3) called a nurse who coordinated a women and infants HIV program at a nearby hospital; 4) advised his patient of the availability of the program at the other hospital and his lack of experience administering AZT during childbirth; 5) contacted the hospital's pharmaceutics and therapy committee to see if the drug could be approved for use in time; 6) consulted with the other obstetricians at his hospital; and 7) spoke with the plaintiff's primary care physician – all before making the decision to transfer the plaintiff's case to the other hospital. *Id.* at 49-51. Rose is not arguing that in order to avoid liability under the Rehabilitation Act, a doctor necessarily need take all the steps Dr. Chie took; but certainly if a doctor expects to rely on an individualized inquiry he conducted to dissipate an inference of discrimination – much less rebut direct evidence of discrimination – the doctor must do significantly more than send the patient away with a note requesting further information. Dr. Cahee's alleged attempts to learn more about Rose's health fall far short of the kind of inquiry contemplated by *Lesley*, and Dr. Cahee's reliance upon these limited steps as justification for his decision to refuse to perform (or delay) Rose's surgery only make those proffered reasons seem more pretextual. Even if credited, such feeble "attempts" leave an issue of material fact before the Court, requiring that summary judgment be denied.

It is only Defendants' attempts to rebut Plaintiff's direct evidence case through circumstantial evidence that might force the ultimate trier of fact to confront whether Defendant

Cahee was motivated by anything other than his unfounded fear of contracting HIV while performing surgery. This is an issue for trial, however, not for summary judgment. Defendants' motion for summary judgment on Plaintiff's Rehabilitation Act claim therefore must be denied.

### III. PLAINTIFF IS ABLE TO MEET HER BURDEN ON SUMMARY JUDGMENT FOR THE WISCONSIN ANTIDISCRIMINATION STATUTES UNDER WHICH SHE BRINGS HER CLAIMS.

Because the evidence establishes that Rose's HIV was the "but-for" cause of Dr. Cahee's refusal to perform surgery on her (*see* Section II.B., *supra*), she is also able to meet her burden for her claims under the Wisconsin antidiscrimination statutes. *See* Wis. Stat. § 106.52(3)(a)(1) (2009) (no person may "deny to another . . . the full and equal enjoyment of any public place of accommodation or amusement because of . . . disability[.]"); Wis. Stat. § 252.14(2) (2009) (making it unlawful for health care providers, among others, to refuse to treat an individual "solely because the individual has HIV infection[.]"). Even if, in assessing Rose's claims under the Rehabilitation Act, this Court holds that disputed issues of fact remain as to whether Dr. Cahee's unfounded fears of transmission of HIV were the sole motivation for his refusal to provide surgical services, Rose nonetheless survives summary judgment on her state claims, as well as her federal ones.

Furthermore, § 106.52 should be interpreted to allow for "mixed motive" claims. Because the operative language of § 106.52 is not identical to the operative language of the Rehabilitation Act, this Court must re-evaluate Rose's claims under the less restrictive standard of Wisconsin's public accommodation law. *Compare* Wis. Stat. § 106.52 (2009) *with* 29 U.S.C. § 794 (2009). This Court looks to Wisconsin law in interpreting a Wisconsin statute, *see U.S. Fire Ins. Co. v. Barker Car Rental*, 132 F.3d 1153, 1157 (7th Cir. 1997), but the few judicial decisions interpreting § 106.52 provide little guidance. (*See* Def.'s Br. at 25.) And though Wisconsin's Supreme Court has previously indicated that it looks to federal law for "guidance" when interpreting similar state laws, *see Luckett v. Bodner*, 769 N.W.2d 504, 511 (Wis. 2009), whether it will continue to do so in this

context is unclear in light of recent developments in the federal jurisprudence regarding the causation standard applied under the ADA – the federal statute most similar to Wisconsin's public accommodations law. *See Serwatka*, 2010 U.S. App. LEXIS 948, at *14 (eliminating the mixed-motive causation standard); *compare* Wis. Stat. § 106.52 *with* 42 U.S.C. §§ 12182. Given Wisconsin's long history of protecting its citizens from discrimination in public accommodations, *see Bryan v. Adler*, 72 N.W. 368 (Wis. 1897) (upholding a claim of racial discrimination at a restaurant), it is an open question whether it will rely on the relatively young ADA – and its newly-minted "but-for" causation standard – as definitive interpretive guidance for § 106.52. In any case, Rose has provided more than sufficient evidence to withstand summary judgment on her claim that Dr. Cahee denied her the full and equal enjoyment of the clinic because of her disability. (*See* Section II.B., *supra*.)

Similarly, it would be inappropriate to dismiss Rose's claim under Wisconsin's HIV-specific antidiscrimination statute based on a "but-for" causation standard. While the language of § 252.14 is more similar to the language of the Rehabilitation Act than the ADA (*i.e.,* both the former use the "solely" language), the problem being addressed by the Wisconsin statute is more specific than the broad range of disability discrimination addressed by the Rehabilitation Act. Section 252.14 makes it unlawful for healthcare providers, fire fighters, police officers, first responders, and other exclusive providers of vital services to refuse to treat an individual solely because of HIV infection. Wis. Stat. § 252.14(2) (2009). This statute, in protecting people with HIV infection from discrimination in a narrow band of critical situations, has no federal equivalent; therefore, this Court should refrain from treating it as merely coextensive with HIV-related cases brought under the federal law.

This Court should interpret Wisconsin's HIV-specific law in a manner that will allow it to fulfill the purpose for which it was enacted. *See State ex rel Kalal v. Cir. Ct. for Dane County*, 681 N.W.2d 110, 124 (Wis. 2004) ("The purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect."). Section 252.14 protects

Case 2:09-cv-00142-JPS   Filed 02/08/10   Page 48 of 50   Document 66

individuals with HIV in specific contexts in which the most common reason for discrimination is likely to be fear of transmission of HIV. This Court, therefore, should not make it more difficult for a plaintiff to establish a claim under § 252.14 by placing an unduly restrictive gloss on the causation standard. The appropriate standard is one recognizing the likelihood of defenses asserting the "exercise of medical judgment" and allowing a plaintiff to prevail if she is able to establish that her HIV infection was *a* motivating factor in the defendant's refusal to provide appropriate services. As with her claim under the Rehabilitation Act, Rose's claim under § 252.14 undoubtedly survives summary judgment – and this is particularly certain if her HIV need only be *a* motivating factor in Dr. Cahee's decision, as should be the appropriate standard under § 252.14.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that Defendant's motion for summary judgment be denied in its entirety.

February 8, 2010                              s/ Scott A. Schoettes

Kathryn S. Devine, Ill. Bar No. 6286033       Scott A. Schoettes, Ill. Bar No. 6282105
Nina M. Knierim, Ill Bar. No. 6298480         Bebe J. Anderson, NY Bar No. 1795327
Attorneys for Plaintiff Melody J. Rose        Attorneys for Plaintiff Melody J. Rose
Schiff Hardin LLP                             Lambda Legal Defense & Education Fund, Inc.
233 South Wacker Drive                        11 East Adams, Suite 1008
Suite 6600                                    Chicago, IL 60603-6303
Chicago, IL 60606                             (312) 663-4413 (tel.); (312) 663-4307 (fax)
(312) 258-5500 (tel.); (312) 258-5600 (fax)   Email: sschoettes@lambdalegal.org
Email: kdevine@schiffhardin.com               Email: banderson@lambdalegal.org
Email: nknierim@schiffhardin.com

Rebekah Kopec-Farrell, Bar No. 1052895
Attorney for Plaintiff Melody J. Rose
AIDS Resource Center of Wisconsin
820 N. Plankinton Ave.
Milwaukee, WI 53203
(414) 225-1578 (tel.); (414) 225-1632 (fax)
Email: rebekah.kopec-farrell@arcw.org

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2010, I caused the foregoing Plaintiff's Brief in Opposition to Agnesian Healthcare, Inc.'s Motion for Summary Judgment, to be served upon the following persons by hand delivery:

Laurie J. McLeRoy, State Bar No. 1018964
Neal Krokosky, State Bar No. 1061620
Attorneys for Agnesian Healthcare, Inc.
OTJEN, VAN ERT & WEIR, S.C.
700 N. Water Street, Suite 800
Milwaukee, WI 53202
Email: lmcleroy@otjen.com
Email: nkrokosky@otjen.com

I hereby certify that on February 8, 2010, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

William R. Wick
Terri L. Weber
Attorneys for Defendants Steven M. Cahee, M.D., and Fond du Lac Regional Clinic, S.C.

Laurie J. McLeRoy
Neal S. Krokosky
Attorneys for Agnesian Healthcare, Inc.

Scott A. Schoettes
Bebe J. Anderson
Attorneys for Plaintiff Melody J. Rose

Kathryn S. Devine
Nina M. Knierim
Attorneys for Plaintiff Melody J. Rose

Rebekah A. Kopec-Farrell
Attorney for Plaintiff Melody J. Rose


s/ Scott A. Schoettes
Scott A. Schoettes
Illinois Bar No. 6282105
Attorney for Plaintiff
LAMBDA LEGAL DEFENSE & EDUCATION FUND, INC.
11 E. Adams St., Suite 1008
Chicago, IL 60603-6303
(312) 663-4413 (tel.)
(312) 663-4307 (fax)
sschoettes@lambdalegal.org