IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MELODY J. ROSE,

            Plaintiff,

   v.

STEVEN M. CAHEE, M.D., FOND DU
LAC REGIONAL CLINIC, S.C., and
AGNESIAN HEALTHCARE, INC.

            Defendants.

Case No. 09-CV-142

Jury Trial Demanded

---

### PLAINTIFF'S ADDITIONAL PROPOSITIONS OF FACT
### IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT ON
### BEHALF OF DEFENDANT AGNESIAN HEALTHCARE, INC.

---

Plaintiff, by her attorneys, submits the following additional factual propositions in response to Defendants Steven M. Cahee, M.D. and Fond du Lac Regional Clinic's Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Civil Local Rule 56.2.

1.     Melody Rose has been living with HIV for at least six years. (Rose Dep. at 33:9-10.)[1]

---

[1] True and correct copies of any evidence cited by Plaintiff in this document that is not also cited in Defendant's Proposed Findings of Fact is attached to the Declarations of Scott A. Schoettes and Nina M. Knierim (filed herewith). Attached to the Declaration of Scott A. Schoettes are deposition transcript pages and deposition exhibits from the following: Deposition of Franklin M. Graziano, M.D. (Exhibit 1); Deposition of Melody J. Rose (Exhibit 2); Deposition of Steven G. Meress, M.D. (Exhibit 3); Deposition of Steven M. Cahee, M.D. (Exhibit 4); Deposition of Jon C. Gould, M.D. (Exhibit 5). Attached to the Declaration of Scott A. Schoettes are excerpts from the following: Answers to Plaintiff Melody J. Rose's Second Set of Interrogatories Directed to Defendant Steven M. Cahee Pursuant to Rule 33 (Interrogatory Nos.5 and 6) (Exhibit 6); Response to Plaintiff Melody J. Rose's Third Request to Defendant Dr. Steven M. Cahee for Production of Documents Pursuant to Rule 34 (Requests Nos. 47 and 48) (Exhibit 7); Plaintiff Melody J. Rose's Responses to Defendant Dr. Steven M. Cahee's Written Interrogatories (Responses No. 5 and 6) (Exhibit 8). Attached to the Declaration of Nina M. Knierim are deposition transcript pages and deposition exhibits from the following: Deposition of Robert Fale (Exhibit A); Deposition of Sister Mary Noel Brown (Exhibit B); Deposition of Norma Tirado Kellenberger (Exhibit C); and Deposition of Glen Treml (Exhibit D). Attached to the Declaration of Nina M. Knierim is a copy of the following: Agnesian Healthcare of Fond du Lac, Wisconsin, Inc. Corporate Bylaws ("Bylaws") (AH 1581-1604) (Exhibit E). Attached to the Declaration of Nina M. Knierim are excerpts from the following: Agnesian Healthcare, Inc.'s Responses to Plaintiff's Third Set of Interrogatories (Nos. 18 and 19) (Exhibit F); Defendant Agnesian's

1

2. Rose was incarcerated in the Taycheedah Correctional Institution ("TCI") in Fond du Lac, Wisconsin from October 2007 through July 2009.

3. Dr. Steven G. Meress was Rose's primary care physician while she was incarcerated at TCI. (Meress Dep. at 16:6–18:19, 32:17–33:16; Meress Aff., ¶ 2 (Meress Dep., Ex. 1001).)

4. Dr. Franklin M. Graziano, an immunologist at the University of Wisconsin Hospitals and Clinics in Madison ("UW – Madison"), treated Rose's HIV disease while she was incarcerated at TCI. (Graziano Dep. at 23:8–24; Rose Dep. at 8:5-6, 58:3-15; Meress Dep. at 22:18-22.)

5. From the time of Rose's incarceration at TCI through June 2008, Dr. Graziano met with her on the following four dates: January 9, 2008; February 27, 2008; April 30, 2008; and June 25, 2008. (Dr. Graziano did not meet with Rose on April 17, 2008.) (Graziano Dep. at 28:16-20, 39:2-3, 42:4-6, 63:25–64:4, 82:20-22, 147:10-13.)

6. On February 27, 2008, Dr. Graziano decided that Rose needed to be placed back on antiretroviral medications to treat her HIV. (Graziano Dep. at 44:10–45:3.)

7. Before prescribing HIV medications for Rose, however, Dr. Graziano recommended that Rose be evaluated to determine whether her gallbladder should first be removed. (Graziano Dep. at 49:19–50:16, 51:3–52:7, 55:2-5; Meress Dep. at 80:19–82:6.)

8. By February 2008, Rose's gallbladder had been giving her problems for a number of years and creating increasingly frequent and painful attacks in recent months. (Pl.'s Resp. to Defs.' First Set of Interrogs. (hereinafter, "Interrog. Resp."), No. 5; Rose Dep. at 50:13-17; Meress Dep. at 66:8–67:2, 68:3-21, 76:3-7, 77:20–78:15; Graziano Dep. at 34:18–35:9, 51:3–52:7.)

9. In response to Dr. Graziano's recommendation, Dr. Meress referred Rose to Agnesian Healthcare, Inc. ("Agnesian") for a surgical consult. (Meress Dep. at 81:8–82:6; Meress Aff., ¶ 2 (Meress Dep., Ex. 1001).)

---

Responses to Plaintiff's Third Set of Requests for the Production of Documents (Nos. 60-62, 146-47) (Exhibit G).

2

10. On March 7, 2008, Rose met with Dr. Steven M. Cahee, a general surgeon at the Fond du Lac Regional Clinic ("FdLRC"). (Cahee Dep. at 182:4-13.)

11. Defendant Cahee provides surgical services both at FdLRC and St. Agnes Hospital. (Cahee Dep. at 27:16-20, 28:8–29:7; Treml Dep. at 143:2-5.)

12. A document called an "Off-Site Service Request and Report" (with only the top section completed at that time, by Dr. Meress) was among the materials that accompanied Rose to her visit with Dr. Cahee on March 7, 2008. (Cahee Dep., Ex. 17 (hereinafter, "Off-Site Service Request"); Meress Dep. at 92:20–93:9.)

13. A list of medications Rose was taking and a lab report detailing her CD4 count and HIV viral load were also a part of the materials that accompanied her to the FdLRC on March 7, 2008. (Rose Dep. at 68:10-19.)

14. The "provider notes" from Rose's visit to the AIDS Resource Center of Wisconsin ("ARCW") in September 2007 were also among the materials that accompanied Rose to her meeting with Dr. Cahee at FdLRC. (Cahee Dep. at 131:25–132:18, 136:10-14, 179:22–182:13, 183:11-18, 206:7-11.) The provider notes from ARCW document the fact that Rose had been experiencing right upper quadrant pain since some time before her August 2007 visit and that she had an ultrasound of her gallbladder (which showed that it contained gallstones) performed at that time. (*See* ARCW – Milwaukee, Provider SOAP Visit Notes, dated Sept. 25, 2007 (hereinafter "ARCW Visit Notes") (Cahee Dep., Ex. 20).)

15. During their brief encounter that day, Dr. Cahee did not physically examine Rose – in fact, he did not touch or come near her at any time. (Rose Dep. at 67:21-24; Rose Decl. ¶ 2 (Docket No. 56); Cahee Dep. at 134:21-22.)

3

16. After introducing himself and ascertaining that Rose was seeing him because of problems related to her gallbladder, Dr. Cahee began asking Rose questions about her HIV. (Rose Dep. at 68:2-7.)

17. Once Dr. Cahee learned that Rose had a high HIV viral load, Dr. Cahee explicitly told Rose that he would not perform the surgery to remove her gallbladder because of the risk her HIV (supposedly) presented to him and his surgical team. (Rose Dep. at 70:6-9; Cahee Dep. at 140:21–141:1; General Surgery Office/Clinic Note – Final Report, electronically signed by Steven M. Cahee, MD, on May 7, 2008 (hereinafter, "Final Report") (Cahee Dep. Ex. 21).)

18. Rose was shocked by Dr. Cahee's statement to her and said, "You've got to be kidding me." (Rose Dep. at 70:22-25.)

19. Dr. Cahee did not respond to Rose's statement. Without further comment or any additional questions, Dr. Cahee exited the room. (Rose Dep. at 71:1-2.)

20. During her visit, Dr. Cahee never asked Rose for the name of her infectious disease specialist in Madison. (Rose Dep. at 71:12-18; Cahee Dep. at 166:2-3.)

21. Later on March 7, 2008, after Rose saw Dr. Cahee, TCI sent to the FdLRC by facsimile transmission the ultrasound report (Cahee Dep., Ex. 18) and current medications list (Cahee Dep., Ex. 19). (Cahee Dep. at 171:14–175:7, 177:17–179:18; Meress Dep. at 94:22–95:17.)

22. Though it is his normal practice to dictate notes regarding a patient encounter within a day or two, Dr. Cahee dictated no notes regarding his patient encounter with Rose until over two weeks after speaking with Dr. Meress; thus, it was approximately a month after seeing Rose. (Final Report, dictated by Steven M. Cahee on April 9, 2008 (Cahee Dep., Ex. 21); Cahee Dep. at 109:8–110:25, 199:19-25.)

4

23. During the next two weeks, Rose continued to experience pain as a result of her gallbladder disease. (Rose Dep. at 101:12-20; Rose Decl. ¶ 3 (Docket No. 56); Meress Dep. at 104:17-19.)

24. On her next visit with Dr. Meress at TCI, Rose told him that Dr. Cahee said he would not perform surgery to remove her gallbladder because of her HIV. (Rose Dep. at 76:2-16, 88:15–89:2; Meress Dep. at 98:24–99:1; Meress Aff., ¶ 3 (Meress Dep., Ex. 1001).)

25. Dr. Meress immediately called Dr. Cahee and asked "him specifically was that the case, would he not do a surgery on Rose because she was HIV positive." (Meress Dep. at 99:2-5; Meress Aff, ¶ 4 (Meress Dep., Ex. 1001); Rose Dep. at 89:2-89:13.)

26. Dr. Cahee confirmed that he would not perform the surgery on Rose because she was not on HIV medications and he thought this presented a risk for him and his surgical team. (Meress Dep. at 99:5-16; Meress Aff., ¶ 4 (Meress Dep., Ex. 1001); *see also* Final Report (Cahee Dep., Ex. 21).)

27. Dr. Cahee further stated that he would not perform the surgery until Rose had been on HIV medications "for at least a month." (Meress Dep. at 91:2-4, 104:12-14, 161:13–162:12; TCI Progress Note, dated Mar. 20, 2007 (hereinafter, "TCI Progress Note") (Meress Dep., Ex. 1002, MJR 266); Meress Aff., ¶ 4 (Meress Dep., Ex. 1001).)

28. At his deposition, Dr. Meress testified that this created a "Catch-22" because – based on Dr. Meress's own examination of Rose, the frequent nurse visits she had lately required, and the pain she was experiencing – Dr. Meress thought that Rose's gallbladder was too inflamed to wait a month before taking it out. (Meress Dep. at 102:11–103:2, 104:14-21.)

29. Dr. Meress has no recollection of Dr. Cahee offering to remove Rose's gallbladder, under any circumstances, before at least a month had elapsed. (Meress Dep. at 104:3-8; Cahee Dep. at 218:11–219:8.)

5

30. According to Dr. Meress, Dr. Cahee made it clear that he would not perform the surgery to remove Rose's gallbladder. (Meress Aff. ¶¶ 4-5 (Meress Dep., Ex. 1001); Meress Dep. 98:21– 99:12, 102:11-20, 104:10-21, 116:17–118:8, 161:13–162:15; TCI Progress Note (Meress Dep., Ex. 1002, MJR 266) ("Will call Dr. Cahee – states will only do surgery [after] HIV meds [times] 1 [month].").)

31. Shortly after speaking with Dr. Cahee, Dr. Meress – who understood that her treating physicians wanted Rose's gallbladder removed *before* starting her back on HIV medications – spoke with Dr. Graziano to inform him that the surgeon at the FdLRC was refusing to perform the surgery until Rose had been on HIV medications for at least a month. (Meress Dep. at 104:14– 105:25.)

32. When Dr. Graziano heard this, he told Dr. Meress that TCI should just send Rose back to UW-Madison to have the surgery performed by a general surgeon there. (Meress Dep. at 104:22–105:25.)

33. In the clinic note that Dr. Cahee dictated a month after his encounter with Rose, he stated that: "It seems reasonable to remove her gallbladder[.]" (Final Report (Cahee Dep., Ex. 21).)

34. In the clinic note that Dr. Cahee dictated a month after his encounter with Rose, he also stated: "[A]lthough if she does indeed, as she says, have HIV with a high viral load, it seems reasonable that she might be started on medication for [her HIV] as it could reduce the risk of exposure to the surgical team." (Final Report (Cahee Dep., Ex. 21).)

35. On April 17, 2008, Rose returned to UW-Madison for a consultation regarding removal of her gallbladder. (Gould Dep. at 27:18-25.)

36. The surgeon at UW-Madison, Dr. Jon C. Gould, reached the conclusion that Rose's gallbladder needed to be removed. (Gould Dep. at 55:23–57:11.)

6

37. Dr. Gould decided the gallbladder needed to be removed because Rose's gallbladder contained gallstones and she was reporting symptoms of biliary colic (primarily including right upper quadrant pain after eating). (Gould Dep. at 55:23–57:11.)

38. Neither Rose's HIV nor whether she was going to be placed on HIV medications prior to surgery played a role in this surgeon's decisions as to whether to remove Rose's gallbladder. (Gould Dep. at 24:24–26:12, 60:9-24.)

39. On June 2, 2008, Rose's gallbladder was removed by Dr. Gould. (Gould Dep. at 46:3-5; Meress Dep. at 133:25.)

40. After the removal of her gallbladder, Rose stopped experiencing the pain she had been having as a result of her gallstones. (Gould Dep. at 46:3-5; Meress Dep. at 133:25–135:14; Rose Decl. ¶ 4 (Docket No. 56).)

41. The Wisconsin Department of Corrections and Defendant Agnesian have an ongoing contractual agreement under which Agnesian arranges for the provision of health services for any individual incarcerated in a Department of Corrections' facility, including TCI. (Meress Dep. at 27:2-8.)

42. In the majority of instances in which an inmate of TCI needs health care services, TCI sends the inmate to the Agnesian facilities Fond du Lac Regional Clinic or St. Agnes Hospital for such services. (Meress Dep. at 27:2-8, 34:6-9, 48:1-7; Am. Compl. ¶ 30 (Docket No. 22); Answer of Defs. Cahee and SC ¶ 30 (Docket Nos. 8, 30.)

43. On February 12, 2009, Rose filed this lawsuit, asserting claims under federal and state antidiscrimination laws to seek redress for the various types of harm she suffered and to prevent the defendants from discriminating against her in the future based on her HIV status. (Am. Compl. (Docket No. 22); Rose Dep. at 108:2-7, 109:2-4, 126:13-19, 127:16–128:1.)

44. On March 20, 2008, Dr. Meress recorded a clinic note describing the result of his conversation with Dr. Cahee. (Meress Dep. at 161:4–162:15; TCI Progress Note (Meress Dep., Ex. 1002, MJR 266) ("Will call Dr. Cahee – states will only do surgery [after] HIV meds [times] 1 [month].").)

<u>Operation and Control of Agnesian Healthcare, Inc.</u>

45. Agnesian Healthcare, Inc. ("Agnesian") is a not-for-profit corporation organized under the laws of Wisconsin. (Fale Dep. at 39:6-10; 92:2-12; Agnesian Healthcare of Fond du Lac, Wisconsin, Inc. Corporate Bylaws ("Bylaws") § 1.2 [AH 1581-1604].)

46. Agnesian operates physician clinics and hospitals (including FdLRC and St. Agnes Hospital) in Fond du Lac, Wisconsin and the surrounding areas. (Cahee Dep. at 29:24-25.)

47. Agnesian identifies itself as "a locally based, not-for-profit integrated healthcare system." (Agnesian, "About Us," available at http://www.agnesian.com/aboutus.html.)

48. Prior to the 1960s, St. Agnes Hospital had been operated under the charter of and primarily by Congregation of the Sisters of St. Agnes ("CSA"). (Brown Dep. at 169:12-18, 172:4–173:13, Ex. 53.)

49. In the 1960s, St. Agnes Hospital was incorporated as a separate civil corporation (St. Agnes Hospital, Inc.), no longer directly owned by CSA, but with its operations still influenced by CSA. (Brown Dep. at 168:4–169:24, Ex. 53.)

50. What had been "St. Agnes Hospital, Inc." went through additional structural changes after the 1960s. (Brown Dep. at 168:4–170:8, 172:4-19, Ex. 53.)

51. Agnesian Healthcare, Inc. has a "sponsorship" relationship with CSA, under which Agnesian operates as an independent corporate entity. (Brown Dep. at 169:12–170:8, 172:4–173:13, Ex. 53; Bylaws § 1.2.)

52. None of the officers of Agnesian are required to be a member of any particular religious organization or to subscribe to any particular religious belief. (Fale Dep. at 38:14-16; Bylaws Art. IV; Brown Dep. at 137:10-137:19, 142:21-25; Tirado-Kellenberger Dep. at 44:7-10, Ex. 57.)

53. None of the Class B Members are required to be Catholic or Christian. (Brown Dep. at 182:8–183:5.)

54. Power over Agnesian's operations is exercised by the executive officers and the Board of Directors. (Bylaws § 2.1.)

55. The chief executive of Agnesian – the President/Chief Executive Officer ("CEO") – is "responsible for the general and active management of the Corporation. (Bylaws § 4.7.)

56. Agnesian's CEO has overall responsibility for strategic planning, monitoring, controlling, and developing the operations of Agnesian, primarily by supervising members of the executive team that are responsible for those functions. (Fale Dep. at 29:3-12, 30:11-20, 31:10–32:2, 32:17-25, 36:9-22.)

57. Agnesian's Executive Committee – which consists of the officers of the corporation and, as an *ex officio* member, the Executive Leader of Sponsorship – sets the compensation of the CEO. (Bylaws § 5.2; Brown Dep. at 93:16-21.)

58. Agnesian's Board of Directors oversees and evaluates the performance of the CEO. (Bylaws § 3.4(q); Brown Dep. at 107:4-14.)

59. Agnesian's Board of Directors is composed of up to fifteen members, three of whom are *ex officio*: the General Superior of CSA or her designee; the Executive Leader of Sponsorship; and the President/CEO of the Corporation. (Bylaws § 3.1.)

60. None of the Directors is required to be a member of any particular religious organization or to subscribe to any particular religious beliefs. (Brown Dep. at 137:10-19; Bylaws § 3.1.)

61. Although the Executive Leader of Sponsorship is an employee of CSA, that person is not required to be a member of any religious organization or subscribe to any particular religious beliefs. (Brown Dep. at 197:9-20; *see also id.* 164:22-165:3.)

62. The *ex officio* Directors have voting rights equal to, not greater than, the other Directors. (*See* Bylaws § 3.1; Brown Dep. at 89:2–90:14; Fale Dep. at 48:15–49:13 (confirming that Bylaws accurately set forth the powers of the directors, including any differences in the powers of the General Superior or her designee).)

63. The Board of Directors has and exercises numerous powers, including: to "establish overall policy for the management and operation of the Corporation, which is consistent with the Articles of Incorporation and these Bylaws, and the policies established by the Members;" to "review and approve the Corporation's annual capital and operating budgets;" to "provide for the annual performance review" of the CEO; to "monitor and evaluate the implementation of the mission within the Corporation;" to "approve and monitor the mechanism to evaluate the quality of care rendered;" and to "review and evaluate the existing and proposed services in order to assure that they meet community needs and Corporation mission." (Bylaws § 3.4; Fale Dep. at 48:15–49:13.)

64. Agnesian's Board of Directors appoints the other officers of the corporation. (Bylaws § 4.3; Brown Dep. at 140:10–141:14.)

65. The Chief Financial Officer of Agnesian presents the annual operating budget and annual capital budget to the Board. (Fale Dep. at 54:5-16.)

66. At least since 1996, the Board has never rejected either budget or even made recommendations with respect to them. (Fale Dep. at 29:13-15, 55:4–56:3.)

67. Agnesian has a corporate membership structure, with Class A and Class B Members. (Bylaws § 2.1.)

68. Appointment of members of the Board of Directors is one of the powers held by the Class B Members. (Brown Dep. at 115:14–116:7, 136:13–137:3.)

69. The Board recommends nominees for the Board of Directors to the Class B Members. (Brown Dep. at 136:13–137:3.)

70. At least in the last five years, Class B members have not rejected any of the Board of Directors recommendations of Director nominees. (Brown Dep. at 36:4-14, 137:4-9.)

71. The Class A Members of the Corporation have delegated almost all of their powers to the Class B Members, including, *inter alia*, the power to: review the effectiveness of the Corporation in fulfilling the mission, philosophy, and values of the Corporation; to appoint the Board of Directors and remove Directors, with or without cause; to appoint and remove the CEO, upon the recommendation of the Board of Directors; to approve the establishment of any new subsidiary or affiliate of the Corporation; to approve any acquisitions, joint ventures or other corporate affiliations; to review and approve the strategic, long-range plan of the Corporation; and to approve any agreement pursuant to which a third party obtains the right or obligation to manage all or substantially all of the operations of the Corporation. (Brown Dep. 114:12–123:15; see also Bylaws § 2.2.)

72. The only powers which the Class A Members have not delegated to Class B Members are those which the current version of the Bylaws precludes them from delegating. (Brown Dep. at 122:6–123:15; Bylaws § 2.2.)

73. In instances where Class B Members have authority to act alone, they sometimes inform Class A Members, but they do not seek approval from the Class A Members. (Brown Dep. at 131:9–132:15.)

74. At least within the past five years, the Class A Members have not exercised their power to change the mission of Agnesian. (Fale Dep. at 50:8-11.)

75. Agnesian's mission has not been altered by the Class B Members, the Board, or CSA, at least not within the past five years. (Fale Dep. at 49:25–50:15.)

76. Neither CSA nor the Class A Members have the authority to do – nor have the ever done – any of the following: hire or fire employees of Agnesian, set compensation or benefits for employees of Agnesian; determine which healthcare services Agnesian offers; set prices of Agnesian's services; determine what proportion of Agnesian's care is provided on a charity or uncompensated basis; determine how Agnesian trains its employees; perform evaluations of Agnesian employees; sign contracts on behalf of Agnesian; sign checks drawn on Agnesian's accounts; invest Agnesian's money; determine which doctors become members of the hospital medical staff; determine which doctors retain privileges as members of the hospital medical staff. (Brown Dep. at 77:1–84:24, 97:10–98:2, 98:18–99:2, 101:11–107:3; Fale Dep. at 57:13–62:5.)

77. The executive leader of sponsorship does not have the authority to do any of the following: hire or fire employees of Agnesian, set compensation or benefits for employees of Agnesian; determine which healthcare services Agnesian offers; set prices of Agnesian's services; determine what proportion of Agnesian's care is provided on a charity or uncompensated basis; perform evaluations of Agnesian employees; sign contracts on behalf of Agnesian; sign checks drawn on Agnesian's accounts; invest Agnesian's money; determine which doctors become members of the hospital medical staff; determine which doctors retain privileges as members of the hospital medical staff (Brown Dep. at 77:1–84:24.)

78. CSA has several "sponsored ministries" in addition to Agnesian. (Brown Dep. at 45:1-22, 197:9-20.)

79. CSA employs an Executive Leader of Sponsorship – who is not required to be a member of CSA – who serves as a liaison with CSA's sponsored ministries. (Brown Dep. at 45:1-22, 197:9-20.)

80. The Executive Leader of Sponsorship is recruited and interviewed by the Class B Members of the Corporation, who are also not required to be members of CSA. (Brown Dep. at 109:23–110:23.)

81. The Class B Members of the Corporation recommend to the Class A members a candidate for appointment to the position of Executive Leader of Sponsorship. (Brown Dep. at 109:23–110:23.)

82. The Executive Leader of Sponsorship communicates with Agnesian's CEO approximately monthly, for approximately 45 to 60 minutes each time. (Brown Dep. at 162:19–163:13.)

83. The Executive Leader of Sponsorship is an *ex officio* Director of Agnesian and also serves as a Class B Member, an Executive Committee member and a Development Committee member, but wields no extra power or authority compared to the other members of each of those bodies. (Brown Dep. at 86:2–90:14.)

84. Agnesian does not issue stock or other equity and does not have any shareholders. (Fale Dep. at 39:13–40:6.)

85. Agnesian itself owns the real property on which its facilities are situated. (Treml Aff. ¶¶ 2-3; Defendant Agnesian Healthcare, Inc.'s Resp. to Pl. Third Req. for Production of Docs. Nos. 146-147.)

86. No employee of Agnesian – not even those who provide spiritual services to patients and their families – is required to be religious. (Tirado-Kellenberger Dep. 44:1-10, 66:13-21, 67:22–68:20, 74:17-20; *id.* Ex. 58, 59, 60, 61.)

87. Agnesian's "equal opportunity policy statement" provides that "no otherwise qualified person shall be excluded from employment, be denied the benefits of employment or otherwise be subject to discrimination in employment in any manner on the basis of [*inter alia*] religion." (Tirado-Kellenberger Dep. at 42:24–43:2, Ex. 57.)

88. No employee of Agnesian has been fired because they were not a Catholic or because they did not have a particular religious affiliation. (Tirado-Kellenberger Dep. at 73:3-14.)

89. It is Agnesian's policy that "[n]o otherwise qualified applicant for service or service participant shall be excluded from participation, be denied benefits, or otherwise be subject to discrimination in any manner on the basis of [*inter alia*] religion;" "this policy covers eligibility for access to service delivery, and treatment in all of the programs and activities" of Agnesian. (Tirado-Kellenberger Dep. at 42:24–43:2, Ex. 57.)

90. The major services Agnesian offers are healthcare services; counseling services; employee assistance programs; volunteer services; disaster relief services; domestic violence counseling and intervention; adult day services; retail services; and education services. (Fale Dep. at 71:22–72:11.)

91. Agnesian makes its services available to patients and others without requiring that they be a member of a particular religion. (Fale Dep. at 72:12–73:22, 74:23–75:1, 75:12–76:8, 76:24–77:3; Tirado-Kellenberger Dep. at 44:22–45:14, 88:2–89:14.)

92. Agnesian prohibits proselytizing, prohibits all staff from imposing personal religious beliefs or practices on patients and requires that the religious beliefs and traditions of all patients and family must be respected. (Fale Dep. at 90:18–91:20, Ex. 71.)

93. All of Agnesian's programs, including its chaplaincy services, are available to members of any faith – and to those who profess no faith at all. (Fale Dep. at 90:18–91:20, Ex. 71; Tirado-Kellenberger Dep. at 58:10–59:5; *see also* Fale Ex. 70 (Agnesian requires that the chapel at St. Agnes Hospital is available on "an ecumenical basis," for the "religious needs for all patients.").)

94. The Executive Leader of Sponsorship has no direct authority to ensure that the Ethical and Religious Directives for Catholic Health Care Services are followed by Agnesian and its employees. (Brown Dep. at 192:3-19.)

95. The Official Catholic Directory lists not only church institutions, but also "affiliated facilities." (*See* "The Official Catholic Directory: About Us" available at http://www.officialcatholicdirectory.com/about.html.)

96. The Official Catholic Directory does not purport to list organizations based on their fit with the wording of the ADA's exemption. (*See* "The Official Catholic Directory: About Us" available at http://www.officialcatholicdirectory.com/about.html.)

97. Entities listed in the Directory include, *inter alia*, "child care centers," "general hospitals," "special hospitals and sanatoria," "protective institutions," and "homes for aged and nursing homes." (Treml Aff. Ex. A & B.)

98. The 2008 version of the Official Catholic Directory lists eleven "general hospitals" in just the Milwaukee area. (Treml Aff. Ex. A.)

99. Agnesian's tax-exempt status is recognized by the U.S. Internal Revenue Service ("IRS"), pursuant to Internal Revenue Code § 501(c)(3), which provides an exemption for corporations organized for religious, charitable, educational or scientific purposes. (Treml Aff. ¶¶ 8-9, Ex. C; *see also* Bylaws § 1.4(b)).

100. The IRS has granted Agnesian that tax exempt status under a group exemption letter, giving blanket tax exemption to entities listed in the Official Catholic Directory. (Fale Dep. at 94:1-17; Fale Ex. 72.)

101. In 1946, the IRS held that entities listed in the Official Catholic Directory "are entitled to exemption from federal income tax" under the provision of the tax code currently known as Section 501(c)(3), and it has continued to grant that exemption to entities listed in that publication. (Treml Aff., Ex. C; Fale Dep., Ex. 72.)

102. The IRS itself did not determine whether Agnesian was eligible to be listed in the Official Catholic Directory. (Fale Dep. at 95:17–98:9, Ex. 72; Treml Aff. Ex. C.)

February 8, 2010                                      s/ Scott A. Schoettes

Kathryn S. Devine, Ill. Bar No. 6286033               Scott A. Schoettes, Ill. Bar No. 6282105
Nina M. Knierim, Ill Bar. No. 6298480                 Bebe J. Anderson, NY Bar No. 1795327
Attorneys for Plaintiff Melody J. Rose                Attorneys for Plaintiff Melody J. Rose
Schiff Hardin LLP                                     Lambda Legal Defense & Education Fund, Inc.
233 South Wacker Drive                                11 East Adams, Suite 1008
Suite 6600                                            Chicago, IL 60603-6303
Chicago, IL 60606                                     (312) 663-4413 (tel.); (312) 663-4307 (fax)
(312) 258-5500 (tel.); (312) 258-5600 (fax)           Email: sschoettes@lambdalegal.org
Email: kdevine@schiffhardin.com                       Email: banderson@lambdalegal.org
Email: nknierim@schiffhardin.com

Rebekah Kopec-Farrell, Bar No. 1052895
Attorney for Plaintiff Melody J. Rose
AIDS Resource Center of Wisconsin
820 N. Plankinton Ave.
Milwaukee, WI 53203
(414) 225-1578 (tel.); (414) 225-1632 (fax)
Email: rebekah.kopec-farrell@arcw.org

# CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2010, I caused the foregoing Plaintiff's Additional Propositions of Fact in Opposition to Motion for Summary Judgment on Behalf of Defendant Agnesian Healthcare, Inc., to be served upon the following persons by hand delivery:

>Laurie J. McLeRoy, State Bar No. 1018964
>Neal Krokosky, State Bar No. 1061620
>Attorneys for Agnesian Healthcare, Inc.
>OTJEN, VAN ERT & WEIR, S.C.
>700 N. Water Street, Suite 800
>Milwaukee, WI 53202
>Email: lmcleroy@otjen.com
>Email: nkrokosky@otjen.com

I hereby certify that on February 8, 2010, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

>William R. Wick
>Terri L. Weber
>Attorneys for Defendants Steven M. Cahee, M.D., and Fond du Lac Regional Clinic, S.C.

>Laurie J. McLeRoy
>Neal S. Krokosky
>Attorneys for Agnesian Healthcare, Inc.

>Scott A. Schoettes
>Bebe J. Anderson
>Attorneys for Plaintiff Melody J. Rose

>Kathryn S. Devine
>Nina M. Knierim
>Attorneys for Plaintiff Melody J. Rose

>Rebekah A. Kopec-Farrell
>Attorney for Plaintiff Melody J. Rose

s/ Scott A. Schoettes
Scott A. Schoettes
Illinois Bar No. 6282105
Attorney for Plaintiff
LAMBDA LEGAL DEFENSE & EDUCATION FUND, INC.
11 E. Adams St., Suite 1008
Chicago, IL 60603-6303
(312) 663-4413 (tel.)
(312) 663-4307 (fax)
sschoettes@lambdalegal.org