IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MELODY J. ROSE,

       Plaintiff,                Case No. 09-C-0142

vs.

STEVEN M. CAHEE, M.D.,
FOND DU LAC REGIONAL CLINIC, S.C.,
and AGNESIAN HEALTHCARE, INC.,

       Defendants.

## AGNESIAN HEALTHCARE, INC.'S REPLY TO
## PLAINTIFF'S BRIEF IN OPPOSITION TO
## AGNESIAN'S HEALTHCARE, INC.'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.  Ms. Rose has not proven that Agnesian Healthcare, Inc. ("Agnesian") acted contrary to the Rehabilitation Act………………………………………………………1

    A.  Ms. Rose has not proven that Dr. Cahee treated her differently than he treated his other patients…………………………………………………………………………..1

    B.  The objective evidence standard is the best rule for *post hoc* judicial review of discrimination claims brought against healthcare providers………………………..2

    C.  Ms. Rose has not proven that Dr. Cahee refused/delayed surgery……………………5

II.  Agnesian has proven it is exempt from Title III of the ADA……………………………..9

    A.  Agnesian is controlled by the Congregation of Sisters of St. Agnes ("Congregation"), a Catholic organization…………………………………………………………………10

    B.  Agnesian is a religious organization……………………………………………13

III.  Conclusion…………………………………………………………………………..15

## TABLE OF AUTHORITIES

### CASES

*Alexander v. Choate,* 469 U.S. 287, 105 S. Ct. 712 (1985)…………………………………………2

*Benitez v. Am. Standard Circuits, Inc.,* 2010 WL 64231 (N.D. Ill. 2010)………………………..1

*Carmichael v. Payment Ctr.,* 336 F.3d 636 (7th Cir. 2003)…………………………………10, 11

*Cent. States, Se. and Sw. Areas Pension Fund v. White,* 258 F.3d 636 (7th Cir. 2001)………....11

*Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co.,* 826 F.2d 725 (7th Cir. 1987)…..10

*Curtis v. Timberlake,* 436 F.3d 709 (7th Cir. 2005)…………………………………………..10

*Doe v. Abington Friends School,* 436 F.3d 709 (3rd Cir. 2007)….………………………....9, 13

*Doe v. Deer Mountain Day Camp, Inc.,* 2010 WL 181373 (S.D.N.Y. 2010)…….…..…………..8

*Ezekiel v. Michel,* 66 F.3d 894 (7th Cir. 1995)…………………………………………………9

*Flynn v. Doyle,* 2009 WL 4262746 (E.D. Wis. 2009)…………………………………………8

*Gillespie v. Equifax Info. Sys., L.L.C.,* 484 F.3d 938 (7th Cir. 2007)………………………10, 13

*Glanz v. Vernick,* 750 F. Supp. 39 (D. Mass. 1990)…………………………………………8

*Grzan v. Charter Hosp. of Nw. Indiana,* 104 F.3d 116 (7th Cir. 1997)………………………...2-3

*Hageny v. Bodensteiner,* 762 N.W. 2d 452 (Wis. Ct. App. 2008)………………………………..4

*Hall v. St. Mary's Seminary & Univ.,* 608 F. Supp. 2d 679 (D. Md. 2009)………………………9

*Hartwig v. Albertus Magnus College,* 93 F. Supp. 2d 200 (D. Conn. 2000)……………………14

*Howe v. Hull,* 873 F. Supp. 72 (N.D. Ohio 1994)……………………………………………....6-7

*Houben v. Telular Corp.,* 309 F.3d 1028 (7th Cir. 2002)………………………………………1

*Johnson v. Thompson,* 971 F.2d 1487 (10th Cir. 1992)………………………………...1-2, 9

Case 2:09-cv-00142-JPS   Filed 02/25/10   Page 3 of 22   Document 71

*J.W. v. B.B.,* 700 N.W.2d 277 (Wis. Ct. App. 2005)……………………………………………..4, 9

*Knight v. Wiseman,* 590 F.3d 458 (7th Cir. 2009)…………………………………………..9

*Legion of Christ, Inc. v. Mount Pleasant,* 24 Misc.3d 706 (N.Y. Sup. Ct. 2009)……………..14

*Lesley v. Chie,* 250 F.3d 47 (1st Cir. 2001)……………………………………………..2, 4-5

*Lewis v. Atlas Van Lines, Inc.,* 542 F.3d 403 (3rd Cir. 2008)…………………………………...13

*Long v. Teachers' Ret. Sys. of Illinois,* 585 F.3d 344 (7th Cir. 2009)……………………………8

*Mallett v. Wisconsin Div. of Vocational Rehab.,* 130 F.3d 1245 (7th Cir. 1997)……………..1, 3

*Marshall v. Sisters of the Holy Family of Nazareth,* 399 F. Supp. 2d 597 (E.D. Pa. 2005)………9

*Merchant v. Kring,* 50 F. Supp. 2d 433 (W.D. Pa. 1999)………………………………………….2

*Nails v. Dothan Rescue Mission,* 2007 WL 1100515 (M.D. Ala. 2007) (unpublished)……..…...9

*New Dynamics Found. v. U.S.,* 70 Fed. Cl. 782 (Fed. Cl. 2006)………………………………...14

*Ortiz v. John O. Butler Co.,* 94 F.3d 1121 (7th Cir. 1995)……………………………………….8

*Peick v. Pension Ben. Guar. Corp.,* 724 F.2d 1247 (7th Cir. 1983)……………………………..14

*Petti v. Register of Wills,* 1990 WL 10930 (Md. Tax 1968)………………………………………14

*Pushkin v. Regents of Univ. of Colorado,* 658 F.2d 1372 (10th Cir. 1981)………………………6

*Rodriguez v. Attorney General of the U.S.,* 313 Fed. App'x 507 (3rd Cir. 2008) (unpublished)…6

*Ross v. Hilltop Rehab. Hosp.,* 676 F. Supp. 1528 (D. Colo. 1987)……………………………..1-2

*Sharrow v. Bailey,* 910 F. Supp. 187 (M.D. Pa. 1995)……………………………………………8

*Spann v. Word of Faith Christian Ctr. Church,* 589 F. Supp. 2d 759 (S.D. Miss. 2008)……..9-10

*State v. Fettig,* 493 N.W.2d 254 (Wis. Ct. App. 1992)……………………….………………..…1

*Toney v. U.S. Healthcare, Inc.,* 838 F. Supp. 201 (E.D. Pa. 1993)…………………………….2-4

*United States v. Hinds,* 329 F.3d 184 (D.C. Cir. 2003)…………………………………………...6

*Wagner v. Fair Acres Geriatric Ctr.,* 49 F.3d 1002 (3rd Cir. 1995)……………………………...3

Case 2:09-cv-00142-JPS   Filed 02/25/10   Page 4 of 22   Document 71

*Woods v. Wills,* 400 F. Supp. 2d 1145 (E.D. Mo. 2005)…………………………………………..9

*Wolford v. Lewis,* 860 F. Supp. 1123 (S.D. W.Va. 1994)…………………………………………2

*Zamora v. Elite Logistics, Inc.,* 478 F.3d 1160 (10th Cir. 2007)……………………………..3, 5

## STATUTES

29 U.S.C. § 794 (LexisNexis 2005)………………………………………………………………1

42 U.S.C. 1395dd (West, Westlaw through P.L. 111-40 (excluding P.L. 111-139))……………15

42 U.S.C. § 12181 (LexisNexis 2003)……………………………………………………………1

42 U.S.C. § 12187 (LexisNexis 2003)………………………………………………………10, 13

Wis. Stat. § 106.52 (2007-08)……………………………………………………………………..1

Wis. Stat. § 252.14 (2007-08)……………………………………………………………………..1

## RULES & REGULATIONS

E.D. Wis. Civil L.R. 37………………………………………………………………………………3

E.D. Wis. Civil L.R. 56………………………………………………………………………………1

Fed. R. Civ. P. 37……………………………………………………………………………………3

Fed. R. Civ. P. 56…………………………………………………………………………………...10

28 C.F.R. Pt. 36 App. B (2009)…………………………………………………………9, 12-13

## OTHER

Black's Law Dictionary (9th ed. 2009)……………………………………………………………10
United States Conference of Catholic Bishops, Ethical and Religious Directives for Catholic
Health Services (4th ed. 2001)…………………………………………………………………...12, 14-15
Oxford English Dictionary (2nd ed. 1989)……………………………………………………..10, 13

v

# I. MS. ROSE HAS NOT PROVEN THAT AGNESIAN HEALTHCARE, INC. ("AGNESIAN") ACTED CONTRARY TO THE REHABILITATION ACT.[1] [2]

## A. MS. ROSE HAS NOT PROVEN THAT DR. CAHEE TREATED HER DIFFERENTLY THAN HE TREATED HIS OTHER PATIENTS.[3]

Ms. Rose has failed to prove that the (alleged) conduct underlying this lawsuit was based solely on her HIV-positive status. *See Mallet v. Wisconsin Div. of Vocational Rehab.,* 130 F.3d 1245, 1257 (7th Cir. 1997). First, Ms. Rose has not produced any evidence that Dr. Cahee treated her differently than his other patients. *See Ross v. Hilltop Rehab. Ctr.,* 676 F. Supp. 1528, 1539-40 (D. Col. 1987) ("Plaintiff has not shown any instance where defendants treated [him] differently . . ."). Second, Ms. Rose has not produced any evidence that Dr. Cahee treated her differently than his other HIV-positive patients. *See Johnson v. Thompson,* 971 F.2d 1487, 1493 (10th Cir. 1992) ("If others with the same handicap do not suffer the discrimination, then the discrimination does not result 'solely by reason of [the] handicap.'"). Third, Ms. Rose has not produced any evidence that Dr. Cahee treated his HIV-positive patients differently than his HIV-

---

[1] Ms. Rose's response violates two rules of this court. First, Ms. Rose's brief is forty-four pages long. *See* E.D. Wis. Civil L.R. 56(b)(8) (thirty page limit). Second, Ms. Rose filed 102 additional proposed findings of fact. *See id.* at 56(b)(2)(B)(ii) (limit 100). Contrary to rule, Ms. Rose did not seek leave before filing her excessive moving papers. *See id.* at 56(b)(7). Accordingly, the court should strike those portions of Ms. Rose's moving papers in excess of the limits. *See Benitez v. Am. Standard Circuits, Inc.,* 2010 WL 64231, *5 (N.D. Ill. 2010).

[2] The arguments in this section apply equally to Ms. Rose's Title III claim. *See Plaintiff's Brief in Opposition to Agnesian Healthcare, Inc.'s Motion for Summary Judgment ("Rose Br.") at 28-29.* And, by extension, the arguments in this section should apply to Ms. Rose's claims brought under Wis. Stat. §§ 106.52, 252.14. Although Ms. Rose acknowledges the parallel between 42 U.S.C. § 12181 and § 106.52, Wis. Stat. and between 29 U.S.C. § 794 and § 252.14, Wis. Stat., she suggests that the court should apply the state and federal laws differently. *See Rose Br. at 42-44.* Ms. Rose provides essentially no authority to support her reading of the Wisconsin statutes. *See id.* And, although she notes that state courts attribute persuasive authority to federal decisions, she effectively asks the court to disregard same. *See id.* Consistent with established state law, the court should apply the arguments contained within this section to the claims that Ms. Rose brings under state law. *See Houben v. Telular Corp.,* 309 F.3d 1028, 1032 (7th Cir. 2002) (federal court must apply state law to claims brought under state law pursuant to supplemental jurisdiction statute); *State v. Fettig,* 493 N.W.2d 254, 261 (Wis. Ct. App. 1992) (state court looks to federal decisions if there are no judicial decisions interpreting the state law at issue). *See also Agnesian Healthcare, Inc.'s Memorandum of Law in Support of Summary Judgment ("Agn. Memo. Law") at 24-26.*

[3] The only actor that Ms. Rose alleges to have discriminated against her is Dr. Cahee. *See Agn. Memo. Law at 1 n.1.*

negative patients. *See Toney v. U.S. Healthcare, Inc.,* 838 F. Supp. 201, 204 (E.D. Pa. 1993).[4]

*Ross, Johnson,*[5] and *Toney* stand for a simple proposition: if Ms. Rose cannot prove that Dr. Cahee treated her differently than he treated his other patients, then she cannot prove that the defendants' (alleged) conduct was motivated <u>solely</u> by her HIV-positive status.[6]

### B. THE OBJECTIVE EVIDENCE STANDARD IS THE BEST RULE FOR *POST HOC* JUDICIAL REVIEW OF DISCRIMINATION CLAIMS BROUGHT AGAINST HEALTHCARE PROVIDERS.

Ms. Rose inaccurately represents to the court that the decision in *Toney,* 838 F. Supp. 201, is limited to situations where the plaintiff is unable to present direct evidence of discrimination. *See Rose Br. at 30.* The facts underlying *Toney* are nearly identical to this case and the court's holding on Mr. Toney's Rehabilitation Act claim unequivocal:

> Plaintiff contends that because he does not allege any reason other than his HIV status for the discrimination, his claim should survive a summary judgment motion. However, there is no factual dispute between the parties. <u>Plaintiff does not contest Dr. Thorndyke's affidavit stating that she has other HIV positive patients, nor does he allege that she treats all of her HIV positive patients</u>

---

[4] Federal courts have consistently held that the Rehabilitation Act was not intended to promote anything more than <u>even-handed</u> treatment. *See, e.g., Alexander v. Choate,* 469 U.S. 287, 299-304, 105 S. Ct. 712, 719-22 (1985); *Wolford v. Lewis,* 860 F. Supp. 1123, 1134-35 (S.D. W.Va. 1994) (collecting cases). The federal courts are equally clear that Section 504 does not "provide a federal malpractice tort remedy." *Grzan v. Charter Hosp. of Nw. Indiana,* 104 F.3d 116, 123 (7th Cir. 1997). *See also Lesley v. Chie,* 250 F.3d 47, 58 (1st Cir. 2001).

[5] Ms. Rose observes that the portion of the *Johnson* opinion referenced in *Agn. Memo. Law* (the *Johnson* pin cite on page thirteen should have been to page 1494) "does not clarify what the phrase 'based solely on disability' means," criticizing Agnesian for "conflating two different elements of a claim under the Rehabilitation Act: the 'based solely on disability' and 'otherwise qualified' elements." *Rose Br. at 28 n.24.* Ms. Rose's criticism elevates form over substance. Although the elements are technically distinct, they are intimately related; "[t]he word *solely* provides the key: the discrimination must result from the handicap and from the handicap alone. If others with the same handicap do not suffer the discrimination, then the discrimination does not result 'solely by reason of [the] handicap.'" *Johnson,* 971 F.2d at 1493 (italics original). The reasoning of the *Ross* and *Toney* courts is in accord.

[6] Given Ms. Rose's failure to produce comparative evidence, her reliance on *Merchant v. Kring* is misplaced. 50 F. Supp. 2d 433, 436 (W.D. Pa. 1999) ("assuming that [the defendant] did not deny Merchant dental services merely because he prescribed an HIV test, [the defendant] provided [the plaintiff] with unequal and/or different services because defendant did not require others to submit to an HIV test"). In fact, contrary to *Merchant,* Ms. Rose admits that "[a] patient's HIV status does not impact the surgical technique that Dr. Cahee uses or the procedure that he follows." *Agnesian P.F.F. ¶ 56.*

> differently than her non-HIV patients. Without such information, plaintiff cannot show that his HIV status was the sole basis for Dr. Thorndyke's alleged discrimination against him . . . Dr. Thorndyke is therefore entitled to summary judgment with respect to the plaintiff's claim under § 504 . . .

838 F. Supp. at 204 (underscore added). The exact same evidence that the *Toney* court found dispositive is present in the instant lawsuit: (1) Dr. Cahee has treated other HIV positive patients, (*Agnesian Healthcare, Inc. Proposed Findings of Fact ("Agnesian P.F.F.")* ¶ 57);[7] and, (2) Ms. Rose has not produced any evidence that Dr. Cahee treated her differently than he treated his other patients. *See supra* Section I.A. In fact, Ms. Rose admits that "[a] patient's HIV status does not impact the surgical technique that Dr. Cahee uses or the procedures that he follows." *Agnesian P.F.F.* ¶ 56.[8] Nothing in the *Toney* opinion supports Ms. Rose's assertion that the basis for the court's decision was the plaintiff's "attempt[] to create an inference of discriminatory intent from circumstantial evidence that did not support such an inference" *(Rose Br. at 35).*[9]

---

[7] Ms. Rose states that Agnesian "should not be permitted to rely on Dr. Cahee's unsubstantiated and self-serving statement that he has, in the past, performed surgeries on individuals with HIV" because "Defendants are unwilling or unable to produce any (appropriately redacted) documentary evidence to support Dr. Cahee's statement on the topic." *Rose Br. at 38.* If that is true, then the court must not consider Ms. Rose's testimony in support of her claim(s). More to the point, however, Ms. Rose does not suggest that there are any evidentiary flaws with Dr. Cahee's testimony nor has she produced any evidence to contradict same. *See Zamora v. Elite Logistics, Inc.,* 478 F.3d 1160, 1170 (10th Cir. 2007) ("a party's deposition testimony, even if uncorroborated by relevant documents, counts as evidence"). *See also Toney,* 838 F. Supp. at 204 (relying on doctor-defendant's affidavit). If Ms. Rose was dissatisfied with the response that she received to her written discovery, her remedy was to meet-and-confer under E.D. Wis. Civil L.R. 37 and file a Motion to Compel under Fed. R. Civ. P. 37; that she chose not to take such actions does not create an issue of material fact – her response to *Agnesian P.F.F.* ¶ 56 (i.e., "disputed") is unwarranted.

[8] Ms. Rose's statement that "[w]ithout establishing that the other HIV-positive individuals on whom Dr. Cahee allegedly performed surgery were similarly situated, [Agnesian] cannot support an inference that he did not act with discriminatory intent in Rose's case" *(Rose Br. at 38)* is an error of law and fact. *See Mallet,* 130 F.3d at 1257 (plaintiff bears burden of proof under Rehabilitation Act). *See also supra* Section I.A. Ms. Rose's citation to *Wagner v. Fair Acres Geriatric Ctr.,* 49 F.3d 1002, 1016 n.15 (3rd Cir. 1995), does not relieve her of the burden of proof, i.e., proving that she was discriminated against. *See Rose Br. at 38.* At most, the cited portion of *Wagner* stands for the proposition that a plaintiff can state a claim under the Rehabilitation Act based on disparate treatment between two subpopulations of individuals afflicted with the same disability. *See id.* The Seventh Circuit does not appear to follow this view. *See Grzan,* 104 F.3d at 121. And, even if it did, Ms. Rose has not produced any evidence to suggest that she has satisfied her burden. *See supra* Section I.A.

[9] Ms. Rose attempts to distinguish *Toney,* commenting that Agnesian's "attempt to equate Toney's voluntary decision to leave the care of his HIV physician, after seeing her *nine* times, with Rose's decision to seek care elsewhere after seeing Dr. Cahee *once* . . . borders on the preposterous." *Rose Br. at 35 n.33 (italics original).*

The facts of this case highlight the reasons why the objective evidence standard is the best rule for *post hoc* judicial review of discrimination claims brought against healthcare providers who <u>do not</u> refuse to provide care and treatment. Although Ms. Rose attempts to distinguish *Lesley,* 250 F.3d 47 *(Rose Br. at 35-36),* she does not dispute its core reasoning:

> Lest questions of medical propriety be conflated with questions of disability discrimination, it must take more than a mere negligent referral to constitute a Rehabilitation Act violation. <u>Were the Act construed otherwise, so as effectively to impose on physicians a special disability-centric duty of care, physicians would face potentially conflicting state and federal legal obligations</u>. That is, to avoid state malpractice liability, a physician might wish to error on the side of caution by referring a patient with disability-related complications to a better qualified specialist or more advanced facility; yet under the Rehabilitation Act, as hypothetically construed, the physician who did so would risk being found liable for discrimination.

*Id.* at 54 (underscore added). If the court holds that Dr. Cahee was required to perform surgery on Ms. Rose, lacking information that he thought was critical to making a recommendation regarding whether or not surgery was even necessary or appropriate, then the court not only exposes Dr. Cahee to potential liability for a claim of medical malpractice but also for liability based on his inability to obtain informed consent. *See J.W. v. B.B.,* 700 N.W.2d 277, 281 (Wis. Ct. App. 2005) (malpractice); *Hageny v. Bodensteiner,* 762 N.W.2d 452, 455 (Wis. Ct. App. 2008) (consent). Accordingly, to accommodate the competing policy considerations identified by the *Lesley* court, the court should require Ms. Rose to prove that Dr. Cahee's decision to seek

---

Initially, to be clear, Dr. Thorndyke was not Mr. Toney's "HIV physician;" she was his primary care physician. *See* 838 F. Supp. at 202. The factual misrepresentation notwithstanding, the number of visits did not bear on the court's decision. *See id.* at 204. As the court explained: "[e]ssentially, plaintiff's claim is that Dr. Thorndyke did not see him or call him frequently enough, not that she refused to provide treatment at all. As stated above, plaintiff does not dispute that Dr. Thorndyke accepted him as a patient with full knowledge that he was HIV positive, that she treated him nine times in ten months herself and referred him to specialists three times, or that the decision to end the doctor-patient relationship was his, not Dr. Thorndyke's." *Id.* The facts in the instant lawsuit are indistinguishable. Dr. Cahee consulted with Ms. Rose, knowing that she was HIV positive. *Agnesian P.F.F. ¶¶ 25, 29.* (Ms. Rose disputes *Agnesian P.F.F. ¶ 29;* however, similar to her response to *Agnesian P.F.F. ¶ 56* (discussed *supra* at 3 n.7), Ms. Rose fails to point to evidence that contradicts what Dr. Cahee understood the purposes of the consultation to

additional information was "devoid of any reasonable medical support." *Lesley,* 250 F.3d at 55. Ms. Rose has not satisfied (and cannot satisfy) this standard.

### C. MS. ROSE HAS NOT PROVEN THAT DR. CAHEE REFUSED/DELAYED SURGERY.

Ms. Rose's claim must fail because "she can[not] demonstrate a disputed issue of material fact regarding whether 'but for' her disability, Dr. Cahee would have offered to perform the [gallbladder] operation." *Rose Br. at 29 (underscore added).* Ms. Rose presented to Dr. Cahee pursuant to an off-site service request authored by Dr. Meress which read: "Referral to general surgery for gallstone. Question removal before starting HIV meds. US of 8-14-07 show multiple gallstones, Mild distention of bile duct at 7mm, and no gallbladder wall thickening or fluid." *Agnesian P.F.F. ¶ 25 (underscore added).* With respect to the off-site service request, Dr. Cahee testified as follows: "I guess I'm being asked two questions: Number 1. Does the gallbladder need to be removed? And Number 2. Do we need to remove the gallbladder before we start her on HIV medicines?" *Agnesian P.F.F. ¶ 29 (underscore added).*

"After consulting with Ms. Rose and speaking to Dr. Meress, Dr. Cahee dictated a clinic note (regarding his consultation with Ms. Rose) on April 9, 2008." *Agnesian P.F.F. ¶ 43.* The pertinent portion of that "Final Report"[10] (which Ms. Rose creatively excerpts, *see, e.g., Rose Br. at 4 n.7)* reads (in full) as follows:

> IMPRESSION: Symptomatic gallstones. It seems reasonable to remove her gallbladder, although if she does indeed, as she says, have HIV with a high viral load, it seems reasonable that she might be started on medication for this as it could reduce the risk of exposure to the surgical team. In speaking with Dr. Meress after the visit, concern had been raised about these medications causing sludging of the bile and possibly making her symptoms worse. If this were to

---

include.). *See Zamora,* 478 F.3d at 1170. Moreover, Dr. Meress (in consultation with Dr. Graziano) voluntarily ended Ms. Rose's relationship with Dr. Cahee, referring her to Dr. Gould for surgery. *Agnesian P.F.F. ¶¶ 44-45, 47.*

[10] The terms "clinic note" and the "Final Report" refer to the same document. *See Rose Br. at 3.*

> happen we could certainly remove her gallbladder on short notice. He has indicated he will discuss this further with the infectious disease staff at UW Madison and after this discussion if it is felt that her gallbladder should be removed, we certainly should be able to schedule this on short notice.

*Agnesian P.F.F.* ¶ *43 (underscore added)*. "Rather than continuing to consult with Dr. Cahee (regarding Ms. Rose), Dr. Meress contacted Dr. Graziano, who indicated that Ms. Rose's surgery could be scheduled at UW Hospital." *Agnesian P.F.F.* ¶ *44.*[11]

That Dr. Meress took the treatment decision out of Dr. Cahee's hands (before he could make a final recommendation regarding surgery) highlights that <u>this lawsuit</u>, unlike those cases cited by Ms. Rose, <u>does not involve a refusal to treat</u>. *See Rose Br. at 29 n.27, 32-34.*[12] For example, in *Howe v. Hull,* 873 F. Supp. 72 (N.D. Ohio 1994), the plaintiff-decedent (Mr. Charon) took a prescription medication that caused him to "experience[] a severe reaction for which he sought emergency treatment at Memorial Hospital." *Id.* at 75. In the emergency room, Mr. Charon was examined by Dr. Reardon who, after he examined Mr. Charon, was concerned that Mr. Charon's "reaction may ultimately develop into toxic epidermal necrolysis [TEN]." *Id.*

---

[11] Ms. Rose underwent surgery at the hands of Dr. Gould on June 2, 2008, *Agnesian P.F.F.* ¶ *47;* she was taking antiretroviral medications when he performed surgery. *See Agnesian Healthcare, Inc.'s Response to Melody J. Rose's Additional Propositions of Fact ("Agn. Resp. Rose A.P.F.")* ¶ *39 (citing Gould Dep. 41:8-14; Graziano Dep. 79:15-80:3).* All deposition testimony referenced herein is attached to the *Krokosky Supp. See Agn. Resp. Rose A.P.F. at 2 n.1.*

[12] The court should not indulge Ms. Rose's implicit suggestion that the court use the *McDonnell-Douglas* burden-shifting approach to analyze her claim(s). *See Rose Br. at 37 n.35.* Throughout her brief, Ms. Rose specifically disclaims her reliance on the burden-shifting approach. *Rose Br. at 27, 30-31, 34.* Therefore, the court should not *sua sponte* act on it. *See Rodriguez v. Attorney General of the U.S.,* 313 Fed. App'x 507, 509 n.2 (3rd Cir. 2008) (unpublished); *United States v. Hinds,* 329 F.3d 184, 186 n.4 (D.C. Cir. 2003). Moreover, the circuit courts of appeal have been slow to adopt and apply the burden-shifting methodology to claims involving the allegedly discriminatory provision of services. *See Pushkin v. Regents of Univ. of Colorado,* 658 F.2d 1372, 1387 (10th Cir. 1981) (reformulating the burden-shifting analysis to more neatly encompass claims brought under the Rehabilitation Act). Even if the court uses the burden-shifting approach, as set forth in *Pushkin,* Ms. Rose has failed to prove that she was otherwise qualified to undergo surgery; accordingly, because Ms. Rose would bear the initial burden of proof, the burden-shifting methodology would not be triggered. *See id.* Finally, Ms. Rose (herself) has suggested that the continued use of the burden-shifting methodology outside of Title VII is unclear. *See Rose Br. at 37 n.35.*

Accordingly, Dr. Reardon contacted Dr. Hull (the admitting doctor) to authorize Mr. Charon's admission. *Id.* The court described that conversation as follows:

> Dr. Reardon told Dr. Hull that Charon's condition was 'not related to AIDS or HIV infection in any way.' Despite this, Dr. Hull remained primarily concerned about Charon's AIDS/HIV status. Dr. Hull never asked Dr. Reardon why he was concerned about the possibility of TEN. During the course of their discussion, Dr. Hull told Dr. Reardon that '[i]f you get an AIDS patient in the hospital, you will never get him out.'"

*Id.* Based on his conversation with Dr. Hull, who ultimately refused to admit Mr. Charon, Dr. Reardon made arrangements for Mr. Charon to be transferred to a different facility. *Id.* at 75-76. The court noted:

> Dr. Hull did not come to the Memorial Hospital emergency room, a four mile trip from his home, until after Dr. Reardon's shift had ended and arrangements for Charon's transfer had been made. <u>When Dr. Hull did eventually come to the emergency room, he neither examined Charon, looked at him nor reviewed his chart, despite the fact that he knew that Charon was waiting in the emergency room and had not yet been transferred to MCO.</u>

*Id.* at 76 (underscored added). Based on those facts, the court found that "the defendants <u>refused</u> to admit Charon for treatment to Memorial Hospital." *Id.* at 77 (underscore added). The facts underlying *Howe* are the converse of those at issue in this case.

Unlike the doctor-defendant in *Howe,* Dr. Cahee consulted with Ms. Rose for the purpose of making a recommendation regarding gallbladder surgery. *Agnesian P.F.F. ¶¶ 24-27.* As part of that consultation, Dr. Cahee personally met with Ms. Rose, examined her,[13] and reviewed the records available to him at the time. *Agn. Resp. Rose A.P.F. ¶ 15.* Rather than waiting for Dr. Cahee to make a final recommendation, Dr. Meress referred Ms. Rose to Dr. Gould. *Agnesian*

---

[13] The parties dispute whether or not Dr. Cahee physically examined Ms. Rose. This dispute is immaterial because Ms. Rose has not produced any evidence to suggest that a physical examination was required.

*P.F.F. ¶¶ 44, 47.*[14] Dr. Meress never asked Dr. Cahee to provide any services other than the consultation.

In addition to admitting that Dr. Meress effectively prevented Dr. Cahee from making a treatment decision, Ms. Rose admits that no matter what action Dr. Cahee recommended (had she waited for him to make one) that recommendation would have been subject to unconstrained revision by the Taycheedah Correctional Institution ("TCI"). *See Agnesian P.F.F. ¶ 50.* Ms. Rose also admits that TCI, the only entity able to schedule off-site service requests for prisoners housed there, has (in fact) refused to schedule surgeries recommended by off-site consultants like Dr. Cahee. *See Agnesian P.F.F. ¶¶ 51-52.* Based upon the foregoing, Ms. Rose puts the proverbial cart-before-the-horse when she states that "Rose and TCI could not 'authorize' the surgery until Dr. Cahee expressed a willingness to perform it." *Rose Br. at 26 n.26.*[15]

_____

[14] That Dr. Meress took the treatment decisions out of Dr. Cahee's hands renders *Sharrow v. Bailey,* 910 F. Supp. 187 (M.D. Pa. 1995) distinguishable. *See Rose Br. at 29 n.27.* In *Sharrow,* "[s]urgery was scheduled for October 7, 1994. Dr. Bailey requested the use of protective suits for himself and the surgical team before he would go forward with the surgery. Such gear was not routinely made available by the hospital, and his request was not granted. Plaintiff's surgery was performed [by a different doctor] the following day . . ." *Sharrow,* 910 F. Supp. at 190 (underscore added). Whereas the surgery at issue in *Sharrow* had already been scheduled, Ms. Rose has not produced any evidence that she would have been scheduled for surgery even if Dr. Cahee recommended it. *See infra at 8 n.15.* Additionally, Ms. Rose has not produced any evidence that Dr. Cahee would not perform surgery on her. *See supra at 5-6.* For the same reasons, this lawsuit is distinguishable from *Glanz v. Vernick,* cited by Ms. Rose on page thirty-eight of her brief. 750 F. Supp. 39, 41 (D. Mass. 1990) (doctor-defendant refused to perform previously scheduled surgery when he learned that the patient was HIV-positive). In addition to the factual distinction, there is a critical procedural difference between *Glanz* and the instant case; in *Glanz,* the court ruled (in favor of the plaintiff) on (what it treated as) a motion for judgment on the pleadings based on its "assum[ption] that the defendants intentionally refused to perform surgery on Mr. Vadnais because of his handicap." *Id.* at 41 (underscore added). To defeat a motion for summary judgment the non-moving party cannot rely on bare allegations alone. *See Long v. Teachers' Ret. Sys. of Illinois,* 585 F.3d 344, 349 (7th Cir. 2009). Rather, "[i]f the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1995).

[15] The unspoken assumption that underlies Ms. Rose's statement must be that Dr. Cahee thought that surgery was both necessary and appropriate on March 7, 2008. Even if the court assumes that Dr. Cahee thought that surgery was necessary and appropriate, Ms. Rose's failure to produce any evidence that TCI would have referred her for surgery renders it impossible for her to prove that Dr. Cahee denied her same. *See Rose Br. at 29 nn.26-27.* If, for example, TCI failed to schedule Ms. Rose for surgery, then the proper defendant would be TCI. *Cf. Doe v. Deer Mountain Day Camp, Inc.,* 2010 WL 181373 (S.D.N.Y. 2010) (plaintiff denied admission to basketball camp). *See generally Flynn v. Doyle,* 2009 WL 4262746, *4 (E.D. Wis. 2009) (Dr. Meress . . . did not see Patient B.J. until approximately two months after she submitted the HSR . . ."). In footnote thirty-nine of her brief, Ms. Rose suggests that the Tenth

## II. AGNESIAN HAS PROVEN IT IS EXEMPT FROM TITLE III OF THE ADA.

The court must grant summary judgment in favor of Agnesian on Ms. Rose's Title III claim if Agnesian is a religious organization <u>or</u> if it is an entity controlled by a religious organization. *See Rose Br. at 15*. To date, in every instance but one, the district court held that the religious exemption applied to the party that raised it.[16] The uniformity with which the courts have applied the exemption demonstrates their fidelity to the implementing regulations, which make the broad scope of the exemption plain. *See* 28 C.F.R. Pt. 36 App. B ("ADA's exemption . . . is very broad, encompassing a wide variety of situations").[17] Like its sister courts, this court should endeavor to apply the exemption broadly. *See id.*[18]

Circuit rejected a "very similar argument" in *Johnson,* 971 F.2d at 1492. In support of her claim, Ms. Rose cites the following passage: "[t]he appellants argue that if the MM team's actions rendered parental consent a sham, [then] such 'consent' cannot be considered an intervening cause that makes section 504 inapplicable." *Id.* (affirmed on other grounds). *See Rose Br. at 39 n.39.* The if-then form of the *Johnson* dicta minimally requires Ms. Rose to prove that: (a) Dr. Cahee recommended surgery; (b) had Dr. Cahee recommended surgery she would have agreed to Dr. Cahee performing the surgery; and, (c) had Dr. Cahee recommended surgery TCI would have scheduled Dr. Cahee to perform the surgery. Ms. Rose has failed to produce any evidence to prove any of these propositions. That Ms. Rose's medical care was scheduled by TCI likely renders her concern that (should the court accept Agnesian's argument) a doctor would never "present surgery as a treatment option" moot. *Rose Br. at 39 n.39.* However, to the extent that Ms. Rose's concern may be rhetorically appealing, her fears are unlikely to materialize in light of a doctor's ethical and legal duties. *See Ezekiel v. Michel,* 66 F.3d 894, 902 n.14 (7th Cir. 1995) (discussing the Hippocratic Oath); *J.W.,* 700 N.W.2d at 281 (medical malpractice). Moreover, given her incarcerated status (at the time), Ms. Rose's rights were constitutionally protected. *See Knight v. Wiseman,* 590 F.3d 458, 463 (7th Cir. 2009).

[16] *See Hall v. St. Mary's Seminary & Univ.,* 608 F. Supp. 2d 679, 682 n.1 (D. Md. 2009) (dicta); *Spann v. Word of Faith Christian Ctr. Church,* 589 F. Supp. 2d 759, 762-64 (S.D. Miss. 2008); *Nails v. Dothan Rescue Mission,* 2007 WL 1100515, *5 (M.D. Ala. 2007) (unpublished); *Marshall v. Sisters of the Holy Family of Nazareth,* 399 F. Supp. 2d 597, 605-07 (E.D. Pa. 2005). *Cf. Woods v. Wills,* 400 F. Supp. 2d 1145, 1161-63 (E.D. Mo. 2005) (dicta) (expressing uncertainty regarding (without deciding) whether or not the exemption applied to individuals unaffiliated with a recognized religion). *See generally Doe v. Abington Friends School,* 480 F.3d 252 (3rd Cir. 2007). In *Doe,* the Third Circuit overruled the district court (which held the defendant exempt) on procedural grounds. *See* 480 F.3d at 258-59. Ms. Rose mischaracterizes the import of *Doe,* suggesting that "[t]he evidence upon which Agnesian relies . . . is very similar to that which the Third Circuit considered insufficient." *Rose Br. at 19.* Ms. Rose misrepresents the holding of *Doe;* the court was only asked to decide whether or not the plaintiff was entitled to discovery. *See* 480 F.3d at 254. The court did not reach the merits. *See id* at 258-59. Furthermore, Ms. Rose juxtaposes two sections of the court's opinion, errantly referencing the plaintiff's discovery requests as the court's holding. *Cf. Doe,* 480 F.3d at 255 *with Rose Br. at 18-19.* Unlike the plaintiff in *Doe,* Ms. Rose conducted substantial discovery related to Agnesian's exempt status. In addition to the written discovery discussed *infra* footnote seventeen, Ms. Rose deposed several individuals affiliated with Agnesian. *See Krokosky Supp.* ¶¶ 6-8.

[17] The court need not be distracted by Ms. Rose's suggestion that Agnesian did not plead the religious exemption as an affirmative defense. *See Rose Br. at 16.* In answering Ms. Rose's complaint, Agnesian plead: "fail[ure] to state a

## A. AGNESIAN IS CONTROLLED BY THE CONGREGATION OF SISTERS OF ST. AGNES ("CONGREGATION"), A CATHOLIC ORGANIZATION.

Ms. Rose does not dispute that the Congregation is a religious organization. *See Agnesian P.F.F. ¶ 13. See also Agn. Resp. Rose A.P.F. ¶ 51 (citing Brown Dep. 40:12-20, 53:14-51:1, 56:13-21, 57:22-58:3, 20-23, 65:10-18)*. Therefore, to qualify for the exemption, Agnesian need only prove that it is controlled by the Congregation. *See* 42 U.S.C. § 12187. The word "controlled" is not defined within the statute or the implementing regulations. Accordingly, the court must give the word its "plain meaning unless doing so would frustrate the overall purpose of the statutory scheme, lead to absurd results, or contravene clearly expressed legislative intent." *Gillespie v. Equifax Info. Sys., L.L.C.,* 484 F.3d 938, 941 (7th Cir. 2007) (citations omitted). As used in § 12187, "controlled" is the past participle of the verb "control." *See* Oxford English Dictionary 853 (2nd ed. 1989). In that form, "control" means "to exercise power or influence over" or "to regulate or govern." Black's Law Dictionary 378 (9th ed. 2009).[19] *See Carmichael v.*

---

claim for which relief may be granted." *See Docket ##12, 30, Affirmative Defense No. 5.* Even if the court considers Agnesian's pleading vague, Ms. Rose was not harmed by same. *See Spann,* 589 F. Supp. 2d at 763-64 (religious exemption not unexpected). *See also Curtis v. Timberlake,* 436 F.3d 709, 711 (7th Cir. 2005) (citations omitted) ("delay in asserting an affirmative defense waives the defense only if the plaintiff was harmed"). Agnesian produced its Corporate Bylaws in response to Ms. Rose's First Request for Production. *See Krokosky Supplemental Affidavit ("Krokosky Supp."). ¶ 2.* Agnesian also produced several documents (including its listing in the Official Catholic Directory) over one month before filing this motion. *See Krokosky Supp. ¶ 4.* Moreover, after Agnesian moved for summary judgment all parties entered into a stipulation that extended Ms. Rose's time to respond. *See Docket #50* ("In order for Plaintiff . . . to conduct the discovery that she believes is necessary to respond to . . . Defendant Agnesian Healthcare, Inc.'s Motion for Summary Judgment . . ."). Thereafter, Agnesian responded to two Requests for Admission, fourteen Interrogatories, and ninety two Requests for Production. *See Krokosky Supp. ¶ 5.* If Ms. Rose desired additional discovery, then her remedy was to file a motion pursuant to Fed. R. Civ. P. 56(f). *See Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co.,* 826 F.2d 725, 726-27 (7th Cir. 1987).

[18] There is no basis for Ms. Rose's suggestion that "[t]he DOJ's guidance uses the term 'very broad' to refer to the *effect* of the exemption once an organization qualifies for it, not to [sic] *whether* an organization or entity qualifies for it." *Rose Br. at 17 (italics original).* Given the placement of the comma, the phrase "encompassing a wide variety of situations" should be read to refer to the scope of the exemption generally.

[19] The last definition of "control" (listed in Black's) is "to have a controlling interest in <the five shareholders controlled the company>." This definition makes sense in certain contexts, e.g., applicability of the Employee Retirement Income Security Act. *See Cent. States, Se. and Sw. Areas Pension Fund v. White,* 258 F.3d 636, 640-41 (7th Cir. 2001). However, if the court used this narrow definition in the context of the exemption it would "frustrate the overall purpose of the [otherwise broad] statutory scheme." *See Gillespie,* 484 F.3d at 941.

*Payment Ctr.,* 336 F.3d 636, 640 (7th Cir. 2003) (the court may consult a dictionary to find the plain meaning of a word).

The undisputed evidence proves that the Congregation exercises power and influence over Agnesian's operations; the same evidence proves that the Congregation regulates and governs Agnesian's operations. As set forth in Agnesian's Corporate Bylaws, Agnesian's Class A Members[20] possess <u>exclusive</u> authority to exercise five fundamental powers:

> (a) To adopt or change the mission, philosophy, and values of the corporation . . .
> (c) To amend or repeal the Articles of Incorporation and Bylaws which affect the reserved powers of the Members . . . (f) To appoint the Class B Members of the Corporation and to remove such Class B Members with or without cause. (g) To appoint and remove the Executive Leader of Sponsorship and the Presiding Member of the Class B Members . . . (n) To approve the dissolution and/or liquidation of this Corporation or any corporation of which this Corporation is the controlling shareholder or member or the consolidation or merger of this Corporation with another corporation or entity or the closure of any institution or major ministry or work conducted by the Corporation.

*Agnesian P.F.F. ¶¶ 16-17. See also Agn. Resp. Rose A.P.F. ¶ 54 (citing Brown Dep. 122:6-123:3).* Additionally, the Class A Members have the <u>sole discretion to delegate</u> a variety of powers to the Class B Members if they so choose.[21] In other words, although the Class B Members have some responsibilities *(Rose Br. 21)*, they perform those functions at the pleasure of the Class A Members; the Class A Members may rescind the delegated authority at any time. *See Agn. Resp. Rose A.P.F. ¶ 71 (citing Brown Dep. 203:25-204:5).* Moreover, the Class A Members may summarily terminate Class B Members at will. *See Agnesian P.F.F. ¶ 17.*

---

[20] Agnesian's Class A Members must be members of the Congregation. *See Agnesian P.F.F. ¶¶ 14-15.*

[21] Class B Members are important to the functioning of the Congregation's sponsored ministries; they maintain institutional knowledge regarding issues affecting same. *See Agn. Resp. Rose A.P.F. ¶ 67 (citing Brown Dep. 204:6-206:2).* Although not required to be religiously affiliated, Class B Members must support the Congregation's mission. *See Agn. Resp. Rose A.P.F. ¶ 53 (citing Brown Dep. 182:22-183:9).*

The Class A Members' reserved powers, as set forth in Agnesian's Corporate Bylaws, highlight that the Congregation possesses ultimate authority over Agnesian and its operations. *See Agnesian P.F.F. ¶¶ 16-17. See also Agn. Resp. Rose A.P.F. ¶ 54 (citing Brown Dep. 122:6-123:3, Fale Dep. 107:24-108:21).*[22] That said, taking an unduly narrow view, Ms. Rose argues that the Board, by carrying out the functions identified in Agnesian's Corporate Bylaws, exercises control of Agnesian. *See Rose Br. at 19-21.* Although the Board carries out some functions, as set forth in Agnesian's Corporate Bylaws, the Board must function in a manner "consistent with the Articles of Incorporation and the[] [Corporate] Bylaws, and the policies established by the [Corporate] Members." *See Agnesian P.F.F. ¶ 18.*[23] Additionally, the Class A Members possess the power to appoint members to the Board. *See Agn. Resp. Rose A.P.F. ¶ 68.* Moreover, the Board includes (at least) two Congregational advocates: the General Superior (or her designee) and the Executive Leader of Sponsorship. *See Agn. Resp. Rose A.P.F. ¶ 59 (citing Agnesian's Corporate Bylaws §3.1).* That the Board exercises some powers does not defeat the Congregation's power and influence over Agnesian; the ultimate power and influence over

---

[22] Ms. Rose's attempt to distinguish the Congregation's relationship with Agnesian "then" versus "now" should not be of consequence. *See Rose Br. at 19-20.* Ms. Rose appears to argue that Agnesian's corporate status (i.e., that it was separately incorporated) affected the control exercised by the Congregation; however, she provides no evidence to support that assertion. Moreover, to the extent that the historical changes are relevant, the court should note that Agnesian's corporate model resulted from contemporaneous changes in the Catholic Church. *See Agn. Resp. Rose A.P.F. ¶ 49 (citing Brown Dep. 167:22-170:9, 177:17-179:5).*

[23] The Board members' religious affiliations are irrelevant to deciding whether or not the Congregation controls Agnesian. Similarly, the Board members' religious affiliations are of little consequence to finding that Agnesian is a "religious organization." *See* 28 C.F.R. Pt. 36 App. B. To the extent that Board members' beliefs are relevant, Agnesian's Board must act in accordance with the Ethical and Religious Directives for Catholic Health Care Services. *See Agn. Resp. Rose A.P.F. ¶ 52 (citing Brown Dep. 192:3-194:7). See also Agnesian P.F.F. ¶ 12.* Moreover, Agnesian's Board members must support Agnesian's mission. *See Agn. Resp. Rose A.P.F. ¶ 52 (citing Fale Dep. 47:4-22, 106:22-107:23).*

Agnesian's operations is exercised by the Class A Members, who possess non-delegable reserve powers and the ability to rescind delegated authority.[24]

## B. AGNESIAN IS A RELIGIOUS ORGANIZATION.

The undisputed evidence proves that Agnesian is a religious organization. *See Agnesian P.F.F. ¶¶ 11-13, 19-22.* Like "control," the word "religious" must be defined consistently with its plain meaning because it is not defined in the statute or in the implementing regulations. *See, e.g., Gillespie,* 484 F.3d at 941. When used as an adjective, as it is in § 12187, "religious" means "[i]mbued with religion; exhibiting the spiritual or practical effects of religion . . ." "[o]f the nature of, pertaining or appropriate to, concerned or connected with religion." Oxford at 570.

The Catholic Church recognizes Agnesian as an affiliated organization, as evidenced by Agnesian's listing in The Official Catholic Directory.[25] *See Agnesian P.F.F. ¶¶ 19-20; Agn.*

---

[24] Ms. Rose places undue weight on the Third Circuit's decision in *Doe,* with respect to the areas that court thought were relevant (i.e., ownership and day-to-day oversight) to determining "control." *See* 480 F.3d at 258. With respect to ownership, although Agnesian owns the Fond du Lac Regional Clinic building and the real property on which it sits, *Treml Aff. ¶¶ 2-3,* Agnesian's Corporate Bylaws specify that should Agnesian be dissolved the corporate assets must be disposed of to the Congregation (or its designee) in accordance with civil and Church law. *See Agn. Resp. Rose A.P.F. ¶ 49 (citing Agnesian Healthcare, Inc. Corporate Bylaws § 1.5).* With respect to oversight, it appears that Ms. Rose reads *Doe* to require that the Congregation be visibly involved in Agnesian's operations. *See Rose Br. at 21-22 ("neither CSA not the Class A Members are authorized to, inter alia: determine which healthcare services Agnesian offers . . .").* Although the legal basis for Ms. Rose's point-of-view is unclear, she may believe that her argument is grounded in the implementing regulations, which provide: "[t]he test is whether the . . . religious organization operates the public accommodation . . ." *See* 28 C.F.R. Pt. 36 App. B. Like "controlled," the word "operates" is not defined in the implementing regulations. Accordingly, the court must endeavor to define the word consistent with its plain meaning. *See Lewis v. Atlas Van Lines, Inc.,* 542 F.3d 403, 409 (3rd Cir. 2008) (using dictionary to give ordinary meaning to undefined word used in regulation). In this context, used as a transitive verb, the word "operate" means "[t]o direct the working of; to manage, conduct, work (a railway, business, etc.)." Oxford 848. Like "control," the definition of "operate" is not limited to the performance of any one set of activities. In light of the Class A Members' reserved powers, the Class A Members' ability to rescind the powers they delegated to the Class B Members, and the dominant position of the Class A Members vis-à-vis the Board, the Class A Members (and the Congregation) certainly "direct the work[] of" and "manage" Agnesian. Among other things, the Class A Members maintain the exclusive authority "to adopt or change the mission, philosophy, and values of the corporation." *Agnesian P.F.F. ¶ 17.*

[25] Agnesian's listing in The Official Catholic Directory serves as the basis for its 501(c)(3) tax exempt status. *Agnesian P.F.F. ¶¶ 21-22.* Without contesting the underlying basis for Agnesian's tax exempt status, Ms. Rose asserts that Agnesian's tax exempt status "does not establish that it is a religious organization[,]"delineating three arguments in support of her claim: (1) "Agnesian does not claim that it has 501(c)(3) status solely based on religious purposes[;]" (2) "the Internal Revenue Service's ('IRS's') criteria for 501(c)(3) eligibility do not require that an

*Resp. Rose A.P.F. ¶ 102 (citing Brown Dep. 189:3-13, 191:5-12; Fale Dep. 95:10-16, 96:18-98:9). See Hartwig v. Albertus Magnus College,* 93 F. Supp. 2d 200, 202-03 (D. Conn. 2000) (<u>The Official Catholic Directory</u> "is the definitive compilation of Roman Catholic institutions in the United States"); *Legion of Christ, Inc. v. Mount Pleasant,* 24 Misc.3d 706, 714 (N.Y. Sup. Ct. 2009) ("[<u>T]he Official Catholic Directory</u>, an official listing of Roman Catholic organizations . . . compiled and published annually by the Church."); *Petti v. Register of Wills,* 1990 WL 10930 (Md. Tax 1968).[26] In addition to being recognized by the Catholic Church, Agnesian is sponsored by a Catholic organization: the Congregation. *See Agnesian P.F.F. ¶ 13. See also Agn. Resp. Rose A.P.F. ¶ 51 (citing Brown Dep. 40:12-20, 53:14-55:1, 56:13-21, 57:22-58:3, 20-23, 65:10-18).*[27] Moreover, consistent with its ties to the Catholic Church, Agnesian's leaders receive training in Catholic beliefs. *See Agn. Resp. Rose A.P.F. ¶ 52 (citing Tirado-Kellenberger Dep. 90:19-91:15, 93:9-94:5, 99:18-100:16.)*

Agnesian's ties to the Catholic Church include its subscription to the Ethical and Religious Directives for Catholic Health Care Services ("ERDs"). *See Agnesian P.F.F. ¶ 12. See also Agn. Resp. Rose A.P.F. ¶ 52 (citing Brown Dep. 192:3-194:7).* The ERDs, which are

---

entity be a 'religious organization' or 'controlled by a religious organization[;]" and, (3) " the IRS has granted Agnesian that status under a group exemption letter . . ." *Rose Br. at 23.* Regardless of who determined that Agnesian should be included in <u>The Official Catholic Directory</u>, which Ms. Rose accurately observes is the Catholic diocese in which Agnesian is located *(Rose Br. at 14, 23),* the Internal Revenue Service was the agency that determined that Agnesian is tax exempt. *See Treml Aff. ¶¶ 8-9. See also New Dynamics Found. v. U.S.,* 70 Fed. Cl. 782, 795 (Fed. Cl. 2006) (tax exempt determination qualifies for presumption of correctness).

[26] Ms. Rose suggests that if the court holds entities listed in <u>The Official Catholic Directory</u> exempt from Title III of the ADA, "a significant number of healthcare providers in this country could deny healthcare services on the basis of disability without fear of liability under the ADA." *Rose Br. at 24.* Even if Ms. Rose's argument has some rhetorical appeal, she provides no evidence in support of her claim. Moreover, "[t]he role of the federal courts is to ensure that Congress acts within its constitutional bounds, not to substitute their own judgment for Congress' as to the fairest solution to a social problem." *Peick v. Pension Ben. Guar. Corp.,* 724 F.2d 1247, 1265 (7th Cir. 1983). Finally, Agnesian notes that its listing in <u>The Official Catholic Directory</u> is only one source of evidence upon which it relies.

[27] Agnesian's senior leaders consider Agnesian a Catholic organization. *See Agn. Resp. Rose A.P.F. ¶ 50 (citing Fale Dep. 110:18-111:12, 113:21-114:3; Tirado-Kellenberger Dep. 105:9-105:23).*

promulgated by the United States Conference of Catholic Bishops, inform all levels of decision-making at Agnesian. *See* Ethical and Religious Directives for Catholic Health Care Services (4th ed. 2001) *available at* http://www.usccb.org (Part 1, Dir. 5). And, Agnesian's subscription to the ERDs refutes Ms. Rose's suggestion that Agnesian is not a "religious organization."[28] Agnesian's Catholic roots, including its long-standing relationship with the Catholic Congregation that founded it, are highlighted in its mission statement, which reads in part: "[w]e are rooted in the healing ministry of the Catholic Church as we continue the mission of our sponsor, the Congregation of Sisters of St. Agnes." *Agnesian P.F.F. ¶ 11. See Agn. Resp. Rose A.P.F. ¶ 51 (citing Brown Dep. 40:12-20, 53:14-55:1).* Given its ties to the Catholic Church, there should be no question that Agnesian's operations are imbued with, and exhibit the practical effects of, the Catholic religion.

### III. CONCLUSION

In light of the fact that Dr. Meress/TCI took the treatment decision out of Dr. Cahee's hands, Ms. Rose has not proven that she was subjected to discriminatory conduct. Therefore, Agnesian requests that the court grant summary judgment in its favor on all claims.

---

[28] Although Ms. Rose recognizes that Agnesian "has historical links to the Catholic Church and continues to be influenced by those roots *(Rose Br. 25; underscore added),* she asserts that Agnesian is not a "religious organization" because: (1) Agnesian employees need not be religiously affiliated; (2) Agnesian patients need not be religiously affiliated; and, (3) Agnesian employees respect their patients' religious beliefs. *See Rose Br. at 22-23.* Ms. Rose's narrow view of Catholic healthcare runs contrary to the values underlying same; Catholic healthcare seeks to benefit all individuals in need. *See, e.g.,* Ethical and Religious Directives for Catholic Health Care Services (4th ed.) *available at* http://www.usccb.org. (General Introduction: "They are joined in the Church's health care mission by many men and women who are not Catholic."; Pt. One, Dir. 1: "A Catholic institutional health care service is a community that provides health care to those in need of it."; Pt. 3, Dir. 23: "The inherent dignity of the human person must be respected and protected regardless of the nature of the person's health problem or social status. The respect for human dignity extends to all persons who are served by Catholic health care."). *See also Agn. Resp. Rose. A.P.F. ¶ 51 (citing Brown Dep. 53:14-55:1), ¶¶ 89, 91, 93 (citing Brown Dep. 53:14-55:1; Fale Dep.106:22-107:23; Tirado-Kellenberger Dep.103:24-105:23).* Moreover, although employees are not required to be religiously affiliated, Agnesian's directors (i.e., individuals functioning in a supervisory capacity) receive training in Catholic beliefs. *See Agn. Resp. Rose A.P.F. ¶ 52 (citing Tirado-Kellenberger Dep. 90:19-91:15, 93:9-94:5, 99:18-100:16).* Finally, in addition to providing services to all-comers based on its core values, Agnesian is required (by law) to provide services to patients irrespective of religious beliefs. *See, e.g.,* 42 U.S.C. § 1395dd.

Dated at Milwaukee, Wisconsin this 25th day of February 2010.

Respectfully submitted,

BY:     s/ Neal S. Krokosky
        Laurie J. McLeRoy, Wis. Bar No. 1018964
        Neal S. Krokosky, Wis. Bar No. 1061620
        Attorneys for Defendant,
        Agnesian Healthcare, Inc.
        700 N. Water St., Suite 800
        Milwaukee, WI  53202
        Telephone: (414) 271-7271
        Facsimile: (414) 271-7272
        Email: lmcleroy@otjen.com
                nkrokosky@otjen.com