# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MELODY J. ROSE,

                Plaintiff,

      v.                                            Case No. 09-CV-142

STEVEN M. CAHEE, M.D.,
FOND DU LAC REGIONAL CLINIC, S.C., and
AGNESIAN HEALTHCARE, INC.,

                Defendants.

## ORDER

Plaintiff Melody Rose ("Rose") brings this action alleging violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12181 *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, and Wisconsin statutes § 106.52 and § 252.14. Rose's claims stem from the alleged refusal of defendant Dr. Steven Cahee ("Dr. Cahee") to perform gallbladder surgery on Rose because she is infected with human immunodeficiency virus (HIV). The three defendants filed two separate motions for summary judgment that are now before the court. Defendants Dr. Cahee and the Fond du Lac Regional Clinic, S.C. ("Fond du Lac Clinic" or "the Clinic") argue in the first motion that they are not subject to the ADA or the Rehabilitation Act, that they are entitled to judgment as a matter of law even if they are subject to the federal laws, and that the Wisconsin state law claims are preempted. Defendant Agnesian Healthcare, Inc. ("Agnesian") files an independent motion for summary judgment arguing: 1) that it is statutorily exempt from Title III of

the ADA because it is an entity controlled by a religious organization; and 2) that Rose cannot prove her remaining claims. The motions involve overlapping factual issues and the court will address them in a single order for the sake of efficiency. Based on the reasoning set forth below, the court will grant, in part, and deny, in part, each of the motions filed by the defendants.

## BACKGROUND

### I. Medical Treatment Provided to Rose

Plaintiff Rose lives with HIV and has done so since before the medical consultation with Dr. Cahee that underlies this action. (Agnesian's Responses to Plaintiff's Additional Proposed Findings of Fact (PFOF) ¶¶ 1, 10). During the medical consultations and treatment at issue, Rose was an inmate at Taycheedah Correctional Institution ("Taycheedah") in Fond du Lac, Wisconsin. (Plaintiff's Response to Dr. Cahee's and Fond du Lac Clinic's Proposed Findings of Fact, (CFOF), ¶ 4; PFOF ¶ 2). Rose received medical treatment from several physicians during her incarceration. Her HIV was treated by Dr. Graziano, an immunologist and HIV specialist at the University of Wisconsin Hospital and Clinics, and her general care was provided by Dr. Steven Meress, a physician who provides services to Taycheedah prisoners. (PFOF ¶ 3, 4; CFOF ¶ 27; AFOF ¶ 23).

Dr. Graziano first saw Rose on January 9, 2008, and learned from Rose that she had a history of gallbladder infections. (CFOF ¶ 28). Rose visited Dr. Graziano again on February 27, 2008, and Dr. Graziano determined that she should be placed

-2-

on antiretroviral medications to treat her HIV. (PFOF ¶ 6; CFOF ¶¶ 30, 31). However, Dr. Graziano did not begin Rose on medications at the time of her appointment because he first wanted Rose evaluated for gallbladder surgery. (CFOF ¶¶ 32, 33; PFOF ¶ 7). Because of Dr. Graziano's concerns, Rose's general physician, Dr. Meress, referred Rose for a surgical consult through the prison's off-site service request process. (PFOF. ¶ 9; CFOF ¶ 35; AFOF ¶ 24). Rose was referred to Dr. Cahee at the Fond du Lac Clinic for a surgical consultation regarding the removal of her gallbladder. (CFOF ¶ 38). Dr. Cahee is a licensed general surgeon and Rose met with him at the clinic on March 7, 2008. (AFOF ¶ 8; PFOF ¶ 10).

During Rose's consultation with Dr. Cahee, the surgeon confirmed that she was seeing him because of issues with her gallbladder. (PFOF. ¶ 16). Rose and Dr. Cahee then discussed the matter of Rose's HIV and the level of her viral load. (PFOF ¶ 17). The subsequent exchange between Rose and Dr. Cahee is in dispute. Rose testified that when Dr. Cahee learned her viral load, he informed her that he would not do the surgery because of the danger it posed to him and his surgical team. Dr. Cahee, however, has a different interpretation of events. Dr. Cahee claims that he left the appointment without ever making a final decision or recommendation regarding surgery because he wanted further information. Following the appointment, Taycheedah faxed Dr. Cahee an ultrasound report regarding Rose's gallbladder and a list of Rose's medications. (PFOF ¶ 21). Approximately one month after his consultation with Rose, on April 9, 2008,

-3-

Dr. Cahee dictated notes regarding their meeting. (PFOF ¶ 22; AFOF ¶ 43). Dr. Cahee made the following statement in his notes: "It seems reasonable to remove her gallbladder, although if she does indeed, as she says, have HIV with a high viral load, it seems reasonable that she might be started on medication for this as it could reduce the risk of exposure to the surgical team." (PFOF ¶¶ 33, 34; CFOF ¶ 51).

In the meantime, Rose resumed normal treatment at Taycheedah following her consultation at the Fond du Lac Clinic. During a visit with Dr. Meress at the prison, Rose informed him that Dr. Cahee refused to perform surgery because she was HIV positive. (PFOF ¶ 25). Dr. Meress followed up on Rose's comments by contacting Dr. Cahee via telephone on March 20, 2008. (CFOF ¶ 52; AFOF ¶ 40). Dr. Cahee responded to Dr. Meress's inquiries by stating that he would not perform surgery because Rose was not on HIV medications, resulting in a risk to him and his surgical team. (PFOF ¶ 26). Dr. Cahee also noted that he would not perform any surgery until Rose had been taking HIV medications for a month. (PFOF ¶ 27). Dr. Meress then contacted Dr. Graziano and reported to him the comments made by Dr. Cahee. (PFOF ¶ 31). Dr. Graziano instructed Dr. Meress to send Rose to the University of Wisconsin to have surgery performed. (PFOF ¶ 32; CFOF ¶ 54; AFOF ¶ 44).

Rose traveled to the University of Wisconsin on April 17, 2008, for a consultation regarding her gallbladder. (PFOF ¶ 35). Dr. Jon Gould, a surgeon at the University facility, determined that Rose's gallbladder should be removed

-4-

because it contained gallstones and because she reported symptoms of biliary colic. (PFOF ¶¶ 36-37). Rose's HIV and the status of her HIV medications did not play any role in Dr. Gould's decision. (PFOF ¶ 38). Dr. Gould removed Rose's gallbladder approximately six weeks later, on June 2, 2008. (PFOF ¶ 39; CFOF ¶ 56; AFOF ¶ 47).

## II.     Relationship Between the Fond du Lac Clinic and Agnesian Healthcare

Rose was referred to the Fond du Lac Clinic for her surgical consultation with Dr. Cahee. The Fond du Lac Clinic is both the name of the clinic facility in which patients receive care and the name of the service corporation owned by physicians who provide medical services at the facility. The clinic building and the property on which it sits are owned by Agnesian and Agnesian directly employs certain staff, such as nurses and receptionists, to provide services there. (AFOF ¶¶ 5, 6; CFOF ¶¶ 10, 11). Agnesian provides health services to individuals incarcerated at Taycheedah, pursuant to an ongoing contractual agreement with the Wisconsin Department of Corrections under which Agnesian arranges health services for incarcerated individuals. (PFOF ¶ 41). Consequently, inmates at Taycheedah are often referred to the Fond du Lac Clinic and St. Agnes Hospital, another nearby facility run by Agnesian. (PFOF ¶ 42).

The Fond du Lac Clinic site and facilities are owned by Agnesian but the Fond du Lac Clinic, S.C. is a service corporation owned by its shareholder physicians. (AFOF ¶ 7; CFOF ¶ 13). These physicians, such as Dr. Cahee, provide services at

Agnesian's facilities but are directly employed by the service corporation. (PFOF ¶ 11). The service corporation that is the Fond du Lac Clinic provides professional services at the clinic facility pursuant to a Professional Services Agreement with Agnesian. (CFOF ¶ 12). Though the service corporation provides the medical services, Agnesian staff schedules patients to be seen by the Clinic's physicians and Agnesian personnel run the Clinic's Business Department. (CFOF ¶¶ 15, 24). Agnesian handles all billing for medical services provided at the Clinic by collecting payments and setting the rates for physicians. (CFOF ¶ 16-18). Agnesian generates bills for services provided to patients by Clinic physicians and sends them to third-party payors. (CFOF ¶¶ 19-20). Agnesian then collects payments for the medical services and distributes a portion of the proceeds to the service corporation as compensation under their agreement. The Fond du Lac Clinic then compensates its employees based on provisions in the agreement. (CFOF ¶ 21). Though the Fond du Lac Clinic pays its own employees, Agnesian oversees the compensation by requiring the Clinic to submit information verifying that it is paying its physicians in compliance with the agreement. (CFOF ¶ 22).

III. **Operation and Control of Agnesian**

Agnesian is a not-for-profit, tax-exempt corporation organized under Wisconsin law that presents itself as an integrated healthcare system. (AFOF ¶¶ 19, 21; PFOF ¶¶ 45, 47). Agnesian is sponsored by the Congregation of the Sisters of Saint Agnes of Fond du Lac, Wisconsin, a Roman Catholic religious institute, and

-6-

Agnesian's mission statement notes: "We are rooted in the healing ministry of the Catholic church as we continue the mission of our sponsor, the Congregation of Sisters of St. Agnes." (AFOF ¶¶ 11, 13). Agnesian operates in accordance with the "Ethical and Religious Directives for Catholic Health Services," Fourth Edition, and is listed in the Official Catholic Directory. (AFOF ¶¶ 12, 19). However, Agnesian is separately incorporated and the corporation does not issue stock or other equity and does not have shareholders. (PFOF ¶¶ 49, 51, 52, 84).

Though Agnesian is separately incorporated, its corporate membership overlaps with that of the Congregation of the Sisters of Saint Agnes. Agnesian's corporate membership is comprised of Class A Members and Class B Members. (AFOF ¶ 14). In order to be a Class A Member, an individual must also be a member of the Congregation of the Sisters of Saint Agnes. (AFOF ¶ 15). A person need not be either Catholic or Christian to be a Class B Member. (PFOF ¶ 53). Class A Members have the sole authority to appoint Class B Members, amend or repeal the Bylaws or Articles of Incorporation for Agnesian, appoint the Executive Leader of Sponsorship and Presiding Member of the Class B Members, and dissolve, liquidate or merge Agnesian with another entity. (AFOF ¶¶ 16, 17). Class B Members of the corporation recommend a candidate for appointment to the position of Executive Leader of Sponsorship to the Class A Members. (PFOF ¶ 81). The Executive Leader of Sponsorship is an ex officio Director of Agnesian and serves as a Class B Member, Executive Committee member, and a Development

-7-

Committee member, but has no extra power or authority than other committee members. (PFOF ¶ 83).

## ANALYSIS

The three defendants have filed two separate motions for summary judgment asking the court to enter judgment as a matter of law on each of Rose's claims. Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Wis. Alumni Research Found. v. Xenon Pharms., Inc.*, 591 F.3d 876, 882 (7th Cir. 2010). A genuine issue of material fact exists when a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party opposing summary judgment cannot simply rest on allegations or denials in its pleadings, but rather, it must introduce affidavits or other evidence setting forth specific facts showing a genuine issue for trial. *Anders v. Waste Management of Wisconsin*, 463 F.3d 670, 675 (7th Cir. 2006). Because the motions for summary judgment were filed by the defendants, the court must view all facts and draw all reasonable inferences in favor of the plaintiff. *See Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006).

## I.     Motion Filed by Dr. Cahee and Fond du Lac Clinic

Dr. Cahee and the Fond du Lac Clinic filed a joint motion for summary judgment asking the court to enter judgment in their favor on Rose's claims under

-8-

the Rehabilitation Act, the ADA, and Wisconsin statutes § 106.52 and § 252.14. The court will address the arguments corresponding to each claim in turn.

## A. Rehabilitation Act Claim Against Dr. Cahee and the Fond du Lac Clinic

Rose asserts that Dr. Cahee and the Fond du Lac Clinic violated Section 504 of the Rehabilitation Act when Dr. Cahee refused to provide Rose with medical services because of her HIV. Section 504 prohibits programs that receive federal funds from discriminating against an individual based on disability, and reads in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined in section 29 U.S.C. § 705(20), shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). The law applies to programs or entities which receive Medicare and Medicaid funds for the provision of medical services to patients. *United States v. Baylor University Medical Center*, 736 F.2d 1039, 1043 (5th Cir. 1984). Acceptance of such federal funds obligates an entity to comply with the requirements of the Rehabilitation Act and opens them up to liability for violating the Act. *See Grzan v. Charter Hospital*, 104 F.3d 116, 120 (7th Cir. 1997). Dr. Cahee and the Fond du Lac Clinic argue, however, that Agnesian is the entity which receives federal financial assistance in the form of Medicare and Medicaid payments and that

-9-

they are merely indirect beneficiaries of these funds. Thus, they are not subject to liability under Section 504 of the Rehabilitation Act.

A plaintiff asserting a claim for the violation of Section 504 of the Rehabilitation Act must establish that the program or activity in question receives federal financial assistance. *See Grzan*, 104 F.3d at 119. Congress limited coverage to those actually receiving federal financial assistance "because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept federal funds." *Grzan*, 104 F.3d at 120 (quoting *United States Depart of Transportation v. Paralyzed Veterans of America,* 477 U.S. 597, 605 (1986)). Liability under the Rehabilitation Act ends with the entity who directly receives the federal funds because "coverage of the Rehabilitation Act does not follow federal aid past the intended recipient to those who merely derive a benefit from the aid or receive compensation for services rendered pursuant to a contractual arrangement." *Id.* (quoting *Gallagher v. Croghan Colonial Bank*, 89 F.3d 275, 278 (6th Cir. 1996)). An indirect beneficiary, such as an employee of an entity who receives federal funds, does not himself "receive" federal financial assistance and is not subject to liability under the law. *See id*.

Dr. Cahee and the Fond du Lac Clinic do not directly receive any Medicare or Medicaid funds. Agnesian bills patients and is the direct recipient of all patient payments from federal funds. Agnesian then pays the Fond du Lac Clinic pursuant to the contractual agreement between the parties. These payments are

-10-

presumptively made from general Agnesian proceeds as there is no evidence that they are earmarked from any particular source. Thus, there is no direct receipt or pass-through of Medicare and Medicaid funds and Dr. Cahee and the Clinic cannot be deemed "recipients" of federal funds. Instead, the Clinic functions as a contractor for Agnesian and receives compensation for the services its physicians provide, pursuant to the Professional Services Agreement. The simple receipt of compensation for medical services provided under a contract does not render the Clinic or Dr. Cahee subject to the obligations of Section 504. The Seventh Circuit explicitly stated that the Rehabilitation Act "does not follow federal aid past the intended recipient to those who merely...*receive compensation for services rendered pursuant to a contractual arrangement.*" (emphasis added) *Grzan*, 104 F.3d at 120.

Rose attempts to downplay the import of the Seventh Circuit's statement by arguing that liability under the Rehabilitation Act is contractual in nature and that Dr. Cahee and the Clinic obligated themselves by committing to the treatment of Medicare and Medicaid patients in the Professional Services Agreement they signed with Agnesian. Rose is correct that the United States Supreme Court describes coverage under Section 504 as "a form of contractual cost of the recipient's agreement to accept the federal funds" and emphasizes that entities with decision-making power are subject to the Act's requirements because the entities are "in a position to accept or reject those obligations as a part of the decision whether or not to 'receive' federal funds." *U.S. Dept. of Transportation v. Paralyzed Veterans of*

-11-

*America*, 477 U.S. 597, 605-06 (1986).  Rose notes that Dr. Cahee and the Fond du Lac Clinic signed an agreement with Agnesian which requires them to accept Medicare and Medicaid patients and to retain eligibility for payment from the programs.  However, the fact that the Clinic made contractual promises to *Agnesian* does not render it a "recipient" of federal funds or grant the Clinic the power to decide whether Agnesian will accept Medicare and Medicaid funds.  Agnesian has sole decision-making authority regarding acceptance of federal funds because Agnesian schedules the patients and handles billing.  Neither Dr. Cahee nor the Clinic has the power to decide whether to treat Medicare and Medicaid patients, regardless of whether they agreed to do so in the contractual agreement.  Only Agnesian can agree to or does accept Medicare and Medicaid funds.  Therefore, only Agnesian takes on the attendant obligations under the Rehabilitation Act.

Alternatively, Rose argues that Dr. Cahee's and the Clinic's interdependent relationship with Agnesian renders them subject to the Rehabilitation Act despite being indirect recipients of federal funds.  She relies upon a Fifth Circuit case, *Frazier v. Board of Trustees of Northwest Mississippi Regional Medical Center*, 765 F.2d 1278 (5th Cir. 1985), to support her proposition.  In *Frazier*, the court found that a private corporation which contracted with a hospital to provide respiratory therapy services fulfilled the "receipt of federal financial assistance" requirement of Section 504 and was subject to the Rehabilitation Act. 765 F.2d at 1288-89.  The hospital received direct Medicare and Medicaid payments, but paid the private corporation

-12-

for its contracted services out of a general hospital fund. *Id.* at 1289. However, the hospital did not earmark for the corporation any Medicare or Medicaid receipts it received as a result of respiratory services provided by the corporation. *Id.* The court noted that the private corporation was not a "disinterested spectator" in its attitude towards the federal financial assistance received by the hospital, but instead, the corporation "reaped a percentage benefit of revenues generated by Medicare and Medicaid patients treated in the respiratory therapy department." *Id.* at 1290. The court found that the private corporation was as "much a recipient of these funds as the hospital" because the hospital "would not have reaped that portion of its federally funded revenue but for the provision of services by [the private corporation]." *Id.* at 1290.

Reliance upon the *Frazier* case is appealing given that the case involves facts very similar to the case currently before the court. As in *Frazier*, the Fond du Lac Clinic is a private corporation providing health care services to a larger health organization pursuant to a contract. As in *Frazier*, Agnesian presumably pays the Clinic from general funds, only some of which come from Medicare and Medicaid payments. Finally, just as in *Frazier*, Agnesian would not receive the federal funding but for the medical services provided to patients by the Clinic.

The reasoning of *Frazier* is additionally appealing because it acknowledges that the larger healthcare organization would not receive certain Medicare and Medicaid funds apart from the services provided by independent contractors. The

-13-

provision of medical services is exactly the anticipated use of Medicare and Medicaid funds. Therefore, private companies who contract to provide medical services directly to patients are different from companies who contract to provide non-medical services, such as cleaning or medical supplies, and benefit indirectly from federal monies received by the contracting hospital.

Regardless of its appeal, the Fifth Circuit's conclusion and reasoning were called into question by later statements of the United States Supreme Court and the Seventh Circuit Court of Appeals. In *Paralyzed Veterans*, a case decided after issuance of *Frazier*, the Supreme Court made a clear distinction between those entities which directly receive federal funds and are in a position to choose whether to do so, and those entities who merely benefit from a recipient's use of federal funds. 477 U.S. at 606, 610. Further, as noted above, the Seventh Circuit stated expressly in *Grzan* that Rehabilitation Act coverage does not follow federal funds such as Medicare and Medicaid payments beyond the direct recipient to those who receive compensation for services provided to the direct recipient under a contract. 104 F.3d at 120. Dr. Cahee and the Fond du Lac Clinic are not direct recipients of federal funds; they are compensated pursuant to a contract with Agnesian. Further, they do not decide whether Agnesian will accept Medicare and Medicaid patients and the federal funds that accompany them. Therefore, the court cannot find that Section 504 covers Dr. Cahee and the Fond du Lac Clinic and the court will grant summary judgment as to Rose's Rehabilitation Act claim.

-14-

**B.     ADA Claim Against Dr. Cahee and the Fond du Lac Clinic**

Rose also asserts that Dr. Cahee and the Fond du Lac Clinic violated Title III of the ADA in refusing to provide Rose with medical care because of her HIV.  Title III forbids discrimination against disabled individuals in public accommodations. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001).  Rose invokes Title III here because the professional offices of health care providers fall within the statutory definition of "public accommodation" and the statute specifically prohibits discrimination in the enjoyment of services and facilities. 42 U.S.C. § 12189(7)(F); 42 U.S.C. § 12182(a).

Dr. Cahee and the Fond du Lac Clinic first argue that Rose cannot maintain her ADA claim because she cannot establish irreparable harm, a necessary element for obtaining an injunction.  The relief Rose seeks for her ADA claim is the issuance of a permanent injunction preventing the defendants from unlawfully discriminating against Rose on the basis of her disability.  Rose requests this relief because an individual claiming a violation of Title III of the ADA cannot seek monetary relief, but may only obtain injunctive relief. *Goodwin v. C.N.J,* Inc., 436 F.3d 44, 50 (1st Cir. 2006); *Powell v. National Board of Medical Examiners*, 364 F.3d 79, 86 (2nd Cir. 2004); *Bowers v. NCAA*, 346 F.3d 402, 433 (3d Cir. 2003).  The defendants argue that Rose does not merit injunctive relief because she cannot show a real or immediate threat that Dr. Cahee or the Fond du Lac Clinic will be in a position to discriminate against her in the future.  Rose is no longer incarcerated at Taycheedah and has moved more than 80 miles away.  Therefore, the defendants conclude,

Case 2:09-cv-00142-JPS   Filed 07/22/10   Page 15 of 40   Document 114

there is no real or immediate threat that she will ever return to see Dr. Cahee at the Clinic and be refused medical services because of her disability.

The argument assumes that Rose must establish that future irreparable harm will result if the court does not issue a permanent injunction. However, the cases Dr. Cahee and the Fond du Lac Clinic cite in support of their argument that Rose must demonstrate a reasonable probability of irreparable injury differ from the instant case because they involve preliminary injunctions, and not permanent injunctions. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 99-100 (1983); *Hamlyn v. Rock Island County Metropolitan Mass Transit District*, 964 F. Supp. 272, 273 (C.D. Ill. 1997); *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 370 (2008). Rose argues that the distinction matters because she need not prove a future threat of irreparable harm in requesting a permanent injunction.

Entry of a permanent injunction requires a plaintiff to prove that he or she had no adequate legal remedy. *Crane v. Indiana High School Athletic Association*, 975 F.2d 1315, 1325 (7th Cir. 1992) (citing *Walgreen Co. v. Sara Creek Property Co.*, 966 F.2d 273, 274 (7th Cir. 1992); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2944 at 392 (1973)). A plaintiff seeking a permanent injunction is not required to show irreparable injury because irreparable injury is only one basis for showing the inadequacy of the legal remedy. *Id.* In the context of an injunction, "irreparable" means that an injury is not rectifiable by entry of a final judgment and,

-16-

therefore, "has nothing to do with whether to grant a permanent injunction."[1] *Walgreen Co.*, 966 F.2d at 275.

The defendants do not argue that Rose has an adequate legal remedy that renders injunctive relief inappropriate. Indeed, the argument would be difficult to make because the ADA provides no remedy for a violation of Title III other than injunctive relief. 42 U.S.C. § 12188, 42 U.S.C. § 2000a-3(a). Consequently, the legal remedy is clearly inadequate to rectify the violation and the court cannot grant summary judgment on this basis.

Dr. Cahee and the Fond du Lac Clinic next argue that Rose cannot maintain her ADA claim because she lacks standing. Specifically, the defendants argue that

---

[1]The defendants respond that the issue of whether "irreparable harm" is a necessary element for a permanent injunction is "at best a disputed notion in this circuit." They cite to *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003), which states the following:

> Where a permanent injunction has been requested at summary judgment, we must determine whether the plaintiff has shown: (1) success, as opposed to a likelihood of success, on the merits; (2) irreparable harm; (3) that the benefits of granting the injunction outweigh the injury to the defendant; and (4) that the public interest will not be harmed by the relief requested.

The defendants assert that the Seventh Circuit's statement means the issue of whether a plaintiff must establish "irreparable harm" to survive a summary judgment motion is arguable. This court disagrees. First, in *Collins*, the court did not address the issue of whether a plaintiff may establish the inadequacy of legal remedies to survive a summary judgment motion, or whether she must specifically establish "irreparable harm." The only element in dispute in the case was the first element: success on the merits. *Collins*, 349 F.3d at 374. Additionally, the Seventh Circuit cited *Plummer v. American Institute of Certified Public Accountants*, 97 F.3d 220, 229 (7th Cir. 1996), as support for the elements it lists. *Collins*, 349 F.3d at 374. However, *Plummer* itself does not state that a plaintiff must definitively establish irreparable harm. Instead, *Plummer* states that a court must consider "**whether the plaintiff will have an adequate remedy at law or** will be irreparably harmed if the injunction does not issue." (emphasis added) 97 F.3d at 229. Thus, the court disagrees that the necessity of establishing "irreparable harm" to survive a motion for summary judgment is a disputed matter.

-17-

Rose cannot allege an actual case or controversy because the threat of injury is neither real nor immediate. They base the assertion on Rose's release from Taycheedah and the fact that she now lives more than 80 miles from the Fond du Lac Clinic. Dr. Cahee and the Clinic conclude that Rose has no reason to ever return to see them for medical services. Therefore, no threat of future injury exists.

Rose responds that she faces a real risk of reincarceration because she must serve six and one-half years of supervised release with the Wisconsin Department of Corrections and may be revoked for violations of her release conditions. Reincarceration will place Rose back at Taycheedah and she will be referred to the Fond du Lac Clinic for medical services and may again be scheduled with Dr. Cahee.

Rose also responds to the defendants' standing argument by asserting that in reality it is a mootness argument. Article III of the United States Constitution limits the power of the federal courts to the resolution of "cases" and "controversies." *O'Sullivan v. City of Chicago*, 396 F.3d 843, 853 (7th Cir. 2005). To satisfy the constitutional requirement, the plaintiff must have "standing," which means "a personal stake in the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Id.* (citing *Flast v. Cohen*, 392 U.S. 83, 99 (1968)). To establish standing, a plaintiff must demonstrate: 1) a concrete, particularized, and actual or imminent injury, rather than one which is conjectural or

hypothetical; 2) a causal connection between the injury and the challenged conduct, such that the injury may be fairly traceable to that conduct; and 3) a likelihood that the injury will be redressed by a favorable decision. *Perry v. Sheahan*, 222 F.3d 309, 313 (7th Cir. 2000).

Rose has standing because the court must consider her situation at the time she filed suit. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 n.4 (1992) (referencing the court's "longstanding rule that jurisdiction is to be assessed under the facts existing when the complaint is filed."). When Rose initiated this action, she was incarcerated at Taycheedah and had to receive medical services at the facility chosen by the Wisconsin Department of Corrections. Taycheedah often referred inmates to the Fond du Lac Clinic and some of these inmates were seen by Dr. Cahee. Therefore, at that juncture, Rose faced a real and imminent possibility that she would again be referred to the Clinic for an appointment with Dr. Cahee.

Rose fulfills the requirements for standing because she demonstrates a concrete and actual injury that is casually connected to Dr. Cahee's challenged conduct and the injury is traceable to the conduct. Rose demonstrates that at the time of filing she faced possible referral to the Clinic where she would again be denied treatment because of the perceived danger caused by her HIV. She also demonstrates that this injury would be ameliorated by an injunction prohibiting any such future refusals of medical services based on her disability. *See Merchant v. Kring*, 50 F. Supp. 2d 433, 434-35 (W.D. Pa. 1999) (holding that a plaintiff who was

-19-

refused dental services because he was perceived to have HIV had standing to bring a claim for injunctive relief under Title III of the ADA). Therefore, the court concludes that Rose has standing.

The argument presented by Dr. Cahee and the Clinic appears to be one of mootness. They suggest that Rose's request for an injunction is mooted by her release from Taycheedah and her move to southeastern Wisconsin. Mootness, like standing, is an aspect of justiciability and limits the disputes which a federal court may hear. *Protestant Memorial Medical Center, Inc. v. Maram*, 471 F.3d 724, 729 (7th Cir. 2006). A claim becomes moot when the plaintiff's legally cognizable interest in the litigation ceases to exist or where the court "can no longer affect the rights of the litigants in the case." *Evers v. Astrue*, 536 F.3d 651, 662 (7th Cir. 2008) (quoting *Worldwide Street Preachers' Fellowship v. Peterson*, 388 F.3d 555, 558 (7th Cir. 2004)). Mootness may arise when circumstances change during the litigation such that a case or controversy no longer exists. *Ovadal v. City of Madison, Wis.*, 469 F.3d 625, 628 (7th Cir. 2006). A suit seeking only injunctive relief becomes moot "once the threat of the act sought to be enjoined dissipates." *Brown v. Bartholomew Consol. School Corp.*, 442 F.3d 588, 596 (7th Cir. 2006).

The parties spend their energy arguing about whether the court can consider the likelihood that Rose will have her supervised release revoked, that she will return to Taycheedah, and that she will subsequently be referred to the Fond du Lac Clinic for medical treatment. However, the court need not delve into the issue. Instead,

-20-

the court will address the assumption that Rose's claim is moot simply because she no longer resides in Fond du Lac. There is no evidence that Dr. Cahee or the Fond du Lac Clinic exclusively service inmates at Taycheedah. Thus, they provide medical services to the general public and Rose could choose to visit the Clinic, regardless of the fact that she now lives approximately 80 miles away. Rose is a prior patient with a history of treatment at the Clinic. Beyond the appointment with Dr. Cahee at issue here, Rose asserts that she received treatment at the Fond du Lac Clinic or St. Agnes Hospital (where Dr. Cahee also provides services) on five other occasions during her incarceration. She may choose to return to a familiar location for treatment by staff familiar with her health history. It is far from unusual for people to travel for particular health care. Further, if an injunction is put in place, Rose may actually prefer to return to the Fond du Lac Clinic to avoid a repeat experience with a different health care provider. She could then be sure of receiving medical care without incident related to her HIV because the facility would be aware of her condition and would be enjoined from denying her services because of it. The fact that Rose resides an hour and a half from Fond du Lac, versus residing in Fond du Lac, seems to be a strange and unjustifiable basis for mooting her claim. The court will not arbitrarily determine what is a "reasonable" distance to travel for health care and what is not. Therefore, the court cannot find that Rose's ADA claim is moot and will deny the motion for summary judgment.

-21-

## C.    State Law Claims Against Dr. Cahee and the Fond du Lac Clinic

In addition to her federal claims, Rose alleges that Dr. Cahee and the Fond du Lac Clinic violated Wisconsin state law prohibiting unlawful discrimination in public accommodations and in the provision of health care services to individuals with HIV.  Rose first relies upon Wisconsin statute § 106.52.  The statute prohibits any person from denying "the full and equal enjoyment of any public place of accommodation" because of disability and defines a "public place of accommodation" to include clinics and hospitals. Wis. Stat. §§ 106.52(1)(e)(1); Wis. Stat. § 106.52(3)(a)(1).    Rose also alleges violations of Wisconsin statute § 252.14(2), which prohibits health care providers from doing the following with respect to an individual with HIV:

> (a) Refuse to treat the individual, if his or her condition is within the scope of licensure or certification of the health care provider, home health agency or inpatient health care facility.
>
> ***
>
> (b) Provide care to the individual at a standard that is lower than that provided other individuals with like medical needs.

Wis. Stat. § 252.14(a-b).  Dr. Cahee and the Fond du Lac Clinic now move for summary judgment on Rose's state law claims arguing that these claims are preempted by Chapter 655 of the Wisconsin Statutes.  They further argue that Rose's claim under Wis. Stat. § 106.52 fails because neither Dr. Cahee nor the service corporation that is the Fond du Lac Clinic is a "place of public accommodation."

-22-

Chapter 655 of the Wisconsin Statutes establishes an exclusive procedure for the prosecution of medical malpractice claims against health care providers and requires injury claims to be reviewed by a patient compensation panel prior to maintaining any court action. *State ex rel. Strykowski v. Wilkie*, 81 Wis.2d 491, 499, 261 N.W.2d 434, 438 (1978). Wisconsin statute § 655.007 states:

> On and after July 24, 1975, any patient or the patients representative having a claim or any spouse, parent, minor sibling or child of the patient having a derivative claim for injury or death on account of malpractice is subject to this chapter.

Dr. Cahee and the Fond du Lac Clinic argue that § 655.007 applies to Rose's claims because "malpractice" includes the failure to treat a patient. The defendants assert that the reason behind Dr. Cahee's alleged refusal to provide treatment is irrelevant to the application of § 655.007, and that the statute preempts Rose's state law claims. The court disagrees.

Malpractice suits covered by Chapter 655 of the Wisconsin Statutes necessarily involve negligence in the providing or withholding of treatment. Section 655.007 does not define "malpractice," but the Wisconsin Supreme Court interprets malpractice to involve negligence in the provision of medical care and specifically rejects the premise that Chapter 655 applies to any and all claims related to a health care provider:

> We conclude that ch. 655 applies only to negligent medical acts or decisions made in the course of rendering professional medical care. To hold otherwise would exceed the bounds of the chapter and would grant seeming immunity from non-ch. 655 suits to those with a medical degree.

-23-

*McEvoy v. Group Health Cooperative*, 213 Wis. 2d 507, 530, 570 N.W.2d 397, 406 (1997). Rose's claims do not arise from negligent provision of medical care. Instead, they arise from the discriminatory provision of medical care. Dr. Cahee allegedly refused to provide Rose with medical services because she has HIV. The defendants argue that a refusal of service is a malpractice claim and cite *Burks v. St. Joseph's Hospital*, 227 Wis.2d 811, 596 N.W.2d 391 (1999). In *Burks*, the Wisconsin Supreme Court stated that "the failure to provide health care services can be a component of medical malpractice." *Burks*, 227 Wis.2d at 825. The court did not, however, state that a failure to provide medical services only gives rise to medical malpractice claims or that failure to provide medical care is malpractice even if it arises from a discriminatory motive. To the contrary, the court in *Burks* suggests that medical malpractice arising from the failure to provide care is dependent upon negligence. *See id.* at 826 n.14 ("The failure to provide health care services to a patient can, in appropriate circumstances, be negligence."). Chapter 655 of the Wisconsin statutes applies when a health care provider engages in negligent acts or decisions and does not apply where, as here, the provider engages in discriminatory acts on the basis of a patient's disability. If it did, health care providers would be insulated against all claims regardless of their basis. The statute does not contemplate such a result.

Alternatively, Dr. Cahee and the Fond du Lac Clinic assert that Rose's § 106.52 claim fails because neither defendant is a "public place of accommodation."

-24-

The court finds this a bewildering argument, as the statute states that "no person" may refuse "full and equal enjoyment of any public place of accommodation" to an individual with a disability. Wis. Stat. § 106.52(3)(a). Dr. Cahee and the corporation that is the Fond du Lac Clinic are the defendant "persons" who allegedly refused Rose equal enjoyment of the services, and the clinic facility is the "public place of accommodation" at issue. Dr. Cahee and the Clinic wrongly imply that defendants in § 106.52 actions must be physical places of accommodation themselves, rather than the individuals or corporations who run them.[2]

The defendants cite *Barry v. Maple Bluff Country Club*, 221 Wis.2d 707, 716, 586 N.W.2d 182 (Ct. App. 1998), in support of their assertion that Rose's § 106.52 claim fails because Dr. Cahee and the Clinic are not "places." In *Barry*, a female member of the Maple Bluff Country Club brought suit against the corporation alleging, among other items, that the club violated the Wisconsin public

_____

[2]The defendants also assert in their reply brief that the court must grant summary judgment because Rose wrongly pled that the service corporation that is the Fond du Lac Clinic is a place of public accommodation, rather than pleading that the clinic facility itself is a place of public accommodation. The defendants base their argument on the fact that at the beginning of Rose's amended complaint, she alleges "On information and belief, Defendant Fond du Lac Regional Clinic, S.C. ("Fond du Lac Regional Clinic") provides health care services in Wisconsin." (Am. Compl. ¶ 8). The defendants conclude that Rose defines the Fond du Lac Regional Clinic, S.C. as ("Fond du Lac Regional Clinic"). This matters because later in her complaint, Rose alleges that: "The Fond du Lac Regional Clinic is a public place of accommodation, within the meaning of Wisconsin Statutes § 106.52." (Am. Compl. ¶ 8). On the basis of these phrases, the defendants conclude that Rose pled herself out of her § 106.52 claim as a matter of law because a service corporation cannot be a place of public accommodation. However, "Fond du Lac Regional Clinic" is also the name of the clinic facility. Rose's choice to abbreviate "Fond du Lac Regional Clinic, S.C." as "Fond du Lac Regional Clinic" in her pleadings does not change this fact. Therefore, the court will not construe Rose's assertion that "Fond du Lac Regional Clinic" is a place of public accommodation to assert that a corporation, which has no physical location, is itself the accommodation at issue, rather than the Fond du Lac Regional Clinic facility.

-25-

accommodation law by giving preferential treatment to men based on men-only tee times and events and the locating of certain amenities in the men's locker room. *Id.* at 713, 716. The plaintiff also alleged a violation of the public accommodation law based on the allegedly discriminatory make-up of the club's Board of Directors and Committees. *Id.* at 716. In short, the plaintiff alleged a lack of access to amenities and a lack of access to the governing bodies of the corporation based on her gender. The Wisconsin Supreme Court found that Barry's asserted lack of access to the Board of Directors could not form the basis for a public accommodation law claim because "the Club is not a place." *Id.* at 716. Thus, lack of access to the governing committees was not a lack of access to a place of public accommodation. However, the court allowed the plaintiff to maintain her public accommodation law claims based on access to golf course and clubhouse amenities. *Id.* at 729-30.

The Wisconsin Supreme Court's finding in *Barry* is inapposite. The plaintiff's claim for access to Club governing boards failed because the intangible entity that is the club organization is not a "place of public accommodation." Rose is not claiming a lack of access to the corporate governance of the Fond du Lac Clinic. Instead, Rose alleges that she was denied equal enjoyment of medical services provided by the defendants at the clinic facility because of her disability. Rose's claim is more akin to Barry's allegations that the Club denied her equal access to golf course and clubhouse amenities on the basis of her gender; a claim which the Wisconsin Supreme Court upheld. The court finds no merit in the defendants'

-26-

argument that Rose's § 106.52 claim fails because the defendants are not "places of public accommodation."

## II.    Motion Filed by Agnesian

Agnesian filed an independent motion for summary judgment as to each of Rose's federal and state claims.  Agnesian argues that it is statutorily exempt from Title III claims under the ADA because it is an entity controlled by a religious organization.  Agnesian further argues that Rose's Rehabilitation Act and state law claims fail because Rose cannot establish that Dr. Cahee refused to perform surgery solely because she was HIV positive.  However, Agnesian only raises an issue of law regarding the ADA claim.  The organization's additional arguments present only proposed interpretations of the evidence and cannot support a grant of summary judgment.

### A.    Title III Claim Against Agnesian

Title III of the ADA prohibits discrimination against disabled individuals in public accommodations but includes an exception for "religious organizations or entities controlled by religious organizations." 42 U.S.C. § 12181(a); 42 U.S.C. § 12187.  The statute does not define what it means to be a "religious organization" or to be "controlled" by one. See 42 U.S.C. § 12187.  Consequently, both parties point to the statute's implementing regulations regarding the meaning of "religious entity" to support their respective arguments.  The regulations preach an expansive application of the exception and state as follows:

-27-

The ADA's exemption of religious organizations and religious entities controlled by religious organizations is very broad, encompassing a wide variety of situations. Religious organizations and entities controlled by religious organizations have no obligations under the ADA. Even when a religious organization carries out activities that would otherwise make it a public accommodation, the religious organization is exempt from ADA coverage. Thus, if a church itself operates a day care center, a nursing home, a private school, or a diocesan school system, the operations of the center, home, school, or schools would not be subject to the requirements of the ADA or this part. The religious entity would not lose its exemption merely because the services provided were open to the general public. The test is whether the church or other religious organization operates the public accommodation, not which individuals receive the public accommodation's services.

Religious entities that are controlled by religious organizations are also exempt from the ADA's requirements. Many religious organizations in the United States use lay boards and other secular or corporate mechanisms to operate schools and an array of social services. The use of a lay board or other mechanism does not itself remove the ADA's religious exemption. Thus, a parochial school, having religious doctrine in its curriculum and sponsored by a religious order, could be exempt either as a religious organization or as an entity controlled by a religious order, even if it has a lay board. The test remains a factual one – whether the church or other religious organization controls the operations of the school or of the service or whether the school or service is itself a religious organization.

28 C.F.R. Part 36, App. B. Beyond the regulations, there is little other guidance regarding application of the religious organization exemption.

Two district courts have considered the question directly and each concluded that the entity at issue – a grade school in one and a seminary in the other – was exempt from Title III of the ADA. In *Marshall v. Sisters of Holy Family of Nazareth*, the court found that a grade school attended by the plaintiff's son was exempt from Title III of the ADA as a religious organization or entity controlled by a religious

Case 2:09-cv-00142-JPS   Filed 07/22/10   Page 28 of 40   Document 114

organization. 399 F. Supp. 2d 597, 598 (E.D. Pa. 2005). The court based its determination on the fact that the school was operated by Roman Catholic nuns, that the curriculum included bible study and Christian principles, that the school was listed in "The Official Catholic Directory," and that the school was 501(c)(3) tax exempt because of its association with the Catholic Church. *Id.* at 606. Similarly, in *White v. Denver Seminary*, the court granted summary judgment to the defendant seminary after finding it to be a religious institution exempt from Title III of the ADA. 157 F. Supp. 2d 1171, 1173 (D. Colo. 2001). The court in *White* based its determination on the seminary's purpose to train students for Christian ministry, its requirement that faculty and students assert a statement of religious beliefs, participate in religious curriculum, and be members of a Christian church, as well as the fact that the majority of the Board of Trustees had to be members of the Conservative Baptist Association. 157 F. Supp. 2d at 1174.

Here, the parties point out facts specific to Agnesian in an attempt to liken the instant case to or distinguish it from *Marshall* and *White*. Agnesian marshals facts demonstrating that it is a religious organization and Rose counters with her own facts weighing against such a conclusion. Agnesian points out that its mission statement asserts it is "rooted in the healing ministry of the Catholic church," and that the organization operates in accordance with the "Ethical and Religious Directives for Catholic Health Services." Agnesian further notes that its affiliation with the Catholic Church relates to its tax exempt status, that it is sponsored by the

-29-

Congregation of the Sisters of Saint Agnes, and that Agnesian is listed in "The Official Catholic Directory." In response, Rose notes that Agnesian is a distinct organization incorporated separately from its sponsor and from the Catholic church. Rose also points out that neither the Congregation nor the Catholic Church have any ownership interest in Agnesian or its assets, and that Agnesian owns and operates the real property for its hospitals and clinics. Rose further states that neither Agnesian's employees or patients are required to be Christian, Catholic or members of the congregation, and that Agnesian does not allow employees to proselytize or impose their religious beliefs on patients. Finally, Rose asserts that Agnesian's 501(c)(3) tax exempt eligibility arises from its charitable purposes and not simply from its affiliation with the Catholic church.

The parties also present competing facts regarding the level of "control" the Congregation asserts over the corporation. Agnesian argues that the Congregation governs and regulates the corporation based on the powers of its Class A Corporate Members. Agnesian's corporate membership is made up of Class A members, who must be members of the Congregation of the Sisters of Saint Agnes, and Class B Members, who need not have any particular religious affiliation. Class A Members have delegated a considerable number of powers to the Class B Members, but retain the exclusive power to adopt or change Agnesian's mission and philosophy, amend or repeal the Bylaws and Articles of Incorporation, appoint and remove Class B Members, appoint and remove the Executive Leader of Sponsorship and the

-30-

Presiding Member of the Class B Members, and to approve dissolution and liquidation of the corporation or the closure of an institution. Additionally, two congregational advocates sit on the Board of Directors: the General Superior and the Executive Leader of Sponsorship.

However, Rose notes that the day-to-day operations of Agnesian are directed by the corporation's executives and Board of Directors, who are not required to be congregation members or have any particular religious affiliation. Only Class A Corporate Members must have a specific religious affiliation. Rose argues that this relationship to the congregation and the Catholic church is irrelevant because Class A Members delegated most of their powers to the unaffiliated Class B Members. Rose also points out that the Executive Leader of Sponsorship, one of the two congregational advocates sitting on the Board of Directors, is not required to be a member of the Congregation and has no extra power or authority over those exercised by other members.

The court must review these facts and determine whether Agnesian is "religious" enough to be a "religious organization," or "controlled" enough by the Congregation and Catholic Church to be an entity "controlled by a religious organization." In enacting the ADA, Congress provided a broad mandate to eliminate discrimination against disabled individuals. *See PGA Tour*, 532 U.S. at 675. However, Congress also specifically limited its mandate by enacting § 12187 as a statutory exemption for religious organizations and the entities controlled by

-31-

them.  The statutory language itself contemplates broad coverage for the exemption, as Congress did not limit application to religious organizations themselves, but included separate entities which religious organizations control.  The regulations agree and describe the exemption as "very broad." *See* 28 C.F.R. Part 36, App. B. The regulations expand upon the description by stating that neither the characteristics of those receiving services from the entity at issue, nor the use of a lay board or corporate mechanism is determinative in applying the exemption. *Id*. Thus, the fact that Agnesian's patients need not be Catholic or Christian, and the fact that Agnesian is a separate corporation, does not disqualify Agnesian from coverage under § 12187.

The court declines to determine whether Agnesian is itself a religious organization because the court finds that Agnesian is controlled by a religious organization.  The Congregation of the Sisters of St. Agnes is indisputably a religious organization.  The Congregation sponsors Agnesian (even giving its name to the corporation) and occupies a primary role in Agnesian's corporate governance structure.  Congregation members make up the entirety of Class A corporate membership.  Class A Members control the corporate character of Agnesian because they alone have authority to amend or repeal Agnesian's Articles of Incorporation and Bylaws.  Further, Class A Members control the fate of Agnesian because they have the sole authority to dissolve the corporation, liquidate the corporation, or merge it with another entity.  Class A Members have delegated

-32-

powers to the Class B Members. However, the powers and service of Class B Members are at the discretion of the Class A Members. Class A Members retain the sole authority to appoint and remove Class B Members and they can rescind the delegation of any and all powers. While the Congregation may not be involved in the daily operation and decision-making of Agnesian's individual healthcare facilities, this does not mean that Agnesian is not "controlled" by the Congregation. A religious organization need not directly determine the rates for medical services or directly engage in the hiring and firing of employees to control a healthcare institution. Indeed, the regulations specify that many religious organizations use lay boards and other secular mechanisms to operate social service entities, and that such "use of a lay board or other mechanism does not itself remove the ADA's religious exemption." 28 C.F.R. Part 36, App. B. Requiring a religious organization to be involved in the daily operations of its social service providers in order to qualify for the § 12187 religious organization exemption undermines the intended broad application of the statute. The court finds that Agnesian falls within the § 12187 exemption and will grant Agnesian's motion for summary judgment on Rose's ADA claim.

### B. Rehabilitation Act Claim Against Agnesian

A plaintiff asserting a violation of Section 504 of the Rehabilitation Act must establish, among other items, that she was excluded from a federally funded program "solely" because of her handicap. 29 U.S.C. § 794(a); *Grzan*, 104 F.3d at

-33-

119.  Agnesian argues that the court must grant it summary judgment on Rose's Rehabilitation Act claim because she cannot show that Dr. Cahee denied her treatment solely because of her disability.  The problem with Agnesian's assertion is that Rose provides evidence which would allow a reasonable finder of fact to conclude otherwise.  Rose testified at her deposition that when she met with Dr. Cahee, he informed Rose that he would not perform surgery on her because of the risks its posed to him and his surgical team.  The affidavit of Dr. Meress, Rose's treating physician at Taycheedah, provides additional evidentiary support.  Dr. Meress testified that during a phone call between the two physicians, Dr. Cahee stated that he would not perform gallbladder surgery on Rose due to the risk of exposure it presented to his staff and that he would only perform surgery after Rose had been on HIV medications for at least one month.  This deposition and affidavit testimony alone would allow a jury to determine that Dr. Cahee refused to perform surgery (at least for a specified period) and that his decision was based on Rose's HIV.  Further, Dr. Meress's actions in following up with Dr. Cahee on his reported refusal to perform surgery and Dr. Meress's subsequent referral of Rose to another surgeon must also be viewed in a light most favorable to Rose.  A reasonable jury could look at all of this evidence and conclude that Dr. Cahee discriminated against Rose in the provision of services by declining to perform surgery on her and that this decision was based on Rose's disability.

-34-

Despite the aforementioned evidence, Agnesian argues that the Rehabilitation Act claim fails because Rose cannot prove Dr. Cahee treated her differently than other patients. Agnesian relies upon *Johnson v. Thompson*, 971 F.2d 1487 (10th Cir. 1992), in support of its proposition that Rose must make a showing of differential treatment. In *Johnson*, the plaintiffs were infants born with a particular form of spina bifida who alleged that medical providers violated Section 504 of the Rehabilitation Act by recommending only "supportive" medical care for them, while other infants with the same condition were recommended more vigorous treatment options. 971 F.2d at 1490. The plaintiffs alleged that medical providers recommended that they receive only "supportive" care because of the socioeconomic status of their parents. *Id*. at 1491. The court found that the plaintiffs failed to establish that the discrimination was based "solely" on their handicap, given that other infants with the same handicap received the vigorous treatment recommendation that the plaintiffs alleged they should have received. *Id*. at 1493.

*Johnson* is easily distinguishable from the case presently before the court. In *Johnson*, the treatment recommendations that the plaintiffs did not receive were given to others with the same handicap. Therefore, the decision not to recommend vigorous treatment could not be based "solely" on disability. Further, the plaintiffs themselves alleged that the discriminatory decision not to recommend more vigorous treatment was based, in part, on the socioeconomic status of their parents. Thus, the plaintiffs acknowledged that the medical providers did not make their decisions

-35-

"solely" on the basis of the plaintiffs' handicap. Here, neither Rose nor Agnesian assert a basis for Dr. Cahee's refusal of medical services other than Rose's HIV. Further, Rose does not have to rely on comparisons with the services received by other patients because she has direct evidence that Dr. Cahee refused to perform surgery on her because of her disability. Dr. Cahee explicitly stated that he would not perform surgery (which he performs on others in the course of his work as a surgeon) on Rose because she has HIV.

Agnesian next argues that Rose's Rehabilitation Act claim fails because Dr. Cahee did not deny her treatment. Agnesian first asserts that Dr. Cahee had not yet made a final recommendation for or against surgery before Rose was referred elsewhere for the gallbladder procedure. Consequently, he did not refuse to provide medical services to Rose. This is one interpretation of the evidence. However, it is not the only interpretation. Given that multiple inferences can be drawn from the evidence, the issue must be determined by a jury and summary judgment is inappropriate.

Agnesian also argues that Dr. Cahee alone did not deny surgery to Rose because, even if Dr. Cahee had recommended surgery, there was no guarantee that Taycheedah would approve the procedure. The court finds this argument wholly unavailing. The fact that Taycheedah may also have prevented Dr. Cahee from performing surgery is irrelevant. Dr. Cahee refused to perform surgery before such a recommendation could even be submitted for approval.

-36-

In addition, Agnesian argues that Rose's claim fails because Dr. Cahee performed surgery on other HIV patients. Agnesian believes that because Dr. Cahee claims to have treated other HIV patients, the corporation merits judgment as a matter of law regarding Dr. Cahee's alleged discrimination against *Rose* on the basis of *her HIV*. The court disagrees. Further, the case Agnesian cites in support and declares "nearly indistinguishable" is anything but indistinguishable. Agnesian cites *Toney v. U.S. Healthcare, Inc.*, 838 F. Supp. 201 (E.D. Pa. 1993), in which the court granted summary judgment for the defendant physician against a plaintiff infected with HIV. The plaintiff in *Toney* began seeing the defendant physician, Dr. Thorndyke, after previously being denied care by other doctors because of his infection with HIV. *Id.* at 202. Dr. Thorndyke, however, saw other HIV positive patients and accepted the plaintiff knowing that he had HIV. *Id.* After accepting the plaintiff for treatment, Dr. Thorndyke saw him nine times in ten months, after which the plaintiff voluntarily left her care. *Id.* at 202-03. The plaintiff later filed suit challenging the "manner in which [his] treatment was handled and the effect of such treatment protocol," suggesting that Dr. Thorndyke did not see or call him frequently enough because of his HIV. *Id.* at 203. Unlike the plaintiff in *Toney*, Rose saw Dr. Cahee only once and was denied the medical procedure underlying her consultation. Further, unlike the plaintiff in *Toney*, Rose alleges that Dr. Cahee refused to provide her with treatment on the basis of her HIV, rather than failing to see or respond frequently enough. Finally, unlike the plaintiff in *Toney*, Rose has

-37-

direct evidence that Dr. Cahee declined to perform surgery because of her HIV, rather than requiring the court to infer discrimination based only on the fact that she was HIV positive and left the doctor's care.

As a final attempt to overcome Rose's evidence, Agnesian argues that the court should defer to Dr. Cahee's exercise of medical judgment in determining that he needed additional information before making a recommendation on surgery. However, the court will not conduct an evaluation of Dr. Cahee's treatment decisions. Agnesian's argument assumes as undisputed fact that Dr. Cahee did not refuse to provide treatment, but rather, merely reserved judgment on the issue until he received further medical records. Contrary to Agnesian's assumption, this issue is indeed disputed. Rose and Dr. Meress each testified that Dr. Cahee refused to perform surgery on Rose. Thus, the question of whether Dr. Cahee denied treatment to Rose is a matter for jury resolution. The court will deny Agnesian's request for summary judgment on Rose's Rehabilitation Act claim.

## C. State Law Claims Against Agnesian

Agnesian also asks the court to grant summary judgment as to Rose's state law claims because she cannot prove that Agnesian acted contrary to Wis. Stat. § 252.14 or § 106.52. Section 252.14 prohibits a healthcare provider from refusing to treat an individual with HIV or providing care to an individual with HIV at a standard lower than that provided to others. Wis. Stat. § 252.14(2)(a, b). Agnesian provides no argument specific to Rose's § 252.14 claims. Instead, the corporation

-38-

asks the court to "apply the same arguments made in Section IV.B of this brief" as a basis for granting summary judgment. The court addressed Agnesian's "Section IV.B" arguments above when it denied summary judgment on Rose's Rehabilitation Act claim. The court concluded that material issues of fact remained regarding whether Dr. Cahee denied Rose medical treatment based on her HIV. Thus, the court will deny Agnesian's motion for summary judgment on Rose's § 252.14 claims for the reasons already stated.

The court will similarly deny Agnesian's request for summary judgment on Rose's § 106.52 claims. Section 106.52 prohibits a person from denying full and equal enjoyment of a public place of accommodation to an individual because of her disability. Wis. Stat. § 106.52(3)(a). Agnesian asserts that Rose cannot prove that it denied her full and equal enjoyment of the Fond du Lac Clinic because she went to the Clinic for a surgical consultation, which she received. Dr. Cahee did not deny services simply because he failed to make a final recommendation on surgery at the time of Rose's appointment because he does not recommend treatment options after every initial consultation. Therefore, Agnesian concludes, Dr. Cahee's failure to recommend treatment options at Rose's consultation did not deprive her of full and equal enjoyment of the Clinic's services. However, as previously stated by the court, whether Dr. Cahee refused to operate on Rose because of fears of HIV transmission or whether he was simply awaiting information before making a final determination is a matter for the jury to decide.

-39-

Accordingly,

**IT IS ORDERED** that the motion for summary judgment filed by Dr. Cahee and the Fond du Lac Clinic (Docket #38) be and the same is hereby **GRANTED in part and DENIED in part**. The court grants summary judgment as to Rose's Rehabilitation Act claim against Dr. Cahee and the Fond du Lac Clinic and denies summary judgment as to the remaining claims against these defendants.

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by Agnesian (Docket #47) be and the same is **GRANTED in part and DENIED in part**. The court grants summary judgment as to Rose's ADA claim against Agnesian and denies summary judgment as to the remaining claims against Agnesian.

**IT IS FURTHER ORDERED** that the motion to seal[3] (Docket #53) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 22nd day of July, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

---

[3]Rose requests that the court seal her responses to the motions for summary judgment filed by the defendants, her responses to the defendants' proposed findings of fact, her additional proposed findings of fact, and two declarations made in opposition to the motions for summary judgment. The court finds that sealing documents upon which it relies in rendering judgment is inappropriate and will deny the request to do so.

-40-